UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                :

UNITED STATES OF AMERICA
                                :

       -v.-                          20 Cr. 320 (PAE)
                                :

WILLIAM SADLEIR,
                                :

                Defendant.
                                :

-------------------------------------------------------------x

## GOVERNMENT'S MOTIONS IN LIMINE

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Jared Lenow
Elizabeth Hanft
Assistant United States Attorneys
      -Of Counsel-

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 2

    I.    The Offense Conduct ................................................................................. 2

    II.    The Evidence ............................................................................................. 3

ARGUMENT ........................................................................................................................ 4

    I.    The Court Should Preclude Sadleir From Introducing Certain Evidence or Making Certain Argument Relating to BlackRock, ███████████████ and the Wealth of BlackRock or Its Employees ............................................. 4

        A.    Applicable Law ............................................................................. 4

        B.    Relevant Facts .............................................................................. 5

        C.    ████████████████████████████ ████████████████████████ ███████ .................................................................. 7

        D.    ████████████████████████████ ███████████ ............................................................... 10

        E.    Evidence of the Wealth or Income of BlackRock, BIT, and its Employees Should Be Precluded ............................................... 12

    II.    The Court Should Preclude Evidence or Argument Concerning Non-Fraudulent Conduct at Aviron or Sadleir's Prior Commission of "Good Acts" ............................................................................................... 13

        A.    Applicable Law ........................................................................... 13

        B.    Discussion ................................................................................... 16

    III.    The Court Should Preclude Evidence or Argument that BlackRock or BIT Was Negligent or Shares Blame for Sadleir's Frauds ........................................ 16

        A.    Applicable Law ........................................................................... 17

B.   Discussion ......................................................................................... 17

IV.   The Court Should Preclude Sadleir From Asserting a "Presence-of-Counsel"
Defense Or, in the Alternative, Should Require a Detailed Factual Proffer of Any
Anticipated Evidence Sadleir Intends to Offer of Interactions or Communications
with Attorneys ................................................................................................ 19

A.   Applicable Law ................................................................................ 20

B.   Discussion ......................................................................................... 22

V.   The Court Should Preclude Evidence or Argument Sounding in Nullification ............ 23

A.   Applicable Law ................................................................................ 24

B.   Discussion ......................................................................................... 26

VI.   The Court Should Admit Certain Categories of Evidence as Direct Evidence of
Sadleir's Frauds or, in the Alternative, Pursuant to Rule 404(b) ................................. 26

A.   Applicable Law ................................................................................ 28

B.   Discussion ......................................................................................... 31

1.   The Cairn Capital Evidence ................................................... 31

2.   Misrepresentations to Aviron Employees Regarding Funding for Aviron ............. 33

3.   Cross-Examination of Sadleir ................................................ 34

VII.   The Court Should Admit Certain Out-of-Court Statements Offered for Non-Hearsay
Purposes ......................................................................................................... 35

A.   Applicable Law ................................................................................ 35

B.   Discussion ......................................................................................... 36

CONCLUSION ................................................................................................ 37

# TABLE OF AUTHORITIES

## CASES

*Costantino v. Herzog*,
203 F.3d 164 (2d Cir. 2000)....................................................................................... 30

*Crawford v. Washington*,
541 U.S. 36 (2004)..................................................................................................... 36

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986)..................................................................................................... 5

*In re United States*,
945 F.3d 616 (2d Cir. 2019)....................................................................................... 25

*Levine v. SEC*,
436 F.2d 88 (2d Cir. 1971)......................................................................................... 15

*Old Chief v. United States*,
519 U.S. 172 (2d Cir. 1997)....................................................................................... 33

*Reilly v. Natwest Markets Grp. Inc.*,
181 F.3d 253 (2d Cir. 1999)....................................................................................... 12

*S.E.C. v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013).................................................................. 20, 21

*Saldarriaga v. United States*,
99 Civ. 4487 (WK), 2002 WL 449651(S.D.N.Y. Mar. 21, 2002) ............................ 9

*SEC v. Lek Securities Corp.*,
17 Civ. 1789 (DLC), 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019) ........................ 22

*SEC v. Stoker*,
11 Civ. 7388 (JSR) (S.D.N.Y. 2012) ................................................................. 21, 22

*Shannon v. United States*,
512 U.S. 573 (1994).............................................................................................. 24, 25

*Tennessee v. Street*,
471 U.S. 409 (1985)................................................................................................... 36

*United States v. Agostini,*
  280 F. Supp. 2d 260 (S.D.N.Y. 2003).................................................................... 9

*United States v. Ahmed,*
  14 Cr. 277 (DLI), 2016 WL 8732355 (E.D.N.Y. June 24, 2016)............................................. 18

*United States v. Amato,*
  46 F.3d 1255 (2d Cir. 1995)........................................................................... 32

*United States v. Amico,*
  486 F.3d 764 (2d Cir. 2007)...................................................................... 17, 18

*United States v. Benedetto,*
  571 F.2d 1246 (2d Cir. 1978).......................................................................... 15

*United States v. Carboni,*
  204 F.3d 39 (2d Cir. 2000)........................................................................ 29, 32

*United States v. Carton,*
  17 Cr. 680 (CM), 2018 WL 5818107 (S.D.N.Y. Oct. 19, 2018) .................................. 14, 17, 18

*United States v. Chambers,*
  800 F. App'x 43 (2d Cir. 2020) .................................................................. 14, 16

*United States v. Colasuonno,*
  697 F.3d 164 (2d Cir. 2012).......................................................................... 19

*United States v. Crowley,*
  318 F.3d 401 (2d Cir. 2003)......................................................................... 5, 12

*United States v. Desposito,*
  704 F.3d 221 (2d Cir. 2013).......................................................................... 34

*United States v. Donovan,*
  20 Cr. 374 (PKC), 2021 WL 6065767 (E.D.N.Y. Dec. 22, 2021)............................................ 8

*United States v. Edwards,*
  342 F.3d 168 (2d Cir. 2003)....................................................................... 29, 32

*United States v. Fazio,*
  S2 11 CR 873, 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012) *aff'd,* 770 F.3d 160
  (2d Cir. 2014)...................................................................................... 15

*United States v. Figueroa,*
  618 F.2d 934 (2d Cir. 1980).......................................................................... 30

*United States v. Fiumano*,
   14 Cr. 518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) ............................................. 15

*United States v. Golfo*,
   19 Cr. 95 (KAM), 2020 WL 2513445 (E.D.N.Y. May 15, 2020) ...................................... 14, 18

*United States v. Gonzalez*,
   110 F.3d 941 (2d Cir. 1997).............................................................................................. 29, 32

*United States v. Jimenez*,
   789 F.2d 167 (2d Cir. 1986)..................................................................................................... 30

*United States v. Katsougrakis*,
   715 F.2d 769 (2d Cir. 1983)..................................................................................................... 10

*United States v. Kaufman*,
   617 F. App'x 50 (2d Cir. 2015) ............................................................................................... 11

*United States v. LaFlam*,
   369 F.3d 153 (2d Cir. 2004)..................................................................................................... 30

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999)..................................................................................................... 10

*United States v. Mustafa*,
   753 F. App'x 22 (2d Cir. 2018) ............................................................................................... 26

*United States v. Nekritin*,
   10 Cr. 491 (KAM), 2011 WL 2462744 ................................................................................... 17

*United States v. Nelson*,
   365 F. Supp. 2d 381 (S.D.N.Y. 2005)........................................................................................ 5

*United States v. Pabon-Cruz*,
   391 F.3d 86 (2d Cir. 2004)....................................................................................................... 25

*United States v. Paulino*,
   445 F.3d 211 (2d Cir. 2006).............................................................................................. 30, 35

*United States v. Pedroza*,
   750 F.2d 187 (2d Cir. 1984)..................................................................................................... 35

*United States v. Perez*,
   09 Cr. 1153 (MEA), 2011 WL 1431985 (S.D.N.Y. Apr. 12, 2011) ........................................ 14

*United States v. Petit,*
   19 Cr. 850 (JSR) .......................................................................................... 21

*United States v. Pitre,*
   960 F.2d 1112 (2d Cir. 1992)........................................................................ 32

*United States v. Poluizzi,*
   564 F.3d 142 (2d Cir. 2009)......................................................................... 25

*United States v. Quattrone,*
   441 F.3d 153 (2d Cir. 2006)......................................................................... 12

*United States v. Quinones,*
   511 F.3d 289 (2d Cir. 2007)......................................................................... 35

*United States v. Reyes,*
   18 F.3d 65 (2d Cir. 1994) ............................................................................ 36

*United States v. Rivera,*
   13 Cr. 149, 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ...................... 15

*United States v. Roldan-Zapata,*
   916 F.2d 795 (2d Cir. 1990)................................................................. 31, 33

*United States v. Scarpa,*
   913 F.2d 993 (2d Cir. 1990)............................................................ 5, 13, 14

*United States v. Schlussel,*
   08 Cr. 694 (JFK), 2009 WL 536066 (S.D.N.Y. Feb. 27, 2009) ............... 5

*United States v. Scully,*
   877 F.3d 464 (2d Cir. 2017)......................................................................... 20

*United States v. Skowronski,*
   968 F.2d 242 (2d Cir. 1992)......................................................................... 32

*United States v. Southland Corp.,*
   760 F.2d 1366 (2d Cir. 1985)........................................................................ 35

*United States v. Stroming,*
   838 F. App'x 624 (2d Cir. 2021) ................................................................. 26

*United States v. Thomas,*
   116 F.3d 606 (2d Cir. 1997).......................................................................... 25

*United States v. Thomas,*
    377 F.3d 232 (2d Cir. 2004)..................................................................................... 17, 18

*United States v. Tussa,*
    816 F.2d 58 (2d Cir. 1987)........................................................................................... 36

*United States v. Walker,*
    191 F.3d 336 (2d Cir. 1999)..................................................................................... 14, 16

*United States v. Washington,*
    705 F.2d 489 (D.C. Cir. 1983)..................................................................................... 25

*United States v. Williams,*
    205 F.3d 23 (2d Cir. 2000)........................................................................................... 14

*United States v. Young,*
    470 U.S. 1 (1985)............................................................................................................ 9

## RULES

Fed. R. Evid. 401 ................................................................................................... 25, 29

Fed. R. Evid. 402 ................................................................................................... 25, 28

Fed. R. Evid. 403 ........................................................................................ 16, 30, 33, 36

Fed. R. Evid. 404 ............................................................................................ 15, 29, 32

Fed. R. Evid. 405 ............................................................................................................ 15

Fed. R. Evid. 608 ............................................................................................................ 4, 5

Fed. R. Evid. 801 ............................................................................................................ 35

## PRELIMINARY STATEMENT

The Government respectfully moves *in limine* for the following evidentiary rulings in advance of trial in this case:

- An order precluding Sadleir from introducing evidence or making argument regarding: ███████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████ and (3) the wealth or income of BlackRock or its current or former employees;

- An order precluding Sadleir from introducing evidence or argument concerning non-fraudulent conduct at his companies or Sadleir's prior commission of "good acts";

- An order precluding Sadleir from introducing evidence or argument that BlackRock was negligent or shares blame for Sadleir's frauds;

- An order precluding Sadleir from asserting a "presence-of-counsel" defense or, in the alternative, requiring a detailed factual proffer from Sadleir of any anticipated evidence he intends to offer of interactions or communications with attorneys;

- An order precluding evidence or argument sounding in jury nullification;

1

- An order admitting certain categories of evidence as direct evidence of Sadleir's frauds or, in the alternative, pursuant to Rule 404(b) of the Federal Rules of Evidence; and

- An order admitting certain out-of-court statements for non-hearsay purposes.

For the reasons set forth below, the Court should grant the Government's motions.

## BACKGROUND

### I.   The Offense Conduct

William Sadleir was the chairman and chief executive officer of Aviron Pictures, LLC, a film production and distribution company based in Los Angeles, California.  The Indictment in this case alleges, and the evidence at trial will show, that Sadleir participated in two fraudulent schemes (together, the "Schemes") relating to an approximately $75 million investment made by the BlackRock Multi-Sector Income Trust ("BIT") in Aviron Pictures, LLC and its associated entities ("Aviron").

In one scheme, the "Advertising Scheme," Sadleir misappropriated millions of dollars in funds from Aviron that had been invested in Aviron by BIT.  Sadleir represented to BIT that this money had been invested by Aviron in pre-paid media credits[1] with the media and advertising planning and placement company MediaCom Worldwide, LLC ("MediaCom"), which is a subsidiary of the advertising and media agency GroupM Worldwide LLC ("GroupM").  Instead, Sadleir, using the bank account for a sham entity he had created, illicitly transferred out of Aviron over $25 million of those funds.  Specifically, Sadleir created a sham New York-based

---

[1] Pre-paid media credits, also sometimes referred to as "up fronts," are advance commitments by large clients for media advertising over a given period, which a media buyer then purchases in bulk from media outlets, aggregating clients' commitments and usually obtaining a discount based on its market power from such aggregation.  Sadleir represented, however, that such credits were paid in advance and could be redeemed for specific media advertising at a later time.

company called GroupM Media Services, LLC (the "Sham GroupM LLC") designed to appear as if it was the legitimate entity, GroupM Worldwide, and a corresponding bank account in the name of that sham entity.  Sadleir then used a significant portion of those illicitly transferred funds for his personal benefit, including to purchase a private residence in Beverly Hills (the "Beverly Hills Residence") for approximately $14 million.  Sadleir then falsely represented to BIT that Aviron had purchased an approximately $27 million balance in pre-paid media credits with MediaCom or GroupM that were available to promote future Aviron films, and pledged a portion of those credits to BIT as collateral for additional loans.  In fact, the claimed credits did not exist, and Sadleir misappropriated BIT's funds.

As part of these false representations, Sadleir also created a fake identity of a purported New York-based female employee of the Sham GroupM LLC named "Amanda Stevens," who corresponded with a representative of BIT, assuring BIT that Aviron had an approximately $27 million balance in pre-paid media credits with the Sham GroupM LLC.  In fact, Sadleir himself posed as Amanda Stevens when engaging in email exchanges with a BIT representative.

In the other scheme, the "UCC Scheme," Sadleir engineered the illicit and fraudulent sale and refinancing, to a third party, of assets that secured BIT's loans to Aviron.  Those assets were worth an estimated three million dollars, and BIT had placed Uniform Commercial Code ("UCC") liens on the assets.  As part of the UCC Scheme, Sadleir forged the signature of one of BIT's portfolio managers, Randy Robertson, to make it appear that Robertson had authorized the UCC liens to be released from those assets.  Sadleir then sold the assets.

## II.    The Evidence

The evidence at trial will include, *inter alia*: the testimony of witnesses from BlackRock; the testimony of witnesses from Aviron; the testimony of witnesses from MediaCom and

3

GroupM Worldwide; the testimony of witnesses from the law firm Paul Hastings; the testimony

of a restructuring manager who replaced Sadleir after Sadleir was removed from Aviron as a

result of the UCC Scheme; bank and other financial records; emails and text messages;

photographs; phone calls; public records; and receipts and invoices documenting Sadleir's

personal spending of BIT funds.  It will also include testimony from a summary witness from the

Berkeley Research Group who will testify about various charts and calculations relating to the

voluminous financial records at issue.

### ARGUMENT

I.  **The Court Should Preclude Sadleir From Introducing Certain Evidence or Making Certain Argument Relating to BlackRock, █████████████████, and the Wealth of BlackRock or Its Employees**

Sadleir should be precluded from questioning witnesses, or otherwise informing the jury,

about: ██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████ and (3) the wealth or income of BlackRock or its

employees.

### A.  Applicable Law

Rule 608(b) of the Federal Rules of Evidence limits cross-examination regarding

"specific instances of a witness's conduct" to situations where the conduct of the witness was

"probative of the [witness's] character for truthfulness or untruthfulness."  Fed. R. Evid. 608(b).

Conversely, Rule 608(b) "'does not authorize inquiry on cross-examination into instances of

conduct that do *not* actually indicate a lack of truthfulness.'"  *United States v. Schlussel*, 08 Cr.

694 (JFK), 2009 WL 536066, at *3 (S.D.N.Y. Feb. 27, 2009) (emphasis added) (quoting *United States v. Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005)).  Moreover, "Fed. R. Evid. 608(b) prohibits a party from presenting 'extrinsic evidence' of '[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility' unless that conduct was the subject of a criminal conviction."  *United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (quoting Fed. R. Evid. 608(b)).  And "under [Federal Rule of Evidence] 403, the district court may exclude even relevant evidence if it finds that the 'probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'"  *Id.* (internal quotation marks and citations omitted).

Furthermore, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment."  It is well settled that "[t]he scope and extent of cross-examination lies within the discretion of the trial judge."  *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (internal quotation marks omitted).  As the Supreme Court has explained:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . [T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted) (emphasis in original).

### B.  Relevant Facts













11



### E.  Evidence of the Wealth or Income of BlackRock, BIT, and its Employees Should Be Precluded

The defense should be precluded from questioning witnesses about the wealth or income of BlackRock, BIT, or its employees.  That information has no bearing on the charged offenses. Questioning on such topics would serve only to make BlackRock and its employees appear unsympathetic to the jury.  *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (observing that "evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations," but holding such evidence was appropriately admitted because it was probative of facts relating to elements of the crimes charged); *see also Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 266 (2d Cir. 1999) (to be relevant for impeachment purposes, evidence of a witness's wealth "must actually be inconsistent with the witness['s] testimony").

Specifically, the defense should be precluded from arguing that any fraud by Sadleir amounted to a "drop in the bucket" for BlackRock or BIT, or that BlackRock employees were excessively compensated.  Such arguments would not only be unduly prejudicial and legally

improper as a grounds for acquittal, but would also be misleading in light of the fact that the assets of BIT at issue were held for the benefit of investors.

By contrast, the Government will limit its introduction of Sadleir's income and spending to matters directly relevant to the charged offenses, such as the fact that Sadleir used misappropriated funds to fund his purchase of an approximately $14 million personal residence (the Beverly Hills Residence), a luxury vehicle, and a vacation to Italy. Indeed, the Government anticipates that the evidence will show that Sadleir was *not* a person of wealth during the relevant time period, and that much of his spending was financed in large part by the proceeds of the charged offenses.

## II.   The Court Should Preclude Evidence or Argument Concerning Non-Fraudulent Conduct at Aviron or Sadleir's Prior Commission of "Good Acts"

To the extent that Sadleir seeks to present evidence or argument concerning non-fraudulent conduct at Aviron, or concerning his commission of "good acts," including prior successful business ventures, philanthropic giving, or other similar deeds, to disprove his guilt, he should be precluded from doing so. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

### A.  Applicable Law

It is black letter law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Whether analyzed under the rubric of relevance, pursuant to Rule 401, or character propensity evidence, under Rule 404(b), courts uniformly hold that evidence that a defendant or others under his supervision engaged in legal, honest business conduct on some occasions may not be introduced to rebut an allegation that the defendant engaged in charged

13

offenses involving fraud or bribery on other occasions. *See, e.g.*, *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) ("Chambers's argument that his running of a legitimate law practice makes it less likely that he had corrupt intent to bribe [. . .] is precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit."); *United States v. Walker*, 191 F.3d 336 (2d Cir. 1999) (affirming district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *Scarpa*, 897 F.2d at 70 ("A defendant may not seek to establish his innocence, however, through proof of the absence of criminal acts on specific occasions."); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (affirming district court's exclusion of evidence that defendant, who was accused of engaging in drug activity during two trips to Jamaica, made trips to Jamaica during which he did not engage in drug activity); *United States v. Golfo*, 19 Cr. 95 (KAM), 2020 WL 2513445 at *2 (E.D.N.Y. May 15, 2020) (evidence that "defendant *also* provided accurately documented and invoiced [] therapy sessions is irrelevant to whether defendant sought and received payment for phantom or embellished therapy sessions") (emphasis in original); *United States v. Carton*, 17 Cr. 680 (CM), 2018 WL 5818107, at *3 (S.D.N.Y. Oct. 19, 2018) ("[I]t is black-letter law that evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.") (internal quotation marks omitted); *United States v. Perez*, 09 Cr. 1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (granting Government's motion *in limine* to preclude defendant who allegedly prepared false asylum applications from introducing evidence "that she provided accurate information to some of her clients and refused to help one individual falsify an application").

14

Thus, for example, in *Levine v. SEC*, 436 F.2d 88 (2d Cir. 1971), the Second Circuit rejected a broker-dealer defendant's claim that he was entitled to offer testimony by certain of his clients that they had not been lied to, because such testimony would not negate the testimony of the customers who testified that false and misleading statements had been made to them.  436 F.2d at 91; *see also, e.g.*, *United States v. Fiumano*, 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) ("A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branches in Brooklyn or the Bronx on April 22 or that he did not rob the Manhattan branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22.").

Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait," or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense.  *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-1250 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, S2 11 CR 873, 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012), ("a defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014); *United States v. Rivera*, 13 Cr. 149, 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving).

Finally, even where a defendant seeks to admit purportedly innocent conduct for some purpose other than propensity, that evidence is inadmissible if its probative value "is substantially outweighed by," among other things, the danger of "confusing the issues, misleading the jury, [and] wasting time." Fed. R. Evid. 403

### B. Discussion

That Sadleir previously engaged in successful business ventures, or that Aviron engaged in legitimate business conduct, including with respect to loans to or investments in the company, is irrelevant to whether Sadleir committed the crimes charged. The Indictment charges Sadleir with specific instances of fraud with respect to loans to or investments in Aviron. Any argument or evidence that Sadleir did not commit fraud on other occasions, or that he committed prior "good acts" or made charitable contributions, is not relevant to the issues in this case; in the alternative, it would be an impermissible effort to prove Sadleir's good character through specific instances of conduct in violation of Rule 404(b)(1). *See*, *e.g., Walker*, 191 F.3d at 336; *Chambers*, 800 F. App'x. at 46.

Further, even if there were marginal, non-propensity relevance of such evidence, despite its having nothing to do with the charged schemes, the evidence would needlessly complicate and lengthen the trial and introduce issues that would distract from the central allegations in this case. *See* Fed. R. Evid. 403. Such evidence could lead the jury to be confused about the actual conduct at issue. *See id.* Those risks would outweigh the limited probative value of such evidence.

### III. The Court Should Preclude Evidence or Argument that BlackRock or BIT Was Negligent or Shares Blame for Sadleir's Frauds

16

Sadleir may argue, as he did in his motion to suppress, that BlackRock is somehow to blame for the crimes charged, or that BlackRock or BIT were negligent in overseeing its loans to Aviron or its failure to discover the frauds. *See, e.g.*, William Sadleir's Memorandum of Law In Support of His Motion to Suppress the Fruits of Two Stored Communications Act Warrants (Dkt. 32) ("BlackRock loaned money to Aviron Pictures . . . apparently in violation of its internal rules and risk limits. It seems that certain BlackRock executives had grown enamored of the movie business and committed quite a bit of BlackRock's money so that they personally could be closer to it."). Such a "blame-the-victim" defense would be wholly impermissible.

## A. Applicable Law

A defendant charged with a fraudulent scheme may not assert as a defense the victim's negligent failure to discover the fraud. *United States v. Thomas*, 377 F.3d 232, 243-44 (2d Cir. 2004) (collecting cases); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (district court did not err by preventing defendant from arguing that "it is a defense to mail fraud to demonstrate that the victim could have discovered based on external sources that the representation was false"); *Carton*, 2018 WL 5818107, at *4, 6 (evidence that victim hedge fund did not exercise sufficient oversight of its investment inadmissible; "[W]hether the Hedge Fund performed due diligence or is a sophisticated investor in the ticket market is wholly irrelevant to these charges, and is merely a facile attempt to blame the victim – which is an impermissible strategy in a fraud case."); *United States v. Nekritin*, 10 Cr. 491 (KAM), 2011 WL 2462744, at *7 ("It is well settled that a fraud victim's negligence in failing to discover the fraudulent scheme is not a defense to a defendant's criminal conduct.").

## B. Discussion

Whether individuals employed at BlackRock were negligent in making loans to Aviron, in overseeing those loans, or in failing to discover either of the charged frauds or the aggravated identity theft is irrelevant to the charges here. It does not matter to the jury's determination of Sadleir's guilt whether BlackRock or its employees were careless, or should have more closely scrutinized documentation provided by Sadleir or his employees and caught on to Sadleir's deception sooner. *See Thomas*, 377 F.3d at 243; *Amico*, 486 F.3d at 780. An argument to the contrary would be an impermissible attempt to blame the victim, *see Carton*, 2018 WL 5818107, at *4,6; it would not be probative, and would be unduly prejudicial.

Any argument that BIT's payment of funds to Aviron in response to fraudulent invoices somehow induced Sadleir into the charged conduct or negates his intent is foreclosed by the same case law. In the context of this case, where Sadleir created a sham media company designed to be mistaken for a legitimate one and diverted money thereto, there is no basis to suggest that Sadleir believed in good faith that BIT or any of its employees were endorsing or sanctioning his conduct. Absent that basis, arguing that BIT's continued transfer of monies to Aviron in the face of Sadleir's fraudulent invoices caused Sadleir to believe that his conduct was permissible would simply be a variation on an attempt to blame the victim for the defendant's fraud. *See Golfo*, 2020 WL 2513445, at *4-5 (granting government motion to preclude defendant from arguing that payment of defendant's fraudulent claims for therapeutic sessions by victim agencies led her to believe her practices were justified or somehow "lulled or induced defendant into the allegedly fraudulent conduct at issue"); *United States v. Ahmed*, 14 Cr. 277 (DLI), 2016 WL 8732355, at *3 (E.D.N.Y. June 24, 2016) (excluding evidence that Medicare paid claims of surgeon accused of defrauding Medicare over defendant's argument that such evidence was relevant to his intent "because it led him to conclude that his claims were proper"

18

as "nothing more than a repackaged version of the argument expressly prohibited by [Second Circuit case law], *i.e.*, victim negligence negates fraudulent intent.").

Accordingly, the Court should preclude evidence or argument that BlackRock or BIT were negligent in making loans, overseeing those loans, or failing to uncover Sadleir's frauds, or shares blame for Sadleir's frauds in some other way.

## IV.   The Court Should Preclude Sadleir From Asserting a "Presence-of-Counsel" Defense Or, in the Alternative, Should Require a Detailed Factual Proffer of Any Anticipated Evidence Sadleir Intends to Offer of Interactions or Communications with Attorneys

The pretrial schedule agreed to by the parties and so-ordered by this Court required the defense to provide notice of any advice-of-counsel defense by December 20, 2021.  Dkt. 48. Sadleir has provided no such notice.  Accordingly, the Government presumes that Sadleir does not intend to rely on an advice-of-counsel defense.  In any event, such a defense would be unavailing, because Sadleir could not show "that he (1) honestly and in good faith sought the advice of counsel; (2) fully and honestly la[id] all the facts before his counsel; and (3) in good faith and honestly follow[ed] counsel's advice, believing it to be correct and intending that his acts be lawful."  *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) (internal quotation marks omitted).  In light of those requirements, Sadleir would have no basis to assert such a defense.

As to the UCC Scheme and the aggravated identity theft charge, some evidence of the presence and involvement of attorneys, who were unwittingly used by Sadleir to perpetrate the fraud, will necessarily emerge at trial in order to recount the events underlying the charges. Also, as to the Advertising Scheme, the Government may seek to introduce certain emails in which newly retained counsel for Aviron Pictures corresponded with Sadleir's fake "Amanda

19

Stevens" identity after Sadleir was removed from his position at the company.  But to the extent Sadleir seeks to rely on what is sometimes referred to as a "presence-of-counsel" defense as to any of the charges, and specifically to present evidence of the presence of attorneys (including Aviron's in-house counsel, Louis Spoto, as to the Advertising Scheme, or attorneys at Paul Hastings or Sidley Austin as to the UCC Scheme and the aggravated identity theft charge), he should be precluded from doing so in the absence of a detailed factual proffer of any such anticipated evidence.

### A.  Applicable Law

Courts in this district have rightly approached the presence-of-counsel defense with caution, mindful that it risks injecting irrelevant or prejudicial information into criminal trials. As to the potential prejudice, the presence-of-counsel defense is not materially different from the advice-of-counsel defense.  The advice-of-counsel defense "is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but instead involves evidence that "if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an unlawful intent." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017).  Because an established body of law, developed under the rubric of the advice-of-counsel defense, governs when and how criminal defendants are entitled to rely on the involvement of lawyers to negate mens rea, courts have been reluctant to endorse a presence-of-counsel defense that would allow a defendant to functionally mount an advice-of-counsel defense without meeting the required elements.

Thus, for example, in *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 683-84 (S.D.N.Y. 2013), Judge Forrest precluded the defendant from highlighting the fact that a lawyer participated in

20

certain communications and transactions once it was clear that the defendant could not show a

valid advice-of-counsel defense.  In precluding the defendant from presenting anything short of a

proper advice-of-counsel defense, Judge Forrest explained:

> A lay jury could easily believe that the fact that a lawyer is present at a meeting
> means that he or she must have implicitly or explicitly "blessed" the legality of all
> aspects of a transaction.  Likewise, the fact that lawyers saw and commented on
> disclosure language could be understood as "blessing" the sufficiency of that
> disclosure.  This misunderstanding would give the defendant all of the essential
> benefits of an advice of counsel defense without having to bear the burden of
> proving any of the elements of the defense.

*Id.*

Apart from the concern of allowing the defendant to benefit from an incomplete advice-

of-counsel defense, the presence-of-counsel defense risks injecting irrelevant or confusing

evidence into the trial, because the involvement of counsel in a transaction is not probative of the

defendant's state of mind if the lawyers were not informed of the facts relevant to a transaction.

Judge Rakoff recently recognized as much in *United States v. Petit*, 19 Cr. 850 (JSR) (Tr. at

2092-2093) (noting that defense counsel "ha[d] been quite good in avoiding" raising presence of

counsel and accountant issues, but that if they were to raise them in summation, "I will probably

interrupt right then and there and say 'There is no defense of counsel here, there is no auditor

advice defense.'"); *see also* Tr. dated Oct. 23, 2020, at 8 ("I'm skeptical that [defense

introduction of evidence of interactions with lawyers] can be done without a waiver of the

attorney client privilege . . . ," but noting issue premature to rule upon).  In *SEC v. Stoker*, 11

Civ. 7388 (JSR) (S.D.N.Y. 2012), Judge Rakoff also took issue with defense counsel's efforts to

highlight, through questioning, the fact that attorneys had reviewed certain offering materials that

the SEC contended were materially misleading.  The Court recognized that "absent evidence that

counsel knew either the information that Mr. Stoker allegedly kept secret, at least from outsiders,

or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] total[ly] irrelevan[t]." *Stoker*, Dkt. 100, 7/23/12 Trial Tr. at 895-96. And although the defendant proffered an alternative reason for the questioning, the Court recognized that it was in fact an effort to mount a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the dangers of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981. Ultimately, the Court gave the jury a supplemental instruction that the testimony's relevance could be limited based upon what information about the transaction counsel had received. *See id.* at 969 ("So if counsel have not received all the relevant information, then their signing off on something may or may not be of any relevance to you."); *see also SEC v. Lek Securities Corp.*, 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019) ("References to counsel's communications are not relevant in the absence of an advice-of-counsel defense and should be excluded as well pursuant to Rule 403.").

### B.  Discussion

Here, evidence and argument regarding the presence of counsel on documents and counsel's participation in communications, with a limited exception in order to recount the narrative of the Schemes (including how they were uncovered), would be irrelevant, prejudicial, and misleading. There is no admissible foundation to show that Spoto or any attorney at Paul Hastings or Sidley Austin was apprised of all the material facts of any of Sadleir's frauds during the relevant time period, such that their presence would be probative of Sadleir's state of mind. Nor is there adequate evidence of the nature and scope of the advice given by any of these attorneys, as would be the case if Sadleir were asserting a true advice-of-counsel claim. Accordingly, any such evidence and argument should be excluded.

In the alternative, if Sadleir wishes to assert a presence-of-counsel defense, he should be required to provide a detailed factual proffer that such evidence is relevant and not unfairly prejudicial or misleading, including describing what particular interactions and counsel communications he may introduce, when they occurred, what information was available to counsel, and why and how such interactions and communications are relevant.  Absent a sufficient foundation, the mere presence of lawyers would serve no purpose other than to mislead the jury into believing that a lawyer had "blessed" Sadleir's conduct.  The invocation of lawyers in that way would be highly prejudicial to the Government and should be excluded under both Rules 401 and 403.  Accordingly, the Court should require Sadleir to specifically identify any such evidence in the first instance and thereby allow the parties and the Court to assess its admissibility before it reaches the jury.

## V.      The Court Should Preclude Evidence or Argument Sounding in Nullification

Sadleir may attempt to offer evidence or argument regarding potential or mandatory sentencing consequences; the difference between the potential consequences he would face upon conviction after trial versus what he would face had he accepted the Government's plea offer; or regarding aspects of his life that may tend to elicit the jurors' sympathy, such as his family or health circumstances.  Such evidence should be excluded as irrelevant, confusing, and prejudicial.

Based on an email Sadleir wrote to a Government witness on or about November 23, 2021, it appears that Sadleir is now involved with a website devoted in part to criminal justice issues, as part of a "team of like-minded former studio executives and writers . . . who have first-hand experience with the tyranny of the criminal justice system."  *See* https://www.reform-media.studio/about-1; https://www.reform-media.studio/copy-of-about (last visited January 5,

2022).  That website includes a section entitled "The Trial Penalty: The Threatened Extinction of our . . . Sixth Amendment Right to A Jury Trial and How to Redeem It," which appears to refer to a documentary focused on the following issue:

> Every day, in virtually every criminal court throughout the United States, accused people plead guilty solely as a consequence of a prosecutor's threat that the accused will receive an exponentially greater post-trial sentence if convicted compared to the pre-trial offer.

*See* https://www.reform-media.studio/thetrialpenalty (last visited January 5, 2022).  A "topical outline" follows and includes a section entitled "How to Save Our Rights to a Jury Trial," with the following subheading: "Jury Empowerment: Conscientious Acquittal / (*aka* Jury Nullification)."  *Id.*

Sadleir is certainly entitled to advocate for criminal justice reform and to address these issues outside the courtroom.  But he should not be permitted to inject them into this case or to attempt to secure a "conscientious acquittal" if that term refers to jury nullification.  They are certainly not relevant to his guilt or innocence, and they are deeply prejudicial and likely to confuse the jury.

### A.  Applicable Law

In all but a limited set of circumstances, it is inappropriate for the jury to be informed about the sentencing consequences of its decisions.  *See, e.g.*, *Shannon v. United States*, 512 U.S. 573 (1994) ("The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. . . . Information regarding the consequences of a verdict is . . . irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities and creates a strong

24

possibility of confusion."); *In re United States*, 945 F.3d 616, 631 (2d Cir. 2019) (noting that

there are "rare circumstances in which evidence of sentencing consequences might pass muster

under Rule 403"); *United States v. Poluizzi*, 564 F.3d 142, 160-62 (2d Cir. 2009) (no Sixth

Amendment right for jury to be informed of mandatory minimum sentence, although such

information may be necessary in limited circumstances; reiterating "general inappropriateness"

of jury nullification); *United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004) (same).

Particularly where such evidence is intended to encourage jury nullification, it must be excluded.

*In re United States*, 945 F.3d at 631 ("[I]f the district court finds that [the defendant]

is . . . seeking to introduce evidence of sentencing consequences solely for the purpose of

encouraging nullification, the court must exclude that evidence as irrelevant.").

      More broadly, any "[e]vidence admitted solely to encourage nullification is by definition

irrelevant, and thus inadmissible." *Id.* at 630 (citing Fed. R. Evid. 401-02; *Shannon*, 512 U.S. at

579). Nullification is, of course, plainly improper. *See, e.g.*, *Poluizzi*, 564 F.3d at 162-63; *(*"It is

not the proper role of courts to encourage nullification."); *United States v. Thomas*, 116 F.3d

606, 615 (2d Cir. 1997) (Jury nullification is "by no means a right or something that a judge

should encourage or permit if it is within his authority to prevent."); *id.* at 614 ("We

categorically reject the idea that, in a society committed to the rule of law, jury nullification is

desirable or that courts may permit it to occur when it is within their authority to prevent."); *see*

*also United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983) (per curiam) ("A jury has

no more '*right*' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant

'guilty,' and the fact that the former cannot be corrected by a court, while the latter can be, does

not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." (emphasis in original)).

Accordingly, evidence or argument that make the defendant appear sympathetic for reasons unrelated to the charges at issue must also be excluded as inviting the jury to acquit a defendant even where the evidence proves his guilt beyond a reasonable doubt.  Juries are not "to act based on their . . . sympathy."  *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021); *see, e.g.*, *United States v. Mustafa*, 753 F. App'x 22, 37 (2d Cir. 2018) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy.").  Any attempt to encourage such sympathy is therefore another method of attempting nullification.

## B.  Discussion

There is no relevant basis for the jury to consider the sentencing consequences of a conviction for Sadleir on the charges in the Indictment, including that Count Three carries a mandatory minimum sentence or that Sadler's decision to proceed to trial, rather than accept a prior plea offer from the Government, may increase his sentencing exposure.  Nor is the Government aware of any relevant reason for the jury to consider Sadleir's family circumstances, such as his having two young children, or his health or other personal circumstances.  Any evidence or argument on these points has nothing to do with guilt or innocence, nor is it permissible character evidence.  Accordingly, Sadleir should be precluded from mentioning such subjects in his opening statement, during the presentation of evidence, or in closing statements, absent a ruling that a specific fact is relevant and more probative than unfairly prejudicial.

## VI.  The Court Should Admit Certain Categories of Evidence as Direct Evidence of Sadleir's Frauds or, in the Alternative, Pursuant to Rule 404(b)

The Court should admit two categories of evidence as either direct evidence of Sadleir's frauds or, in the alternative, pursuant to Rule 404(b). That evidence, as well as evidence of Sadleir's fraud in connection with applying for Paycheck Protection Program loans (the "PPP Fraud") is also admissible on cross-examination pursuant to Rule 608(b)(1) should Sadleir testify.

*First*, the Government expects the evidence to show that Sadleir defrauded Cairn Capital ("Cairn"), a London-based alternative credit asset manager, by providing false performance data to Cairn regarding the performance of the movie *Serenity* (the "Cairn Fraud"). As described further below, the Cairn Fraud involved Sadleir falsely stating to Cairn that the performance data was sufficient to trigger a contractual right to a three-million-dollar payment, when the performance data did not in fact meet the required threshold, thereby defrauding Cairn out of that three million. Sadleir then perpetrated the UCC Fraud (charged in Counts Two and Three of the Indictment) in order to generate funds to settle anticipated litigation over the Cairn Fraud. Evidence regarding Sadleir's deception vis-à-vis Cairn should be admitted as direct evidence of the charged offenses and background and context for those offenses; in the alternative, it is also admissible as evidence pursuant to Rule 404(b) as proof of Sadleir's motive, opportunity, intent, and/or absence of mistake or accident with respect to the crimes charged in the Indictment.

*Second*, the Court should admit evidence of Sadleir's misrepresentations to various Aviron employees that Sadleir had obtained firm commitments from third parties (other than BIT) to fund the Aviron entities, when in truth he had not received such firm commitments. That evidence provides background and context for the charged offenses; it explains the development of the relationships between Sadleir and other employees or officers at Aviron; and it provides

27

evidence of the financial condition and business dealings of Aviron during the time frame of the charged offenses.

*Third*, Sadleir committed fraud in connection with applying for Paycheck Protection Program loans (the "PPP Fraud"), an offense for which he has been charged in the Central District of California with wire fraud, bank fraud, making false statements in connection with loan applications, and money laundering. That conduct involved Sadleir obtaining funds for his own personal use by misrepresenting that those funds would be used for the business purposes of Aviron entities, and by making false representations about the entities' payroll expenses, number of employees, and operational status. Sadleir misrepresented that the loan funds would be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, when in truth Sadleir intended to, and did, misappropriate the loan funds in substantial part for his own personal use and for expenses prohibited by the program. Evidence regarding the PPP Fraud should be admitted pursuant to Rule 608(b)(1).

With respect to the first two categories of evidence above, which the Government intends to offer in its case-in-chief, any resulting prejudice from its admission does not substantially outweigh its significant probative value; in any event, any prejudice can be adequately minimized through appropriate limiting instructions to the jury. Finally, should Sadleir testify, all three categories of the above-described evidence would also be admissible under Rule 608(b)(1) to shed light on his credibility.

### A. Applicable Law

Under Rule 402 of the Federal Rules of Evidence, "relevant evidence is admissible" at trial unless its admission is contrary to the United States Constitution, a federal statute, another Federal Rule of Evidence, or other rules prescribed by the United States Supreme Court. Fed. R.

Evid. 402.  Federal Rule of Evidence 401 defines "relevant evidence" as evidence having "any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Direct evidence is "not confined to that which directly establishes an element of the crime."  *United States v. Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997).  Rather,"[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  *Id.*  In keeping with that principle, "other acts" evidence can constitute direct evidence and, in that case, is not subject to analysis under Rule 404(b). *See, e.g.*, *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).  It is well established that "other acts" evidence is admissible as direct proof of the crimes charged and not considered Rule 404(b) evidence if it (i) "arose out of the same transaction or series of transactions as the charged offense," (ii) "is inextricably intertwined with the evidence regarding the charged offense," or (iii) "is necessary to complete the story of the crime on trial."  *Carboni*, 204 F.3d at 44 (quotation marks and citation omitted).

Under Rule 404(b) of the Federal Rules of Evidence, evidence of uncharged or other crimes, wrongs, or other acts by a defendant may be admitted for purposes other than proving the defendant's propensity to commit crimes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  The Second Circuit has long followed "an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's criminal propensity."  *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003) (internal quotation marks and citation omitted).  Under Rule 404(b), it is well settled that "other acts" evidence is admissible so long as the evidence: (1) is advanced for a

29

proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006); *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). If requested, the admission of such evidence must be accompanied by an appropriate limiting instruction to the jury. *See id.*

Regardless of whether the evidence is admitted as direct evidence or under Rule 404(b), "other acts" evidence is, like all evidence, excludable under Federal Rule of Evidence 403 if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 authorizes the exclusion of relevant evidence only if its "probative value is substantially outweighed by [the] danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that is not the same as being "unfairly" prejudicial under Rule 403. *See Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000). As the Second Circuit has stated, "all evidence incriminating a defendant is, in one sense of the term, 'prejudicial' to him: that is, it does harm to him" and in "that sense, the more pertinent evidence is, the more prejudicial it is," but "[w]hat 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'" *United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986) (emphasis in original). Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Evidence that is neither "more sensational" nor more "disturbing" than the charged

crimes will not be deemed unfairly prejudicial.  *See United States v. Roldan-Zapata*, 916 F.2d

795, 804 (2d Cir. 1990).

   **B. Discussion**

   1.   The Cairn Capital Evidence

   The Government expects that documentary evidence will show, and at least one witness

will testify, that Sadleir defrauded Cairn through fabricated performance data.  Cairn provided

approximately $20 million in principal lending to Aviron, which proceeds were to be applied

toward a movie Aviron was to distribute, *Serenity*.[3]  The release of the loan's three-million-

dollar final advance was conditioned upon *Serenity* achieving certain agreed-upon performance

metrics.  Sadleir provided Cairn with performance reporting documents from a third party,

National Reporting Group, that fabricated the metric that *Serenity* had achieved (suggesting it

had satisfied the contractual requirement), in order to induce Cairn to release the final advance.

Cairn later received the reporting directly from National Reporting Group; that reporting had a

significantly lower rating than the agreed-upon metric.  After investigating the matter, Cairn

circulated a draft complaint to Aviron and demanded repayment of the final advance as

fraudulently obtained.  Ultimately, in May and June 2019, the parties reached a settlement, in

which Aviron agreed to repay Cairn the three million dollars of the final advance (the

"Settlement Payment"), in return for Cairn's agreement not to file suit.  Purely Capital Alpha

Limited ("Purely Capital") made the Settlement Payment to Cairn.

   Importantly, Purely Capital was the recipient of Sadleir's illicit and fraudulent sale in

July 2019 of certain assets worth an estimated three million dollars that secured BIT's loans to

---

[3] The loan was secured by, among other things, the Beverly Hills Residence.

Aviron – the conduct at issue in the UCC Scheme.  In other words, Sadleir engaged in the UCC Scheme in order to generate the money he owed for having defrauded Cairn.

The Cairn Fraud evidence is admissible as direct evidence of the UCC Scheme.  The Cairn Fraud "arose out of the same . . . series of transactions as the charged offense"; it is "inextricably intertwined" with the UCC Scheme evidence; and it is "necessary to complete the story" of the UCC Scheme.  *See Carboni*, 204 F.3d at 44.  Sadleir's defrauding of Cairn "g[ives] coherence to the basic sequence" of events at issue, *see Gonzalez*, 110 F.3d at 942, and provides necessary background, *see United States v. Skowronski*, 968 F.2d 242, 246 (2d Cir. 1992) (superseded by statute on other grounds as stated in *United States v. Amato*, 46 F.3d 1255, 1261 (2d Cir. 1995)).  It explains what led up to the UCC Scheme and why Sadleir needed to generate three million dollars in proceeds in or about July 2019.

In the alternative, the Cairn evidence is admissible under Rule 404(b), pursuant to the Second Circuit's "inclusionary approach, which allows evidence to be received at trial for any purpose other than to demonstrate the defendant's criminal propensity."  *Edwards*, 342 F.3d at 176; *see also United States v. Pitre*, 960 F.2d 1112, 1118-1119 (2d Cir. 1992).  It makes plain Sadleir's motive for the UCC Scheme – to avoid litigation that would expose Sadleir's fraudulent conduct, which would unquestionably have affected his ability to secure funding from other parties such as BlackRock (and potentially exposed him to criminal charges).  *See* Fed. R. Evid. 404(b) (evidence admissible to prove motive).  It is also relevant to Sadleir's intent and knowledge.  *See id.* (evidence admissible to prove intent and knowledge).  The Cairn evidence is admissible to refute any argument that the UCC Scheme was a legitimate use of BIT's funds, authorized by BlackRock or its employees.  These facts are necessary for the jury to understand why it is highly implausible that BlackRock or its employees consented to applying BIT funds to

make a payoff for a brazen fraud. Accordingly, any proposed whitewashing of the evidence to include solely the fact that Sadleir used the UCC Scheme's proceeds to pay off an existing debt would be insufficient, omitting relevant, probative evidence. The fraudulent nature of Sadleir's conduct toward Cairn bears on his intent to defraud BlackRock and on the plausibility that BlackRock or any of its employees consented to the UCC lien releases.

Nor is the highly probative nature of such evidence "substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Any prejudice to Sadleir based on the Cairn evidence is not "unfair prejudice," but instead is evidence that the Government should be permitted to introduce based on its "need for evidentiary richness and narrative integrity in presenting [the] case." *Old Chief v. United States*, 519 U.S. 172, 193, 183 (2d Cir. 1997). Stripping out the nature of the Cairn fraud would present an incomplete picture to the jury, damaging the "narrative integrity" that the Government is entitled to present to the jury. Finally, such evidence is neither "more sensational" nor more "disturbing" than the charged crimes. *See Roldan-Zapata*, 916 F.2d at 804. Sadleir's three-million-dollar fraud against Cairn pales in comparison with his diversion of more than twenty-five-million dollars from BIT in a years-long fraud that involved a sham company and fake employee.

## 2. Misrepresentations to Aviron Employees Regarding Funding for Aviron

Documentary and testimonial evidence will also show that, at various times, Sadleir represented to one or more employees at Aviron that he had obtained firm commitments from third parties other than BIT to invest in Aviron. For example, at one point Sadleir informed an employee that he had three investors ready to invest in Aviron, one of which would fund the company for five years. Those representations were false.

33

Such misrepresentations should be admitted as direct evidence of the charged offenses. Sadleir's lies to his employees provide necessary background and context; they explain Sadleir's relationships with his employees at Aviron, how he created an environment in which he was in a position to commit the charged offenses clandestinely, and why Aviron employee witnesses took certain actions (such as agreeing to work at Aviron). It also provides highly probative evidence of Aviron's financial condition. For the same reasons, this evidence is also admissible pursuant to Rule 404(b), as proof of Sadleir's motive, intent, preparation, and plan. This evidence, too, meets a Rule 403 balancing test.

3. Cross-Examination of Sadleir

Finally, in the event that Sadleir testifies, the evidence described above regarding Cairn and Sadleir's misrepresentations about Aviron's funding, as well as the PPP Fraud scheme for which Sadleir is being prosecuted in the Central District of California, are permissible subjects for cross-examination. All of this conduct – a fraud in which Sadleir fabricated data, lies about Aviron's financial status, and lies and false certifications on documents in order to receive an undeserved payout through a Government program designed to assist companies affected by a global pandemic – manifestly bears on Sadleir's character for truthfulness. *See, e.g.*, *United States v. Desposito*, 704 F.3d 221, 234 (2d Cir. 2013) (affirming district court's admission of evidence of a pending state prosecution to impeach defendant's character for truthfulness after defendant testified, with limiting instruction; because the defendant's similar conduct in the state case "severely undermined [his] innocent explanation for the plan to fabricate evidence," it was "highly probative of his credibility after his testimony on direct examination.") And none of the conduct's significant probative value is substantially outweighed by the danger of unfair prejudice. To the contrary, there is little to no *unfair* prejudice associated with these categories of evidence and, to

34

the extent the Court determines that a risk of such prejudice exists, it can be appropriately mitigated

through a limiting instruction.

**VII.    The Court Should Admit Certain Out-of-Court Statements Offered for Non-Hearsay Purposes**

The Government intends to offer into evidence certain documents, and to elicit testimony

regarding certain conversations, that constitute statements made by individuals who will not

testify as witnesses.  These statements are, nevertheless, not hearsay, either because they

constitute statements of a party opponent (the defendant) or by the defendant's agent or

employee (or someone otherwise authorized to make a statement on the subject), *see* Fed. R.

Evid. 801(d)(2), or because the Government is not offering them for their truth, *see* Fed. R. Evid.

801(c)(2).  Accordingly, the Court should admit them.

**A.  Applicable Law**

Hearsay is an out-of-court statement admitted for the truth of the matter

asserted.  *See* Fed. R. Evid. 801(c); *United States v. Quinones*, 511 F.3d 289, 312 (2d Cir. 2007).

An out-of-court statement that is not offered for the truth of the matter asserted is not hearsay,

however, and may be admitted if relevant for another proper purpose.  For example, where an

out-of-court statement "show[s] the circumstances surrounding the events, providing explanation

for such matters as the understanding or intent with which certain acts were performed," the

statement is not hearsay and is therefore admissible.  *United States v. Pedroza*, 750 F.2d 187,

200 (2d Cir. 1984) (citations omitted); *see also United States v. Southland Corp.*, 760 F.2d 1366,

1376 (2d Cir. 1985) ("[a] state of mind can be proved circumstantially by statements . . . which

are not intended to assert the truth of the fact being proved" (internal quotation marks and

citation omitted)); *cf. Paulino*, 445 F.3d at 216-17 (statements offered for the non-

hearsay purpose of establishing context or background do not implicate the Confrontation

Clause). The Supreme Court has explained that admission of non-hearsay, even if testimonial,

does not implicate the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 59 n.9

(2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

     If the statement is otherwise admissible, the court must determine "whether the probative

value of this evidence for its non-hearsay purpose is outweighed by the danger of unfair

prejudice resulting from the impermissible hearsay use of the declarant's statement." *United*

*States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994) (citing Fed. R. Evid. 403); *see also United States v.*

*Tussa*, 816 F.2d 58 (2d Cir. 1987).

### B.  Discussion

     Where the Government offers written or oral statements made by non-testifying

witnesses for purposes other than their truth, there is no hearsay problem. The Court should

admit such testimony and evidence. For example, the Government intends to introduce a text

message sent by a non-testifying witness ("Individual-1") to a testifying witness ("Witness-1").

In that message, in substance and in part, Individual-1 informs Witness-1 that Sadleir's

companies did not have prepaid media to "be used as and when" on reserve at GroupM and that

Group M would "never do that" for a client like Aviron. That statement, among others, formed

the basis for Witness-1's subsequent actions, including his departure from Aviron. The

Government also intends to introduce evidence of statements made by non-testifying witnesses

to the individual who served as Chief Restructuring Officer (the "Restructuring Officer") of

Aviron after Sadleir was removed. Those statements explain the steps that the Restructuring

Officer then took, which led him to begin to uncover the Advertising Scheme.

That the Government is not introducing these statements for their truth in an attempt to circumvent the restrictions on hearsay or avoid cross-examination into the matters asserted is evident from the fact that the Government is calling multiple witnesses from GroupM and MediaCom.  Those witnesses can, and likely will, be examined on the topic of whether Aviron had millions of dollars in prepaid media credits on reserve at GroupM.  But the non-hearsay statements described above are admissible for legitimate non-hearsay purposes and are necessary in order to explain what actions the witnesses through whom they will be offered took and to provide the jury with proper context and evidence of their states of mind.  Finally, the danger of unfair prejudice from those statements, which, as noted, will in many cases be echoed by other evidence being offered, does not outweigh their probative value for a non-hearsay purpose.

## **CONCLUSION**

For the reasons set forth herein, the Government respectfully requests that the Court grant the Government's *in limine* motions.

Dated:          New York, New York
                January 5, 2022

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


                                   By: _____/s/_____
                                        Jared Lenow/Elizabeth Hanft
                                        Assistant United States Attorneys
                                        Southern District of New York
                                        (212) 637- 1068/2334