**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br>      v. <br><br> WILLIAM SADLEIR <br><br>          Defendant. | No. 20 Cr. 320 (PAE) |

**SENTENCING MEMORANDUM**
**ON BEHALF OF WILLIAM SADLEIR**

BOIES SCHILLER FLEXNER LLP

Matthew L. Schwartz
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for the Defendant*

William Sadleir respectfully submits this memorandum of law, supporting materials, and accompanying letters of support to assist the Court in determining the appropriate sentence to impose at the June 14, 2022 sentencing hearing. For the reasons that follow, we respectfully submit that a substantially below-guidelines sentence is sufficient but not greater than necessary to serve the purposes of sentencing.

## PRELIMINARY STATEMENT

Mr. Sadleir is deeply sorry for, and embarrassed by, his crimes. Faced with challenges to his business, Mr. Sadleir did what too many others have done in the same situation: he lied. Not to personally enrich himself, but to try to avoid the collapse of his business, the loss of dozens of jobs and tens of millions of dollars in third-party investment, and the devastation of his young family. But he lied nonetheless, and Mr. Sadleir readily acknowledges that in doing so defrauded two lenders, a BlackRock fund (the subject of this case) and the U.S. government (the subject of the Central District of California case).

There is no sugar coating what happened here, and Mr. Sadleir does not shy from the facts. At the same time, the conduct at the heart of these cases is deeply out of character for a 68 year-old man with no prior criminal record and a long history of success in business, philanthropy, and public service. Mr. Sadleir has never so much as been arrested before, and his conduct here is confounding to everyone who knows him. By all accounts, Mr. Sadleir is "honest," "a man of honor and his word," "kind," and "a good and decent man" who made an "uncharacteristic mistake." As one of his nephews, Afifi Kadadu, explains, Mr. Sadleir's conduct here "was out of character and inconsistent with his otherwise honest behavior. . . . That conduct was an aberration. What's not surprising, however, is his acknowledging mistakes, taking responsibility for his actions, and seeking to make things right for everyone who was

hurt."  Another nephew, Edmond Kadadu, agrees, calling Mr. Sadleir a "humbled and accountable man" who "reflects on the events and has learned and grown from those actions."

Mr. Sadleir is also a "kindhearted friend" and a "wonderful" and "devoted father" "who puts family above everything," a "positive presence" who is "super caring and thoughtful towards every individual he's around."  In his personal life, Mr. Sadleir is described as "loving" and a "genuinely caring family man," with "a patient and kind heart" who teaches "wholesome values."  In the workplace and in his community, Mr. Sadleir is "level-headed," "empathetic," and someone "you could turn to for advice" – a "'father' to us all."  At the same time, he is described as an "inspirational leader" who "set a motivating example" to his colleagues and who possesses "vision, leadership and generosity" as well as a "belief in fostering emerging talent." As one of his former employees at Aviron Pictures, Katie Rich, explains: "Will innovates and supports the communities around him" and lifts up the people around him, "championing the skills, talents, and passion that people bring to the table."

After reading the numerous letters submitted on his behalf by Mr. Sadleir's family, friends, and co-workers, we are hopeful that the Court will see him for who he truly is:  a loving father and husband, a loyal friend, and a valuable member of his community.  Simply put, Mr. Sadleir's offense conduct is entirely at odds with his character and the way he has lived his life.

As a result of his crimes, though, Mr. Sadleir has lost not only his job but his business and his reputation, as well as the house he and his young family were living in.  At 68 years of age, and having been very publicly convicted of two crimes, Mr. Sadleir will almost certainly never work in the film business again and, in fact, as part of a settlement with the Securities and Exchange Commission, he has consented to never participate in the issuance, offer, or sale of any security – a prohibition that effectively means he can never be involved in fundraising of the sort

that has been a staple of his career.  He has also agreed to separate forfeiture and restitution

orders in this case of in excess of $31 million, which is orders of magnitude more than he

benefited from his crimes.

Since his arrest in May 2020, and even before that, dating to his removal as CEO of

Aviron in January 2020, Mr. Sadleir has been the primary caretaker for his two young sons, aged

3 and 5, while his wife attempts to find some way to support their family.  The absence of Mr.

Sadleir from the life of his young children – children for whom Mr. Sadleir has been primary

caretaker for essentially their entire conscious lives – will be devastating.  As his niece Ursula

Kadadu explains:

> Watching him be a father to [his sons] is beautiful to see. He loves
> them with such a patient and kind heart. He teaches them wholesome
> values and over all how to be the best little boys possible. The way
> he pushes them to become their very best is inspiring. He takes every
> opportunity as a learning experience for his boys. He never holds
> back on educating them on all the things relevant to their age. It is
> truly inspiring to watch him with his two boys and all the joy he gets
> when he is with them. . . . Life is very delicate and to spend it with
> family is a blessing some do not get. I truly do not want that to be
> taken from the Sadleir family. A broken home is not a positive
> trajectory for two young boys. . . . That is a family home that will be
> torn apart if William goes to jail.  The emotional pain for his wife
> and children to lose him would be something I can't bare to see.  The
> two boys are so young and truly at a fragile state.

All that Mr. Sadleir desires to do now is to help raise his two boys, and to use his skills to benefit

his community and the world at large, including by donating his time to help focus a scientific

venture known as Acuity Applied Physics.  Of course, any money that Mr. Sadleir might

ultimately earn in that venture will go towards his restitution and forfeiture obligations, for the

benefit of the victim in this case.

Under these circumstances, we respectfully submit that a non-Guidelines, non-custodial sentence will serve as sufficient punishment and satisfy the other objectives of the Sentencing Guidelines and section 3553.

## **BACKGROUND**

Mr. Sadleir was arrested on May 22, 2020, in connection with two separate cases: this one, and a case in the Central District of California alleging that he made false statements in connection with approximately $1.7 million in loans under the so-called Paycheck Protection Program, or PPP. Although Mr. Sadleir did not plead guilty until January 2022, he took responsibility for his conduct in this case from the start. As the government reported to the Court from the earliest days of this case, Mr. Sadleir promptly offered his cooperation to the government, including through a proffer of information. It is our understanding that the government took no issue with Mr. Sadleir's honesty throughout that process, but that it ultimately determined that he could not render substantial assistance so as to make a cooperation agreement worthwhile. The delay in Mr. Sadleir ultimate guilty plea in this case is largely attributable to complications arising from the interplay of the two cases, and certainly never reflected any hesitance on Mr. Sadleir's part to take responsibility for his misconduct in this case.

As the Court is aware, Mr. Sadleir ultimately pleaded guilty on January 19, 2022, to Counts One and Two of the Indictment, pursuant to a plea agreement. It is anticipated that the government will move to dismiss Count Three at the time of sentencing. The plea agreement contains the parties' agreement about the application of the Sentencing Guidelines, with which the Probation Office also concurs. PSR ¶¶ 104-120. Section 2B1.1 of the Guidelines applies to Counts One and Two, which are grouped. Pursuant to that section, Mr. Sadleir's offense level is

33, less two points for acceptance of responsibility, for a total offense level of 31.

(Notwithstanding his complete and early acceptance of responsibility, because Mr. Sadleir's

actual plea came relatively close in time to the scheduled start of trial and so required the

government to materially prepare for trial, the government declined to offer Mr. Sadleir the

benefit of the third acceptance point.)  Mr. Sadleir has absolutely no criminal history, yielding an

advisory Guidelines range of 108-135 months imprisonment.  PSR ¶ 152.  The Probation Office

recommends a bottom-of-the-Guidelines sentence of 108 months' imprisonment.  PSR at 37.[1]

For the reasons expressed below, Mr. Sadleir respectfully requests a non-Guidelines and

non-custodial sentence.

## A NON-CUSTODIAL SENTENCE IS APPROPRIATE IN THIS CASE

As the Court is well aware, a criminal sentence must be "sufficient, but not greater than

necessary" to meet the objectives of sentencing.  18 U.S.C. § 3553(a); *Kimbrough v. United

States*, 552 U.S. 85, 111 (2007).  In crafting a sentence, "the punishment should fit the offender

and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 477 (2011).

**A.     Mr. Sadleir's Personal History and Characteristics**

The mandate of 18 U.S.C. § 3553(a)(1)—which requires courts to consider "the history

and characteristics of the defendant"—weighs particularly heavy among the sentencing factors.

As noted by Judge Rakoff,

> surely, if ever a man is to receive credit for the good he has done,
> and his immediate misconduct assessed in the context of his overall
> life hitherto, it should be at the moment of his sentencing, when his
> very future hangs in the balance. This elementary principle of
> weighing the good with the bad, which is basic to all the great
> religions, moral philosophies, and systems of justice, was plainly
> part of what Congress had in mind when it directed courts to

---

[1]     In two places in the narrative section of the PSR, the Probation Office refers to a
recommendation of 120 months' imprisonment.  PSR at 38 and 39.  We believe that to be a typo.

consider, as a necessary sentencing factor, "the history and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). We respectfully submit that the good from Mr. Sadleir's life dramatically outweighs the bad and justifies a non-custodial sentence. Certainly, the prospect of an effective life sentence – which is what a sentence within the advisory guidelines range or anything remotely like it would amount to – would fail to properly value the good that Mr. Sadleir has done in his life, and the value that he can still contribute to the world.

William Sadleir is 68 years old. He was born in 1954 in Denver, Colorado, the eldest of four children who were raised in the Mormon church. He grew up in Salt Lake City and in the Pacific Northwest. Mr. Sadleir's childhood was out of a Norman Rockwell painting. He had two loving parents, did well in school, was an Eagle Scout in his spare time, and mowed lawns in his neighborhood to make spending money and, later, to pay for college.

After graduating from public high school in Seattle in 1972, Mr. Sadleir enrolled in and attended Brigham Young University for a semester, before he left for his Mormon mission. After spending two years as a volunteer missionary in France – including with his life-long friend Jonathan Neville, who has written in Mr. Sadleir's support – Mr. Sadleir returned to BYU to complete his education, graduating in 1980. He was also a standout athlete in college, both a junior Olympic volleyball player and a nationally-ranked freestyle skier.

Mr. Sadleir joined the Peace Corps out of college, volunteering in both the Dominican Republic and in Washington, D.C. Mr. Sadleir moved to Washington full-time in 1982 to enter into government service, working first as Special Assistant to President Reagan, where he was director of presidential appointments and scheduling, and then later on detail to the State Department, where he served as Deputy Assistant Secretary of State.

Following his government service, in or about 1985, Mr. Sadleir began his career as a serial entrepreneur, founding and running a series of companies in different industries. He founded an early telecommunications hardware company, a company that served as a wholesaler for grass seed, an office-equipment leasing company, and a retail store. Somewhere in the midst of running these businesses, Mr. Sadleir also found time to attend Harvard Business School, graduating in 1993 from Harvard's prestigious Owner-President-Manager Program, a course of study designed for successful entrepreneurs who were actively managing businesses of a certain size.

While he did all of this, Mr. Sadleir was also an active philanthropist, not only giving money to charity but giving his time as well. In addition to participating in charitable endeavors through his Church, Mr. Sadleir took a leadership role with the Seatrek Foundation, an educational charity relating to individuals who immigrated to Utah in the 1850s. The Seatrek Foundation took on particular prominence in the run-up to the Winter Olympics in Salt Lake City 2002, and Mr. Sadleir worked closely with now-Senator Mitt Romney, who served as President and CEO of the Salt Lake Organizing Committee for the Olympic and Paralympic Winter Games of 2002, on coordinating efforts.

In or about 2003, Mr. Sadleir and his long-time wife Deann divorced. At the time, the couple had four children who were mostly grown and out of the house. They were approximately 22, 20, 19, and 17 at the time. Mr. Sadleir was a committed, loving, and active husband to Deann and father to his children. As his oldest son Tyson explains, Mr. Sadleir is "a generous, caring, and loving" father. "I had the benefit of growing up in a loving home, and I learned a great deal from my dad. He taught me to work hard, to be patient, to be kind, and, perhaps most importantly, to navigate a right-handed world as a 'lefty.'" There was no dramatic act that caused the couple to split, but as their children got older and they considered the prospect of how to spend the rest of

their lives together, the couple realized that they had irreconcilable differences, particularly around their respective commitment to the strictures of the Mormon Church.

Not long after his divorce from Deann, Mr. Sadleir moved to California and got into the motion picture industry.  Although Mr. Sadleir had not been involved in that business before, he had a friendship with Oscar-winning composer Hans Zimmer, whom Mr. Sadleir met through his love of music.  Mr. Sadleir went on to found a company called Clarius Entertainment that was effectively a predecessor entity to Aviron Pictures.  Clarius and Aviron were in the business of motion picture *distribution*.  That is, they were not typically involved in the making (production) of movies, but rather acquired the rights to already-completed independent films, arranged for their theatrical distribution, and financed the advertising for those films.

Clarius and Aviron were quite successful.  Under Mr. Sadleir's leadership, Clarius distributed films such as *Legends of Oz: Dorothy's Return*, a sequel of sorts to *The Wizard of Oz*; *And So It Goes*, the Rob Reiner-directed film starring Michael Douglas and Diane Keaton, and *Before I Go To Sleep*, a thriller starring Nicole Kidman and Colin Firth.  Under his leadership at Aviron Pictures, that company distributed a series of films including *My All-American*, *A Private War*, *Kidnap*, *Destination Wedding, Serenity, The Strangers: Prey at Night*, *47 Meters Down*, *After*, and *The Informer*.  Mr. Sadleir himself received Executive Producer credits on seven of the films distributed by Aviron Pictures.  *See* https://tinyurl.com/y67ebep2.

Meanwhile, Mr. Sadleir met and fell in love with Hanan Kadadu, known as Hannah.  The couple married in 2016, and have two young boys aged 3 and 5, who were the product of extensive fertility treatments.  The couple also have three fully-fertilized frozen embryos (two girls and a boy), whom they were in the process of having implanted until their efforts were interrupted by Mr. Sadleir's arrest and then COVID.  Per the PSR's interview of Hannah, Mr. Sadleir "is a great

father and a wonderful husband.  She described him as patient, kind, caring, calm, determined, and non-judgmental.  Mrs. Sadleir stated that their children love the defendant dearly."  Hannah expands on these points in her letter to the Court:

> William is my best friend, a loving companion, my cheerleader, my rock, and an exceptional father. He is my support system. He is dependable, has always been faithful, and brings hope even when things seem hopeless. He is everything to me. William can fix almost anything. Our children are convinced that he has magic-producing lost items from their ears. His bedtime reading is mesmerizing and he patiently explains the "how and why" to a seemingly endless stream of questions. I cannot raise our sons without William being a daily, nurturing presence in their lives. We love him so much and need him with us.

Mr. Sadleir served as President and CEO of Aviron Pictures until January 2020, when he was removed following a lawsuit filed by BlackRock in New York State Court.  As the Court is aware, he was arrested in May 2020 in this case and in one pending in the Central District of California.  He was simultaneously sued by the SEC for largely the same conduct as involved in this case.  He has now pleaded guilty in both criminal cases and agreed to a consent judgment in the SEC enforcement action,[2] including agreeing to forfeiture and restitution orders in this case of more than $31 million, and in the California case further restitution of $282,566.89 and forfeiture of an additional $308,058.11 – amounts that dwarf Mr. Sadleir's actual assets.

Importantly, Mr. Sadleir accepted responsibility for his crimes not only legally, but morally as well.  As noted, Mr. Sadleir immediately offered to cooperate with the government, and met (separately) with representatives of both the U.S. Attorney's Office and the SEC in proffer sessions.  To be clear, Mr. Sadleir does not argue that he is entitled to a downward

---

[2]     The SEC's proposed consent judgment has been agreed to by Mr. Sadleir, but as of the time of the filing of this memorandum, has not yet been submitted to Judge Koeltl by the SEC. A copy of the proposed consent judgment is attached as Exhibit D.

departure under section 5K1.1 of the Guidelines and appreciates that he did not receive a cooperation agreement from the government.  We raise this point merely to underline Mr. Sadleir's early and complete acceptance of moral responsibility for his crimes, particularly because it did take quite a bit longer for him to actually plead guilty, mostly due to complications arising from the interaction of this case and the one in California.  The Probation Office likewise notes that Mr. Sadleir willingly took responsibility for his crimes.  PSR ¶ 103.

As former Aviron employee Katie Rich explains, "In all of my interactions with him over the past two years, since his arrest, he has taken responsibility and demonstrated remorse for the harm that was done to so many, particularly to those who so loyally followed him."

Mr. Sadleir's wife Hannah elaborates:

These past two years of federally-imposed confinement[3] has been a period of deep reflection for William. His strengths have proved to also be his weaknesses. He is persevering, tenacious, determined, and is driven by defined goals and objectives. But, as he regretfully realized, those traits also compelled him to believe that the ends justified the means. He is deeply remorseful and knows that his conduct was not justified, although his objective was to make sure the company was successful for the benefit of its' lenders and employees. This period of confinement also helped William appreciate how little time he may have left to be a positive influence in our sons' lives. After taking responsibilities for his conduct and pleading guilty, I found a paper on his desk one morning that he had written, which gives a glimpse into William's character and values. The letter's content included the following:

***Lessons to Teach*** [***The Boys***]
- Learn to like what doesn't cost much.
- Learn to like reading, conversation, music.
- Learn to like fields, trees, brooks, hiking, rowing, climbing hills.
- Learn to like people, even though some of them may be different . . . different from you.

---

[3]     Mr. Sadleir was subject to home confinement for approximately the first year following his arrest, at which point pretrial supervision was stepped down to permit travel within the Central District of California with the prior consent of Pretrial.

- Learn to like work and enjoy the satisfaction of doing your job as well as it can be done.
- Learn to like the songs of birds, the companionship of dogs.
- Learn to like gardening, puttering around the house, fixing things.
- Learn to like the sunrise and the sunset, the beating of the rain on the roof, windows, or tent.
- Learn to keep your wants simple, and refuse to be controlled by the likes and dislikes of others.
- Learn that the ends seldom justify the means.
- Learn that you can always earn more money, but time you will never get back.

Hannah concludes that Mr. Sadleir has "accepted his misfortune and his mistakes and has made it a catalyst for reinvention," pointing to his work assisting a group of theoretical physicists to bring their ideas to fruition for the benefit of humanity. Mr. Sadleir's adult son Paul echoes this same sentiment, writing that Mr. Sadleir "deserves an opportunity to show his young boys first-hand the power of remorse and ability to overcome difficulty."

And Mr. Sadleir's own words demonstrate the deep remorse he feels for his actions:

> I am profoundly sorry that I lied to people who trusted me, and that my actions betrayed the lessons of truth and honesty learned from my parents, grandparents, teachers, and friends over the past six decades. There is no justification for what I did. I can now only do everything possible, in the few years that I may have, to make restitution to those who have been harmed by my dishonesty, and to set an example of integrity and resilience to my young children, family, friends, and colleagues.

In short, as everyone around him agrees, Mr. Sadleir is an honest and hard-working man who has always carried himself with great integrity. He is a source of strength for his family, his community, his business associates, and the charitable endeavors that he has dedicated himself to. If one thing stands out from the picture painted by the letters submitted in Mr. Sadleir's support, it is that the conduct in which he engaged leading to his criminal convictions is inconsistent with Mr. Sadleir's history and characteristics. Mr. Sadleir deserves credit for having

built a lifetime of goodwill with people from all over the world.  A non-custodial sentence will ensure that he can continue to contribute to the world, rather than be taken from it.

## B.      The Nature and Circumstances of the Offense

Mr. Sadleir engaged in illegal conduct, for which he takes full responsibility.  The central facts of his offense are not disputed, and Mr. Sadleir does not hide from them.  We describe them briefly below to provide some context for Mr. Sadleir's motivations in entering into this uncharacteristic conduct, but nothing below should be read as in any way trying to minimize, rationalize, justify, or otherwise shy away from his criminal conduct.  Mr. Sadleir is fully aware of what he has done, and is immensely remorseful.

In short, as CEO of Aviron Pictures, Mr. Sadleir solicited a series of loans from a BlackRock-managed fund known as BIT, which were supposed to go to the advertising and distribution of motion pictures.  Under pressure from the BlackRock executives managing the loan facilities, Aviron drew down more funds than it could deploy after the producers of a movie that BlackRock had approved, *Drunk Parents*, failed to deliver the completed movie as promised.[4]  Mr. Sadleir invested a portion of those funds, rather than in anything having to do with the motion picture business, in valuable Los Angeles real estate.  (The balance of the funds were used to pay Aviron operating expenses, including employee salaries.)  However when others in BlackRock sought to confirm how Aviron had used the money, Mr. Sadleir falsely

---

[4]      It appears that at least one of the BlackRock executives wanted to invest so much money in the motion picture industry not for the benefit of BIT's investors, but for his own personal benefit, including to advance his daughter's own movie career.  The two executives responsible for managing the Aviron loan were in fact fired by BlackRock, at least one of whom was fired months before the charges in this case were filed, expressly for violating BlackRock's policies against conflicts of interest and self-dealing.  *See generally* Jason Zweig, "The Hollywood Drama that Cost a BlackRock Fund $75 Million," *The Wall Street Journal*, Feb. 28, 2020, available at https://tinyurl.com/5fz6ky5d.

represented that the excess funds had in fact been used to acquire prepaid media credits (*i.e.*, future advertising rights) for *Drunk Parents*. Mr. Sadleir further represented that the media credits were purchased from GroupM Media Services, which was an entity that he created and named so as to be confused with GroupM Worldwide, a legitimate and well-known media investment company. Mr. Sadleir further invented the persona of "Amanda Stevens," a made-up person who supposedly worked for GroupM and verified Aviron's media credits to BlackRock.

Later, Mr. Sadleir copied and placed the digital signature of one of the BlackRock executives on a UCC filing that released BlackRock's lien over certain Aviron assets, allowing them to be sold or refinanced. Mr. Sadleir justified this conduct to himself by noting that BlackRock had previously approved and signed a UCC release in connection with the sale of the exact same assets in December 2018, to a different buyer, which sale never actually closed. And although the proceeds of the sale that did close in or about July 2019 were in fact used to pay down Aviron's debt, Mr. Sadleir acknowledges that he placed the executive's signature on the UCC filing without his express permission to do so.

In short, like so many before him, Mr. Sadleir engaged in a fraud to try to support his business and, perversely, because he thought it was responsive to his largest lender and the victim of the fraud. Consistent with those aims, Mr. Sadleir did not materially enrich himself as a result of his crimes aside from the payment of certain ordinary (Hollywood) business expenses including the purchase of a car. At the same time, Mr. Sadleir took a greatly reduced salary during this time period in consideration for the payment of these expenses, as well as the

privilege of living in (and maintaining) the real estate in which Aviron's excess funds were invested.[5]

## C.     The Need To Promote The Purposes of Sentencing

Section 3553(a) calls for the Court to weigh the purposes of sentencing, including the need for the sentence to (a) reflect the seriousness of the crime, promote respect for the law, and provide just punishment; (b) afford adequate deterrence; (c) protect the public from the defendant's further crimes; and (d) provide the defendant with needed training, medical care, or other correctional services in the most effective manner.

We respectfully submit that the consequences already suffered or to be suffered by Mr. Sadleir have served as sufficient punishment for his crime, and that the other sentencing factors likewise favor a non-Guidelines, non-custodial sentence.

### 1. Mr. Sadleir Has Already Been Punished Severely

Mr. Sadleir takes full responsibility for his conduct.  He has brought shame and embarrassment not only on himself, but on his family.  He has lost not only his job but the business that he created from the ground up, and he bears the burden of knowing that more than three dozen Aviron employees abruptly lost their jobs as a result of his conduct.  Because Aviron's collapse occurred in January 2020, just weeks before the start of the pandemic that largely shut down the movie business and caused the collapse of many other independent theatrical distribution companies, most of those former Aviron workers remain unemployed and without benefits.

---

[5]     Mr. Sadleir never had an ownership interest in the house, which at all times was also totally and transparently encumbered by a lien from another of Aviron's investors.

Mr. Sadleir will almost certainly never work in the motion picture industry again.  Aside

from the mortal reputational damage he has rightly suffered, he has agreed to be barred by the

SEC from essentially ever soliciting investments again.  He has also agreed to forfeit and/or pay

as restitution materially more money than he actually realized as a result of his crimes.

His arrest, the attendant publicity,[6] the loss of his business, and the prospects of never

working again in the business that he loves – all of this have made clear to Mr. Sadleir the

seriousness of his conduct.  He will likely never be in a position to engage in the sort of conduct

he committed here again, but regardless, the harsh consequences that have already befallen Mr.

Sadleir have served as real punishment and affected the necessary deterrence.  As his former

---

[6]      Mr. Sadleir's arrest and guilty pleas were covered extensively in the press, including in
every major motion picture trade publication.  *See, e.g.*, Gene Maddus, "William Sadleir, Ousted
Aviron Pictures Chair, Arrested in Alleged $30 Million Fraud," *Variety*, May 22, 2020, available
at https://tinyurl.com/3r8yh7h7; Trey Williams, "Aviron Pictures Founder William Sadleir
Arrested on More Than $30 Million in Fraud Charges," *The Wrap*, May 22, 2020, available at
https://tinyurl.com/ya5bk4vh; Jonathan Stempel, "U.S. charges Hollywood film distributor with
defrauding BlackRock fund," *Reuters*, May 22, 2020, available at https://tinyurl.com/3zfcbcrj;
Ben Feueherd, "Feds say Hollywood CEO stole millions to build manse, also swiped coronavirus
$$," *The New York Post*, May 22, 2020, available at https://tinyurl.com/mump97ha; Matthew
Heller, "Aviron Pictures Founder Accused of $25M Fraud," *CFO Magazine*, May 26, 2020,
available at https://tinyurl.com/2p8kcdw5; Jennifer Bennett, "Producer Arrested for BlackRock
Pilfering, Covid Loan Fraud," *Bloomberg*, May 22, 2000, available at
https://tinyurl.com/2b554maj; Chris Dolmetsch, "BlackRock-Scamming Producer Pleads Guilty
to Diverting Funds," *Bloomberg*, January 20, 2022, available at https://tinyurl.com/4cp2b4f4.

The California case against Mr. Sadleir also received wide-spread media attention, which
generally also referenced the BlackRock fraud.  *See, e.g.,* Ryan Parker, "Aviron Pictures Founder
Charged in $1.7M Pandemic Scam," *The Hollywood Reporter*, May 22, 2020, available at
https://tinyurl.com/y5txeyyf; Dominic Patten, "Aviron Pictures Founder William Sadleir
Arrested In $1.7M COVID-19 Scam," *Deadline*, May 22, 2020, available at
https://tinyurl.com/4ju65kt8; Bruce Haring, "Aviron Pictures CEO William Sadleir Pleads Guilty
To Felony Fraud, Money Laundering In PPP Scam," *Deadline*, March 10, 2022, available at
https://tinyurl.com/2jjvtc9a; Gregory Yee, "Former Hollywood film executive will plead guilty
to pocketing fraudulent COVID-19 loans," *Los Angeles Times*, March 10, 2022, available at
https://tinyurl.com/msmywhn2.

employee, producer Katie Rich, explains in her letter to Your Honor, "Will is a good and decent man. . . He made an uncharacteristic mistake.  In all of my interactions with him over the past two years, since his arrest, he has taken responsibility and demonstrated remorse for the harm that was done to so many, particularly to those who so loyally followed him."

2. **The Purposes of Deterrence Have Been Served**

A custodial sentence is not necessary to afford adequate deterrence.  As to individual deterrence, as described above, Mr. Sadleir and his family have already suffered so much by virtue of his crime that there is no need for incarceration to assure that he is deterred from future crimes.  And at almost 70 years old, he will not be in a position to commit future crimes of this sort anyways.  As his friend of nearly 50 years, Jonathan Neville, explains, Mr. Sadleir's "conduct was an aberration," but "taking responsibility for his actions" is not.  Mr. Sadleir "is not going to let this mistake define his personal legacy."  To the contrary, Mr. Sadleir is strongly motivated to put good back into the world, both through his young children as he hopefully is given the time to raise them to become men, and through his guidance of a team of scientists in connection with Acuity Applied Physics.

The severe consequences that have befallen Mr. Sadleir – a felony conviction, an effective industry bar, the loss of his job and destruction of his business, the collateral damage to his co-workers and family, public humiliation, not to mention a more than $31 million judgment, all combined with his strong desire not to be defined by his crimes – will more than adequately deter Mr. Sadleir and others like him from committing a similar offense.

3. **There Is No Need To Protect The Public From Mr. Sadleir**

Mr. Sadleir poses no risk of recidivism.  As a threshold matter, he will almost certainly never be in a position to commit this sort of crime again, as he has been effectively banned from

fundraising through his settlement with the SEC and thanks to the extensive publicity around his crimes.  More to the point, the suffering and embarrassment his crimes have caused not only to him, but to his family, friends, and former employees and colleagues, will ensure that he does not re-offend.  Despite those consequences, as the attached letters demonstrate, Mr. Sadleir is surrounded by family and friends who will ensure that he does not go astray again.[7]  This is not a situation in which a sentence of imprisonment is necessary to protect the public from Mr. Sadleir.

### 4.      Mr. Sadleir Does Not Need Treatment, But He Does Have Medical Needs

Pursuant to section 3553(a)(2)(D), the Court must also consider the need for any sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

In general, Mr. Sadleir is physically and mentally healthy.  He does, however, have a range of medical conditions not atypical for a 68 year-old man, which make him vulnerable and which require appropriate medical treatment.  Most notably, Mr. Sadleir has a history of heart disease which required and angioplasty and the surgical placement of three stents in his heart in early 2020.  PSR ¶ 132.  He takes beta-blockers and ACE inhibitors to treat his heart disease, as well as medications to combat his high blood pressure and to lower his cholesterol.  *See generally* Exhibit G.

---

[7]      The Court will note that many of the letters, especially from Mr. Sadleir's wife's family, contain identical phrases.  This is the result of Mr. Sadleir providing a sample template to those people, which they (being totally unfamiliar with the criminal justice system) took literally.  We trust that the Court will appreciate that though the words may in same cases be the same, that is because so many of Mr. Sadleir's friends and family believed they were accurate and were prepared to sign their name to them, knowing their letters would be submitted to a federal judge and made a part of the official court record.

Mr. Sadleir does not need vocational training, and the services available to him through incarceration would not serve to rehabilitate him.  Although he will not work in the motion picture industry again, he is already using his leadership skills and knowledge of how to build a business to advise a group of physicists who are working on developing projects that will benefit the health and safety of all people.  Mr. Sadleir's long-time friend Jonathan Neville quotes a NASA rocket scientists as saying that "Acuity's discoveries are an especially meritorious contribution to the security and national interests of the United States, and to world peace."  Mr. Neville adds, for his part, that Mr. Sadleir "is the ideal leader to guide the development and implementation of these technological advances. . . .  Because of his talent stack and determination, Bill is uniquely capable of guiding and managing these efforts."

Being able to lead this distinguished group of scientists in an endeavor that could contribute to the world for the benefit of all peoples, while simultaneously serving as primary caregiver for his two young sons, would have the greatest rehabilitative force, whereas a term of imprisonment would "wreak extraordinary destruction" on Mr. Sadleir's family.  *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992).  *See also United States v. Huerta*, 371 F.3d 88 (2d Cir. 2004) (finding extraordinary family circumstances where defendant was sole caregiver to child); *United States v. Kon*, 05 Cr. 271 (RWS), 2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006) (imposing sentence of time served (one day) to drug offender with Guidelines of 30-37 months in light of defendant's parental responsibilities); *United States v. Roberts*, 01 Cr. 410 (RWS), 2005 WL 1153757 (S.D.N.Y. May 16, 2005) (imposing sentence of time served (one day) to drug offender with Guidelines of 10-16 months in light of defendant's responsibilities to care for his life partner).

**D.     The Kinds of Sentences Available**

The Court must also consider the "kinds of sentences available."  18 U.S.C. § 3553(a)(3).

In this case, we respectfully submit that alternatives to incarceration – such as probation, home

confinement, community service, and the like – would best serve the purposes of section 3553

and the interests of justice.  U.S.S.G. §§ 5F1.2, 5F1.3.  Indeed, the Sentencing Commission has

recognized that probation can satisfy the purposes of sentencing, including providing just

punishment for the offense.  U.S.S.G. Manual, Chapter 5, Part B, Introductory Cmt.

Home confinement in particular would be a meaningful punishment because it would

severely restrict Mr. Sadleir's liberty and serve as a meaningful punishment, but would still

allow him to remain with his family and provide child care for his two sons – a responsibility

that will fall predominantly upon Mr. Sadleir as his wife figures out a way to support the family

financially.

It is particularly important that the Court consider the kinds of sentences available in

view of the continuing COVID-19 pandemic, along with Mr. Sadleir's age and medical

conditions.  As Judge Abrams recently explained:

> Countless judges, including myself, have given significantly
> reduced sentences since the pandemic began, and have recognized
> that, as Judge Oetken put it in the *Gonzalez* case, prison time is much
> more punitive given conditions that have been extraordinarily harsh.
> In his estimate, incarceration now is essentially the equivalent of
> either time and a half or two times that would ordinarily be served.
> In *United States v. Saez*, Judge Engelmayer rightly noted that
> beyond the risks to health, the pandemic has also subjected all
> inmates to far more restrictive conditions of confinement and has
> prompted limits on access to visitors, including family, far beyond
> what would normally be the case.

ECF No. 1005 at 40-41, *United States v. Archer*, 16 Cr. 371 (RA) (Feb. 28, 2022 sentencing at which the Court sentenced defendant whom court found responsible for loss of $43 million, with guidelines range of 105-135 months, to a year and a day in prison).

As Your Honor is well aware, in the *Saez* case the Court denied a motion for sentence reduction while at the same time acknowledging that the pandemic not only posed an "outsized" health risk in the prison population, but also resulted in harsher conditions of confinement. *United States v. Saez*, No. 16 CR. 317-6 (PAE), 2021 WL 1252031, at *3 (S.D.N.Y. Apr. 5, 2021).  Your Honor also agreed with the parties that the petitioner in that case's medical condition, including obesity and hypertension, "present extraordinary and compelling reasons for release." *Id.*  Those same considerations apply to Mr. Sadleir, who is particularly vulnerable at 68 years of age, and who is clinically overweight with a history of heart disease, hypertension, and high cholesterol.  *See* attached medical records at Exhibit G.

"Whether or not we can quantify how much harder [imprisonment] is between the risks of COVID, the lockdowns, and the limitations on healthcare, movement, and visitation, this is an important factor to consider at sentencing, particularly for someone like Mr. [Sadleir], who does not present a danger to the community and is unlikely to recidivate." *Archer*, ECF No. 1005 at 41.  In view of Mr. Sadleir's age, health, vulnerability, and the harsh conditions of confinement on the one hand, and the meaningful punishment and deterrence that would be worked by a non-custodial sentence on the other, we respectfully submit that a sentence of home confinement would be appropriate and "not greater than necessary" to serve the goals of sentencing.

E.      **The Need To Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) requires the Court to consider the need to avoid unwarranted

sentencing disparities among defendants "with similar records" who have been found guilty "of

similar conduct."  This factor weighs heavily in favor of a non-custodial sentence.

This case involves a defendant with no criminal history, who defrauded a single

institutional victim in a misguided attempt to support his business and his employees.  Although

the applicable sentencing guidelines range in this case is substantial – 108 to 135 months – Mr.

Sadleir respectfully submits that that range severely overstates the nature of the offense and

would result in, rather than avoid, sentencing disparities.  We do not reiterate here the many

criticisms of the fraud guidelines' over-reliance on loss amount, which are well-known to the

Court.  *See, e.g., Adelson,* 441 F. Supp. 2d at 515.

Further, the loss amount is specifically overstated in this case, where there is no dispute

that the loss amount attributed to Mr. Sadleir does not represent the sum by which he personally

profited from the fraud, if at all.  In cases involving much greater loss amounts, courts have

substantially varied from the applicable guidelines range.  *See, e.g., United States v. O'Hara*, No.

10 Cr. 228 (LTS) (ECF No. 1232, imposing sentence of 30 months' imprisonment for guidelines

of life imprisonment and loss amount exceeding $19.7 *billion*); *United States v. Cervino*, 15 Cr

171 (ALC) (ECF No. 375, imposing sentence for defendant who went to trial of a year and day

in a case involving losses of $15 million to more than 100 investors, resulting in a guidelines

range of 108 to 135 months); *United States v. Morton*, 16 Cr. 371 (RA) (ECF No. 945, imposing

sentence of 15 months' imprisonment for guidelines of 168-210 months and loss amount of

$48,785,176, for defendant who received no acceptance credit after moving to withdraw her

guilty plea); *United States v. Antoine*, 16 Cr 763 (LGS) (ECF No. 490, imposing sentence of a

year and a day for guidelines of 51-63 months in health care fraud case involvement loss amount of $3.2 million and enhancement for abuse of trust because defendant was a licensed doctor).

*United States v. Casper*, 19 Cr. 337 (JPO), is a particularly apt comparison.  In that case, the defendant was charged with fraudulently obtaining $43.3 million in loans from a financial institution to a company formed by the defendant, based on the representation that the money would be used to purchase two chemical and oil tankers.  The defendant then attempted to fraudulently induce nine other financial institutions to lend his company between $46 and $52 million *each* to refinance the first loan, a fraud that was only unsuccessful because it was interrupted by the FBI.  Like Mr. Sadleir, the defendant in that case also made up fake third parties and caused e-mails to be sent from made-up representatives of those fake third-parties to verify the value of a fictitious investment portfolio which allegedly secured the loans.  The defendant in that case also attempted to deflect questions and explain his suspicious behavior by falsely claiming that his daughter was dying of cancer.  Further, the defendant in *Casper* continued to engage in the fraud after he was arrested, "presumably in an effort to dig out of a desperate financial situation."  Exhibit H at 34 (ECF No. 60 in that case, the sentencing transcript, reflecting Judge Oetken's remarks).  Moreover, "even after pleading guilty in this case and apologizing for his conduct, he continued a separate but similar fraud scheme, again using misrepresentations in an effort to obtain trade credit insurance for a potential gold-mining venture."  *Id*.

Based on this conduct, the defendant in *Casper* faced an advisory guidelines of 121-151 months.  In calculating that range, the defendant was given the benefit of using the actual loss caused to the first lender, as opposed to the intended loss to the nine putative subsequence

lenders, which would have increased the range considerably.  He was also given the benefit of all three acceptance points, notwithstanding his post-arrest and post-plea conduct.

Judge Oetken sentenced Casper to 18 months' imprisonment, pointing to a variety of factors:  "One, he is a first-time offender. His age is 50 now. He has had medical issues. He has family responsibilities. No doubt that his children and parents and other friends and family members will suffer as a result of a term of incarceration. And the letters in support of the defendant describe someone who has otherwise led a good life. He has a history of participating in community boards and charitable activities and worked in public service."  *Id.* at 34-35.  Judge Oetken also noted that "As in many fraud schemes, the defendant likely acted out of desperation, and he likely did not intend to simply abscond with tens of millions of dollars from the victim. This would be worse if the defendant were simply taking money from a vulnerable victim and then using it for his own personal expenses. He did try to invest in a business scheme and probably hoped it would pay off in the end. That, of course, does not justify the misrepresentations he made which made his conduct fraudulent and criminal."  *Id.* at 35-36. Judge Oetken reasoned that in light of these consideration, he "would have been inclined" to sentence Casper to even less than the 18 months imposed notwithstanding the defendant's "brazen and sophisticated" fraud scheme, *id.* at 34, but that Casper's post-arrest and post-plea misconduct warranted a more severe sentence.  *Id.* at 35 ("It's troubling, though, that his continued behavior involved similar fraud schemes and, in light of that, it is harder to take seriously the defendant's expression of remorse at the time of his plea, and the considerations of specific deterrence and protecting the public from criminal conduct become more salient. In addition, the consideration of respect for the law takes on more significance, given his continued behavior before and after his plea of guilty.").

Mr. Sadleir's offense conduct – fraudulently inducing a loan from a major financial institution in a misguided attempt to support his business – is comparable to Casper's, though the loss amount in Mr. Sadleir's case (about $31 million) is smaller than in Casper's ($43.3 million, not including intended loss), and the guidelines range in Mr. Sadleir's case is lower than in Casper's.  And unlike Casper, Mr. Sadleir did not continue any criminal conduct after his arrest, but took responsibility for his conduct promptly and attempted to honestly cooperate with the government.   On the flip side, all of the mitigating considerations cited by Judge Oetken apply with equal or greater force to Mr. Sadleir:  Mr. Sadleir is older, his children are younger, and his history of good works and extensive family support are set out at length above and in the support letters.

While no two cases or defendants are identical, as the cases cited above and the many like them demonstrate, a non-custodial sentence would be neither inappropriate nor create unwarranted sentencing disparities.

### F.    The Need To Provide Restitution

Finally, section 3553(a)(7) directs the Court to consider "the need to provide restitution to any victims of the offense."  Mr. Sadleir has in this case agreed to provide full restitution to the victim of his crime, in the amount of $31,597,000.00.  PSR ¶ 7.[8]

---

[8]    He has also agreed to the entry of an order of forfeiture in the same amount.  In view of the size of the restitution and forfeiture orders, and Mr. Sadleir's ability to pay, the Probation Office recommends that the Court not impose a fine on Mr. Sadleir.  *See* PSR ¶ 150 and pp. 37, 43.  Mr. Sadleir obviously agrees with this assessment, and his ability to pay is even less than as set forth in the PSR.  In particular, the PSR calculates Mr. Sadleir's net worth at $133,294.18, but that figure includes the value ($80,178.00) of a vehicle that Mr. Sadleir has agreed to forfeit to the government, meaning that Mr. Sadleir's net worth is actually more like $53,000, of which only $600 is liquid – and even that assumes that the valuation on the other vehicle is correct, when the Probation Office appears to have used that vehicle's sticker price.  PSR ¶ 146.

The PSR, however, states that "BlackRock through counsel" asserts that the proper restitution figure is $56,466,730, PSR ¶¶ 99-100, and thus the PSR recommends restitution in that amount, PSR at 37.  Mr. Sadleir is not privy to whatever submission BlackRock's counsel may have made to the Probation Office, but the $56 million restitution figure cannot be squared with the acknowledgment by both the government and the Probation Office that Mr. Sadleir "is responsible for a loss of $31,597,000."  PSR ¶ 98.  As best as can be gleaned from the PSR, the $56 million figure either includes a measure of double-counting, or seeks restitution for amounts that BlackRock voluntarily chose to pay its investors to give them not only a return of their full principal but also "a rate of return equal to the return on the other investments in BIT during the period of the Aviron investment," or perhaps both.  PSR ¶ 100.  Should BlackRock and/or the Probation Office persist in requesting more than $56 million in restitution, Mr. Sadleir respectfully requests the opportunity to be heard further after the Court is provided some evidentiary and legal basis for that figure.  But whichever restitution figure is correct – $31 million or $56 million – Mr. Sadleir is committed to doing everything within his power to provide full restitution to the victim of his offense, including, as the Court is aware, consenting to the bankruptcy sale of the house he and his family were living in during the pendency of this case.  [ECF Nos. 73-74.]  Mr. Sadleir has also entered into a consent judgment with the SEC that provides for any appropriate order of disgorgement or civil penalty, including prejudgment interest.

## CONCLUSION

For the reasons set forth above, Mr. Sadleir respectfully submits that consideration of the relevant sentencing factors results in a non-custodial sentence.  A sentence of probation, including a period of home confinement that would allow Mr. Sadleir to continue caring for his

young children as his wife finds a way to support their family, along with community service, would serve as just punishment.

Mr. Sadleir's conduct was wrong, but it was plainly out of character. There is no chance of recidivism. He is deeply ashamed of his conduct and has taken every action to accept responsibility for his crimes, both civilly and criminally, in this case and in California. He has begun to heal the damage that has been caused to his family, who have forgiven and support him. We respectfully submit that sending Mr. Sadleir to prison at nearly 70 years of age, and leaving his wife penniless and needing to support two young boys aged 3 and 5, would impose a punishment that would fall disproportionately on them and would serve no rehabilitative or other legitimate purpose as to Mr. Sadleir.

We therefore respectfully request that the Court impose a substantially below-guidelines sentence.

Dated: June 1, 2022                              Respectfully submitted,


                                                  /s/ Matthew L. Schwartz
                                                 Matthew L. Schwartz
                                                 BOIES SCHILLER FLEXNER LLP
                                                 55 Hudson Yards
                                                 New York, New York 10001
                                                 (212) 446-2300
                                                 mlschwartz@bsfllp.com

                                                 *Attorneys for William Sadleir*

## **INDEX OF EXHIBITS**

A          Letter to the Court by William Sadleir

B          Letter to the Court by Hanan "Hannah" Kadadu, Mr. Sadleir's wife

C          Letters to the Court from Mr. Sadleir's family, friends, and co-workers

D          Proposed Consent Judgment in *SEC v. Sadleir*, No. 20 Civ. 3997 (JGK)

E.          Docket Sheet in *United States v. Sadleir*, No. 20 Cr. 299 (C.D. Cal.)

F.          March 10, 2022 Plea Agreement in *United States v. Sadleir*, No. 20 Cr. 299 (C.D. Cal.)

G.          Health and Medication Summary, printed from MyChart electronic medical records

H.          Sentencing Transcript in *United States v. Casper*, No. 19 Cr. 337 (JPO)