

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 7, 2022

BY CM/ECF

Honorable Paul A. Engelmayer
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

>    Re:    *United States v. William Sadleir*, 20 Cr. 320 (PAE)

Dear Judge Engelmayer:

The Government respectfully submits this letter in connection with the sentencing of the defendant, William Sadleir, which is scheduled for June 14, 2022 at 10:00 a.m., and in response to the defendant's sentencing submission dated June 1, 2022 ("Def. Sub."). The parties agree that the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range applicable to the defendant is 108 to 135 months' imprisonment, and the Probation Department agrees with that calculation, as set forth in the Presentence Report ("PSR"). For the reasons set forth below, the Government respectfully submits that a sentence of approximately 108 months' imprisonment, at the bottom of the Guidelines range, is appropriate in this case.

### The Offense Conduct

William Sadleir was the chairman and chief executive officer of Aviron Pictures, LLC, a film production and distribution company based in Los Angeles, California. Sadleir participated in two fraudulent schemes (together, the "Schemes") relating to an approximately $75 million investment made by the BlackRock Multi-Sector Income Trust ("BIT") in Aviron Pictures, LLC and its associated entities ("Aviron").

In one scheme, the "Advertising Scheme," Sadleir misappropriated millions of dollars in funds that BIT had invested in Aviron. Sadleir represented to BIT that Aviron had in turn invested this money in pre-paid media credits[1] with the media and advertising planning and

---

[1] Pre-paid media credits, also sometimes referred to as "up fronts," are advance commitments by large clients for media advertising over a given period, which a media buyer then purchases in bulk from media outlets, aggregating clients' commitments and usually obtaining a discount based on its market power from such aggregation. Sadleir represented, however, that such

placement company MediaCom Worldwide, LLC ("MediaCom"), which is a subsidiary of the advertising and media agency GroupM Worldwide LLC ("GroupM").  Instead, using the bank account for a sham entity he had created, Sadleir illicitly transferred out of Aviron over $25 million of those funds.  Specifically, Sadleir created a sham New York-based company called GroupM Media Services, LLC (the "Sham GroupM LLC"), designed to pass as GroupM.  He also created a corresponding bank account in the name of the Sham GroupM LLC.  Sadleir then used a significant portion of those illicitly transferred funds for his personal benefit, including to purchase a private residence in Beverly Hills (the "Beverly Hills Residence") for approximately $14 million.  Sadleir then falsely represented to BIT that Aviron had purchased an approximately $28,597,000 balance in pre-paid media credits with MediaCom or GroupM that were available to promote future Aviron films.  He also pledged a portion of those credits to BIT as collateral for additional loans.  In fact, the claimed credits did not exist, and Sadleir misappropriated BIT's funds.

As part of these false representations, Sadleir also created a fake identity of a purported New York-based female employee of the Sham GroupM LLC named "Amanda Stevens," who corresponded with a representative of BIT, assuring BIT that Aviron maintained an approximately $27 million balance in pre-paid media credits with the Sham GroupM LLC.  In fact, Sadleir himself posed as Amanda Stevens when engaging in email exchanges with a BIT representative.

In the other scheme, the "UCC Scheme," Sadleir engineered the illicit and fraudulent sale and refinancing, to a third party, of assets that secured BIT's loans to Aviron.  Those assets were worth an estimated three million dollars, and BIT had placed Uniform Commercial Code ("UCC") liens on the assets.  As part of the UCC Scheme, Sadleir forged the signature of one of BIT's portfolio managers, Randy Robertson, to make it appear that Robertson had authorized the UCC liens to be released from those assets.  Sadleir then sold the assets.

**Procedural History**

On May 22, 2020, Sadleir was arrested on a Complaint in this matter (the "Complaint") charging him with two counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A.  Sadleir was simultaneously arrested on charges brought in the Central District of California for fraudulently obtaining Paycheck Protection Program loans (the "PPP Fraud"), including charges for committing wire fraud, bank fraud, making false statements in connection with loan applications, and money laundering.  In the PPP Fraud, Sadleir obtained funds for his own personal use by misrepresenting that those funds would be used for the business purposes of Aviron entities, and by making false representations about the entities' payroll expenses, number of employees, and operational status.  Sadleir misrepresented that the loan funds would be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, when in truth

---

credits were paid in advance and could be redeemed for specific media advertising at a later time.

Sadleir intended to, and did, misappropriate the loan funds in substantial part for his own personal use and for expenses prohibited by the program.

On June 23, 2020, the grand jury returned Indictment 20 Cr. 320 (PAE), charging Sadleir with the same offenses as the Complaint.

After the Government indicted Sadler, Sadleir's counsel in this matter made several attorney proffers to the Government regarding information Sadleir could provide to the Government. Subsequently, in December 2020, Sadleir attended one proffer session with the Government. In that proffer session, Sadleir did not address the conduct charged in this case, but rather spoke about facts relating to other potentially fraudulent conduct in the film industry. The Government evaluated the information provided by Sadleir, and ultimately determined that it did not appear to concern criminal conduct.

In May 2021, the Government extended a written plea offer to Sadleir, which Sadleir declined to accept. In May 2021, Sadleir moved to suppress the fruits of search warrants (a motion mooted by the Government's election not to use that evidence at trial), *see* Dkt. 32 and 38.

On January 20, 2022, less than one week before trial in this matter was scheduled to begin and after the parties had briefed motions *in limine*, Sadleir pleaded guilty to Counts One and Two of the Indictment pursuant to a written plea agreement (the "Plea Agreement"). The Plea Agreement set forth the following stipulations, resulting in an applicable Guidelines offense level is 31.

- Pursuant to U.S.S.G. §§ 3D1.1(a)(1), 3D1.2(d), and 3D1.3(b), Counts One and Two are grouped together as a single group because the offense level is determined largely on the basis of the total amount of loss or harm.

- The applicable sentencing guideline is U.S.S.G. § 2B1.1. Pursuant to U.S.S.G. § 2B1.1(a)(1), the defendant's base offense level is 7.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), the defendant's offense level is increased by 22 because the offense involved more than $25,000,000 but less than $65,000,000 in intended loss.

- Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), the defendant's offense level is increased by 2 because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

- Pursuant to U.S.S.G. § 2B1.1(b)(17)(A), the defendant's offense level is increased by 2 because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense.

- Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G § 3E1.1(a).

The Plea Agreement states that the defendant did not have any criminal history points at that time, meaning the defendant's Criminal History Category was I.  Those provisions resulted in a stipulated Guidelines range of 108 to 135 months' imprisonment.  The Plea Agreement also provided that Sadleir would pay restitution and forfeiture in an amount of at least $31,597,000, and would forfeit the Beverly Hills Residence and a 2017 Tesla Model X vehicle.

Following his guilty plea in this case, Sadleir pleaded guilty on or about March 16, 2022 in the Central District of California to charges relating to the PPP Fraud.  *See* 20 Cr. 299 (DMG) (C.D. Cal.).  Sadleir is scheduled to be sentenced in that case on or about July 13, 2022.  In light of Sadleir's guilty plea in the PPP Fraud matter (for which he has not been sentenced), he now has one criminal history point, *see* U.S.S.G. § 4A1.2(a)(4), which does not change his Criminal History Category.

## The PSR

The PSR's Guidelines calculation is the same as that set forth in the Plea Agreement. The PSR recommends a sentence of 108 months' imprisonment,[2] at the bottom of the Guidelines range, which aligns with the Government's recommendation.  The Probation Department believes this sentence is appropriate because of Sadleir's "exceptional level of greed and criminality solely for an astronomical personal gain."  PSR at 38.

The PSR also recommends restitution of $56,466,730, based on information provided by BlackRock concerning the amount of BIT's overall losses with respect to its investment in Aviron.  PSR at ¶¶ 99-100. However, the Government submits that the appropriate amount of restitution is $31,597,000, based on (1) the $28,597,000 in assets that Sadleir falsely claimed to have invested with the Sham GroupM LLC; and (2) the $3,000,000 in assets that Sadleir illicitly sold in the UCC Fraud.[3]

---

[2] The PSR also includes as reference to a recommended 120-month sentence; the Government understands that is a typo, and that the Probation Department recommends a 108-month sentence in this case.

[3] The victims of Sadleir's offenses in this matter were BIT and its representatives.  The Government received a letter from an individual claiming to be a victim of criminal conduct perpetrated by Sadleir, who asked that the Government to provide the Court with a copy of the letter.  The Government does not believe that this individual is a victim of the conduct charged in this matter, but nonetheless is providing the letter to the Court so that the Court can make its own assessment.  The Government does not seek to have the Court rely on this letter for the purposes of sentencing here.

## A SENTENCE OF 108 MONTHS' IMPRISONMENT IS APPROPRIATE

A sentencing judge must begin the process of imposing sentence by calculating the applicable Guidelines range. *See United States* v. *Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."); *United States* v. *Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable."). After calculating the applicable Guidelines range, a court may impose a sentence above or below the Guidelines range in order to meet the sentencing goals set forth in Section 3553(a) if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into considering by the Sentencing Commission." 18 U.S.C. § 3553(b)(1). The sentencing goals identified in Section 3553(a) include, among other things, promoting respect for the law, providing just punishment, and deterring criminal conduct. *See United States* v. *Park*, 758 F.3d 193, 197 (2d Cir. 2014) (citing 18 U.S.C. § 3553(a)(2)).[4]

Here, a sentence of 108 months' imprisonment would be sufficient but not greater than necessary to accomplish the goals of sentencing. As discussed in greater detail below, such a sentence is primarily justified because of (1) the brazen and calculated nature of the offense conduct, including the creation of a fake advertising company and fake identity; (2) the lengthy period of time during which Sadleir engaged in fraudulent conduct; (3) the fact that Sadleir obtained extravagant personal benefits from his fraud, including the Beverly Hills Residence; (4) Sadleir's prolific and diverse fraudulent conduct, encompassing not just the two separate fraudulent schemes charged in this case but several other frauds committed during approximately the same time period; and (5) Sadleir's tremendous personal privilege, including degrees from prestigious universities, employment in multiple executive positions, and role as a personal aide to a U.S. president.

### 1. Sadleir's Fraud Was Brazen and Calculated

Sadleir's fraudulent conduct here was brazen and calculated. This was not a case in which he fudged a few numbers. Rather, Sadleir fabricated an advertising company and then masqueraded as a female advertising executive on maternity leave. The fraud involved the filing

---

[4] The full set of factors outlined in Section 3553(a) are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, namely the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7).

of corporate registration documents for a sham company whose name was specifically chosen to deceive; the establishment of a bank account in the name of the sham company; the drafting of fake invoices; the creation of a website for the sham company; and sending a number of lengthy emails from Sadleir's fake "Amanda Stevens" persona that provided elaborate, Kafkaesque explanations about Aviron's pre-paid media assets in response to refund requests, coupled with references to "Stevens" being on maternity leave and attending a baby shower. An example of one such email exchange, Government Exhibit 609, is attached. Sadleir spun an elaborate web of lies, and his sentence should take the nature of his conduct into account.

### 2. Sadleir Committed Fraud Over the Course of Years

Sadleir engaged in a concerted pattern of fraudulent conduct over the course of approximately three years. This was not a temporary lapse in judgement. Sadleir created the Sham GroupM LLC and a bank account in the sham company's name in 2016, approximately one year after BIT first provided funding to Aviron. PSR ¶¶ 20-23. Thereafter, in or about 2016 and 2017, Sadleir diverted approximately $28 million to the Sham GroupM LLC. Then, in 2019 and 2020, Sadleir corresponded with BIT and Aviron's new management using Sadleir's fake "Amanda Stevens" persona. *See, e.g.*, PSR ¶¶ 54, 57-59, 62, 68-76. Also in 2019, Sadleir forged the signature of a BIT representative as part of the UCC Fraud, in order to illicitly sell off Aviron assets. PSR ¶¶ 90, 94. In other words, Sadleir's fraud spanned years, and its duration counsels in favor of a significant sentence.

### 3. Sadleir Obtained Extravagant Personal Benefits From His Fraud

Sadleir obtained extravagant personal benefits from his fraud. He purchased the Beverly Hills Residence for approximately $14 million and a Tesla vehicle for approximately $127,000. PSR ¶¶ 28-31, 33, 35-38. The nominal owner of the residence was an entity controlled by Sadleir called Temerity Trust Management, LLC. In his sentencing submission, Sadleir refers to the purchase of the Beverly Hills Residence as an investment in "valuable Los Angeles real estate," Def. Sub at 12. But the evidence indicates that far from being some sort of business investment, the Beverly Hills house was purchased to be the personal residence of Sadleir and his family, who spent tens of thousands of dollars in Aviron funds on interior décor for the house. Emails from Sadleir with his interior decorator are attached as Government Exhibits 339 & 340, and the interior designer's final bill is attached as Government Exhibit 337. Sadleir's use of investor funds to pay for such an extravagant residence undermines his contention that his lies were "[n]ot to personally enrich himself, but to try to avoid the collapse of his business, the loss of dozens of jobs and tens of millions of dollars in third-party investment, and the devastation of his young family" Def. Sub. at 1.

Sadleir cites cases in which other defendants in this District who participated in significant financial frauds have received sentences below the Guidelines range in this case. But there are also many examples of defendants in this District who participated in such frauds receiving substantial sentences. *See, e.g.*, *United States v. David Hu*, 20 Cr. 360 (AKH) (perpetrator of $120 million fraud sentenced to 12 years' imprisonment); *United States v. Pedro Jaramillo*, 17 Cr. 4 (LTS) (perpetrator of $1.2 million fraud sentenced to 12 years'

imprisonment); *United States v. Ruless Pierre*, 19 Cr. 783 (SHS) (perpetrator of frauds with over $2 million in losses sentenced to seven years' imprisonment); *United States v. Sharma*, 16 Cr. 371 (LGS) (mastermind of $25 million fraud sentenced to eight years' imprisonment); *United States v. Borland*, 18 Cr. 487 (KPF) (perpetrator of $26 million investment fraud scheme sentenced to seven years' imprisonment).

Sadleir places particular emphasis on Judge Oetken's imposition of an 18-months sentence of imprisonment in *United States* v. *Capser*, 19 Cr. 337 (JPO). As an initial matter, the Government in *Capser* sought a "significant term of imprisonment in the vicinity of 84 months," and the Probation Department also recommended an 84-months sentence, although Judge Oetken ultimately did not adopt those recommendations. 19 Cr. 337, Dkt. 54 at 10. In any event, the facts in *Capser* differ from those in this case in several material ways. First, the fraud in *Capser* involved misrepresentations to obtain loans for two chemical and oil tankers that were actually purchased for business purposes (and that were later seized by the defrauded lender, substantially mitigating their losses), as opposed to misrepresentations for the purposes of personal enrichment and extravagant spending as in this case. In *Capser*, Judge Oetken found that the defendant "likely acted out of desperation, and he likely did not intend to simply abscond with tens of millions of dollars from the victim." 19 Cr. 337, Dkt. 60, at 35-36. Sadleir, on the other hand, did in fact intend to simply abscond with millions of dollars to fund his purchase of a $14 million Beverly Hills estate. Second, the defendant in *Capser* also had a number of serious medical conditions, including one which required the surgical implantation of a device in Capser's brain. *Id.* at 11. In short, *Capser* is easily distinguishable from this case.

### 4. Sadleir Engaged in a Prolific and Diverse Array of Fraudulent Conduct

Although Sadleir did not have any criminal history at the time of his arrest in this case, he nonetheless engaged in a prolific and diverse array of fraudulent conduct between 2016 and 2020, encompassing not just the two separate fraudulent schemes charged in this case but at least two other frauds committed during approximately the same time period.

After Sadleir was forced out of Aviron due to the discovery of the UCC Fraud, he fraudulently obtained $1.7 million in loans under the Paycheck Protection Program (PPP) for Aviron entities. Sadleir obtained the loans for three Aviron entities by falsely representing that the funds would be used to support payroll expenses for 33 employees at each company. Within days of the loans being funded on May 1, 2020, Sadleir transferred nearly $1 million of those funds to his personal checking account. Sadleir expended a substantial amount of the fraudulent loan proceeds on utility bills, mortgage expenses, and his personal attorney, among other things, and did not use any of the fraudulent loan proceeds to pay Aviron employees.

The PPP Fraud is an important consideration for sentencing here because it was committed after Sadleir had already been caught committing the UCC Fraud. It thus demonstrates the need for a significant sentence to deter Sadleir from future crimes. Being caught committing the UCC Fraud could have served as a wake-up call for Sadleir, but it clearly did not have that effect. Moreover, the conduct demonstrated a callous indifference to the critical need that legitimate businesses had for PPP funds during some of the most difficult days of the

COVID-19 pandemic.  Prosecutors in the Central District of California have agreed to recommend that whatever sentence is imposed in the PPP Fraud case run concurrently with the sentence imposed by the Court in this case.  Accordingly, this Court should consider the PPP fraud as an aggravating 3553(a) factor in imposing sentence in this case.

Additionally, as discussed in the Government's motions *in limine*, Dkt. 56, Sadleir defrauded Cairn Capital ("Cairn"), a London-based alternative credit asset manager.  Sadleir defrauded Cairn by providing false performance data to Cairn regarding the performance of the movie *Serenity* and thereby triggering a contractual right to a three-million-dollar payment to which Sadleir was not entitled (the "Cairn Fraud").  The Government uncovered the Cairn Fraud in the course of investigating the UCC Fraud, and the facts of the two frauds are intertwined. Cairn had provided approximately $20 million in principal lending to Aviron, which proceeds were to be applied toward a movie Aviron was to distribute, *Serenity*.[5]  The release of the loan's three-million-dollar final advance was conditioned upon *Serenity* achieving certain agreed-upon performance metrics.  Sadleir provided Cairn with performance reporting documents from a third party, National Reporting Group, that fabricated the metric that *Serenity* had achieved (suggesting it had satisfied the contractual requirement), in order to induce Cairn to release the final advance.  That email from Sadleir and its attachment is appended as Exhibit 1607.  Cairn later received the reporting directly from National Reporting Group; that reporting had a significantly lower rating than the agreed-upon metric.   An email from National Reporting Group with legitimate data (prior to its being doctored by Sadleir) is attached hereto as Exhibit 1702.  After investigating the matter, Cairn circulated a draft complaint to Aviron and demanded repayment of the final advance as fraudulently obtained.  Ultimately, in May and June 2019, the parties reached a settlement, in which Aviron agreed to repay Cairn the three million dollars of the final advance (the "Settlement Payment"), in return for Cairn's agreement not to file suit. Purely Capital Alpha Limited ("Purely Capital") made the Settlement Payment to Cairn.  Purely Capital was the recipient of Sadleir's illicit and fraudulent sale in July 2019 of certain assets worth an estimated three million dollars that secured BIT's loans to Aviron – the conduct at issue in the UCC Scheme.  In other words, Sadleir engaged in the UCC Scheme in order to generate the money he owed for having defrauded Cairn.

The Government respectfully submits that the Court should consider the Cairn Fraud as relevant under the Section 3553(a) factors, and specifically in response to Sadleir's emphasis in his sentencing submission on his lack of criminal history and the claimed absence of a need for specific deterrence.  The Cairn Fraud provides another data point evidencing Sadleir's willingness to lie and cheat when it serves his ends, and undermines the defense claim that "the conduct at the heart of these cases is deeply out of character" for Sadleir.  Def. Sub. at 1.

## 5. Sadleir's Personal History and Position of Privilege

Sadleir has led an extraordinarily privileged life.  He is by all accounts intelligent and charismatic, and possesses a resume that includes a degree from Harvard Business School.  He served as a special assistant and director of presidential appointments and scheduling to a sitting

---

[5] The loan was secured by, among other things, the Beverly Hills Residence.

Case 1:20-cr-00320-PAE   Document 81   Filed 06/07/22   Page 9 of 10

U.S. president in the early 1980s, and has held senior leadership positions at a variety of businesses. He also has a loving and supportive family, as demonstrated by the letters submitted along with his sentencing submission. In short, Sadleir could have lived an amply comfortable life without resorting to fraud. That fact is relevant to sentencing for at least two reasons. First, it demonstrates the degree to which greed motivated Sadleir's actions, as opposed to financial desperation or some other motive. Second, it is important for the public to see that defendants of wealth and privilege are held to account for serious criminal offenses, in order to promote respect for the criminal justice system. Although the offense conduct here would be egregious regardless of the defendant's background, Sadleir's conduct is all the more shocking because of his position of immense privilege. For a defendant with so much support and success—unlike many disadvantaged defendants that come before the Court—to nevertheless choose to commit the charged offenses reflects an uncommon brazenness and greed.

Sadleir's age and health do not warrant the dramatic downward variance from the Guidelines range that he seeks. The fact that Sadleir committed this offense in his 60s was his choice, after building, by his own account, a life of personal and business success. Part of the consequences of choosing to engage in such a crime, with the benefit of years of experience that likely lent him increased credibility in his business dealings with BIT, Cairn, and others, is that incarceration may be more difficult for him than for a younger person. There is no reason to believe that his health concerns cannot be addressed while he is in custody just like they are for many other incarcerated defendants.

Sadleir seeks a non-custodial sentence of home confinement, but such a sentence would send the wrong message to both the defendant and the public about the consequences for a well-connected CEO perpetrating a substantial fraud and stealing company and investor funds. Individuals who commit fraud often do so on the basis of a cost-benefit analysis—a belief that the likelihood of financial gain outweighs risk of being caught and punished. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). In this context, a significant deterrent message to the defendant and public is necessary.

## **Conclusion**

For the reasons set forth above, the Government respectfully submits that a sentence near the bottom of the Guidelines range, of approximately 108 months' imprisonment, is appropriate in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:      _____/s/_____

Jared Lenow / Elizabeth Hanft
Assistant United States Attorneys
(212) 637-1068 / -2334

cc: Matthew L. Schwartz (counsel for defendant)