WILLIAM SADLEIR
Federal Register Number: 79460-112
FCC Lompoc Satellite Camp
3705 West Farm Road
Lompoc, California 93436-2756

August 7, 2023

Clerk's Office
United States District Court
Southern District New York
500 Pearl Street
Room 120
New York, New York 10007-1312

Re:  **MOTION FOR REDUCTION OF SENTENCE**
     <u>UNITED STATES v. SADLEIR,</u>  20 Cr. 520 (PAE)

Dear Clerk:

   Enclosed you will find the above referenced Motion.  I am
a federal prisoner without counsel.  I do not have access to
PACER or the internet to look-up the local rules for the Court,
or to obtain any other documents that may be required to be
submitted with my Motion.


   Therefore, I am requesting your assistance in filing my
Motion or to be provided such documents with instructions,
should such be required.


                         Sincerely,


                         William Sadleir,
                         Defendant.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------x
                            :
UNITED STATES OF AMERICA
                            :
            -v.-                    20 Cr.320(PAE)
                            :
WILLIAM SADLEIR,
                            :
            Defendant,
                            :
----------------------------x


## MOTION FOR REDUCTION OF SENTENCE
## Pursuant To 18 U.S.C. § 3582(c)(1)(A)


WILLIAM SADLEIR
Fed. Reg. No.: 79460-112
FCC Lompoc Satellite Camp
3705 West Farm Road
Lompoc, California  93436-2756

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------x
                              :
UNITED STATES OF AMERICA      :
                              :
            -v.-              :          20 Cr.320(PAE)
                              :
WILLIAM SADLEIR,              :
                              :
            Defendant,        :
                              :
-----------------------------x

### MOTION FOR REDUCTION OF SENTENCE
#### Pursuant To 18 U.S.C. § 3582(c)(1)(A)

WILLIAM SADLEIR
Fed. Reg. No.: 79460-112
FCC Lompoc Satellite Camp
3705 West Farm Road
Lompoc, California  93436-2756

## MOTION FOR REDUCTION OF SENTENCE

Defendant William Sadleir, a federal prisoner without counsel, moves this Honorable Court on his Motion For Reduction Of Sentence Pursuant To 18 U.S.C. § 3582(c)(1)(A).

This motion is based on the attached Memorandum of Points and Authorities, Accompanying Exhibits, the Files and Records in this case, and other such evidence or argument as may be required by the Court.

In support of granting Defendant's sentence reduction the following is stated:

Respectfully submitted,

Dated:

William Sadleir,
Defendant.

-2-

MEMORANDUM OF POINTS AND AUTHORITIES

## I. SUMMARY OF MOTION

First, Defendant contends and the facts support that
there was insufficient evidence to convict him of wire fraud
under 18 U.S.C. § 1343's elements set forth in counts one and
two of the indictment.

Second, evidence was withheld as to the actual loss
used to calculate the sentence, when the government knew or
should have known that the restitution order exceeded the
court's authority under 18 U.S.C. § 3663(a)(1), which
authorizes district courts to order restitution only for
losses traceable to a defendant's offense of conviction.

Third, consideration should be given to Defendant's
deteriorating health conditions from prostrate cancer and
the Federal Bureau of Prison's (BOP) failure to provide
adequate treatment and care required for his cancer.

The Supreme Court has held in Concepcion v. United States,
142 S. Ct. 2389 (June 27, 2022) that the First Step Act
allows district courts to consider evidence of rehabilitation,
disciplinary infractions or unrelated Guideline changes. Id.,
at 2401-02, 2404 (holding that the First Step Act allows

-3-

district courts to consider intervening changes of law or
fact in exercising their discretion to reduce a sentence
pursuant to the First Step Act."). Concepcion allows the
opening of a closed case.

## II. BACKGROUND

### 1. Procedural History

On or about June 23, 2020, Defendant was charged in a
three count indictment with two counts of wire fraud in
violation of 18 U.S.C. § 1343, counts one and two. Count
three charged aggravated identity theft in violation of
18 U.S.C. § 1028A(c).

On or about January 18, 2022, the government made a
plea offer and on that same day, Defendant, on the advice of
counsel, accepted the written plea.

On January 19, 2022, Defendant changed his plea to
guilty to counts 1 and 2 of the indictment and continued his
release on bond.

On September 9, 2022, Defendant was sentenced to 72
months in prison with 3 years supervised release. An Order
of Restitution was entered by the Court [Dkt.84] in the
amount of $31,597,000. On the same day Judgment was entered.
[Dkt.87].

-4-

Defendant was ordered to self-surrender to the Bureau of Prisons. [Dkt.93].

There was no direct appeal or post-conviction filings.

Sometime in December 2022, Defendant became aware that victim was made whole.

With these new facts known, Defendant files this motion on the grounds set forth herein.

## 2.   Pertinent Facts

### A. Parties

Defendant was the Chairman and Chief Executive Officer of Aviron Group, LLC., which included two operating subsidiaries, Aviron Pictures and Aviron Capital, film production and distribution companies, (collectively herein "Aviron") based in Los Angeles, California.  Aviron had a picture distribution financing relationship with the world's largest and most influential asset managers, BlackRock, through its publicly traded company BlackRock Multi-Sector Income Trust ("BlackRock" or "BIT").

//

//

//

**B.   Terms**

BlackRock set forth the terms of the financing to be a
loan of which would be collateralized through the filing of
a Uniform Commercial Code ("UCC") instrument.  Each film
for which funding would occur was secured by the actual film
copyright, equal to the amount actually funded, plus fifteen (15)
percent interest.  All proceeds were deposited into a lockbox
with Fintage, a third-party collection manager.  Fintage would
issue a "waterfall" statement to all the parties disclosing
the distribution of all proceeds.  The proceeds flowed as
follows: first [1] to BlackRock, second to Aviron, and third
to producers.

**C.   Additional Security**

On or about July 17, 2017, Defendant procured a surety
bond which provided a guarantee to pay the full amount loaned,
including interest, in the event of a default by Aviron.
BlackRock negotiated the terms and accepted the surety bond.
Further, because BlackRock was no longer at risk for the loan,
the interest rate was reduced to five (5) percent.

---

1.    In some cases, a "Box Office Bonus" is paid to the movie
      talent first, which is pre-approved by BlackRock before
      funding.

//

//

//

**D.  Funding and BlackRock Involvement**

On or about October 2015, BlackRock loaned $12 million at an interest rate of fifteen (15) percent for the movie "My All American" secured by a UCC filing.  Two BlackRock executives were assigned to the Aviron account, Randy Robertson and Mark Volosov, both Managing Partners.  Robertson and Volosov were responsible for directing the funding.

However, Robertson and Volosov became enamored of the movie business, and began to pressure Defendant into making certain business decisions in which they had no experience. For example, Robertson insisted, as part of the ongoing financing, to have his daughter, an aspiring actress, appear and receive a credited role in an approved Aviron film.

Sometime after October 2015, the BlackRock executives Robertson and Volosov agreed to increase the Aviron loan package by an additional $20 million.  The $12 million "My All American" feature film was then rolled into the amended loan agreement.  The film was released in November 2015.

In July 2016, Robertson and Volosov requested to review a list of 13 possible films in production that Aviron was considering to acquire, upon completion, for theatrical distribution in the United States.  One of those films was

"Drunk Parents" staring Alec Baldwin and Salma Hayek, which Volosov pressured Aviron to pursue.  Volosov was starstruck by Salma Hayek and stated that "Salma Hayek is my hall pass. I'd love to meet her at the set and at the premier."  Because Robertson and Volosov were in control of the money and if Aviron wanted to proceed with new projects, Defendant felt an involuntary obligation to have to accept Volosov and Robertson's unsolicited direction.  Volosov insisted that Defendant proceed to acquire the distribution rights to "Drunk Parents."  Once Defendant made the deal to acquire the film, Volosov was not able to fund the initial required amount for "Drunk Parents," to acquire the film.  Volosov continued to pressure Defendant which forced him to obtain a $5 million dollar bridge loan, guaranteed by BlackRock as part of the October 2016 amendment to the original BlackRock loan agreement.

To further illustrate the lender and borrower relationship specifically, BlackRock Managers Robertson and Volosov made the following requests, promises and demands from Defendant:

1.  Very first meeting in LA, Randy Robertson and Ibrahim Incoglu, along with Robertson's youngest daughter, Rebecca, along with several Aviron senior executives. Robertson asks Aviron to explore possible job opportunities for Rebecca at Aviron, since his daughter lives in LA and is an aspiring actress. Robertson expressed that his daughter had stronger financial aptitude than acting skills, and asked the executives at Aviron to keep her in mind for a position at Aviron, possibly in the finance department.

2.   Aviron's President, David Dinerstein, subsequently
     arranges for Rebecca to meet with famed casting
     director, Bonnie Timmermann, in New York, along with
     other casting directors, to assess the caliber of
     Rebecca's acting talent.

3.   Aviron continues to explore acting roles for Mr.
     Robertson's daughter, Rebecca, primarily with
     speaking parts, so she can qualify for a Screen
     Actors Guild Card, which includes favorable health
     insurance, and acting roles exclusive to SAG members.

4.   At Robertson's request, Rebecca is invited to the
     premier of "Kidnap" in both LA and New York, and
     time is arranged for Rebecca to spend one-on-one
     time with "Kidnap's" star, Oscar-winning actress
     Halle Berry on the red carpet.  BlackRock's Chloe
     Jacobs requests that a list of BlackRock executives
     be invited to the NY premier of "Kidnap".  Aviron
     complies.

5.   Rebecca is cast in a minor role in the feature film
     "After" based on the best-selling young adult novel.
     In order to earn her SAG card, her role is upgraded
     to a speaking role.  Aviron pays the travel and
     lodging costs for Rebecca to go to the set in Georgia
     (the production did not budget for her travel and
     expenses, as it would normally just cast an actress
     already living in Atlanta for the role).

6.   Rebecca is given a prominent position at the red-
     carpet premiere of "After" in LA, along with the
     lead actors.  Randy Robertson and a guest are invited
     to the premiere of the film.

7.   Randy Robertson and one of his girlfriends, along
     with Mark Volosov and his "colleague" from BlackRock,
     Chloe Jacobs, attend the New York premiere of
     "Serenity" as well as the after-party with the stars
     of the film, Anne Hathaway and Matthew McConaughy.

8.   Each year, Mark Volosov requests, on behalf of his
     BlackRock "colleague" Chloe Jacobs, that Aviron
     arrange for Chloe and three of her friends to be
     invited to various VIP parties at the Sundance Film
     Festival in Park City, UT.  Aviron arranges
     invitations to events and parties, as requested.

9.    Mark Volosov, in an effort to impress his two young teenage daughters, asks that Aviron arrange a personalized video message to his daughters from "The Strangers" actress, Bailee Madison. Bailee Madison also offers to Face-Time Volosov's daughters, which the young girls were thrilled to do.

10.   Mark Volosov, in reviewing a slate of possible Aviron films, enthusiastically encouraged Aviron to acquire the rights to "Drunk Parents" claiming that its female lead, Salma Hayek, was his "hall-pass" and that he wanted to meet her. Volosov's direction to acquire the rights to "Drunk Parents" was at the exclusion of of other film acquisitions that Aviron favored and recommended, like "The Big Stick," which ultimately was very successful for its distributor.

11.   When the producers of "Drunk Parents" failed to deliver the completed picture to Aviron, after having been paid over $4m for the distribution rights, Volosov promises attorney Betty Schumener that BlackRock, not Aviron, would pay all of her firm's legal expenses to pursue legal remedies against the "Drunk Parents" producers. Vosolov subsequently claimed that he never made that promise, although e-mails and phone conversations prove otherwise. Schumener sued BlackRock for reimbursement of close to $1m in unpaid legal expenses. BlackRock ultimately pays Schumener in a settlement.

12.   Mark Volosov induced Aviron to repay the "My All American" related loan balance (approx. $11m), before maturity, by promising access to the $12m of credit available on the $75m facility, guaranteed by CBL Insurance. Once the MAA loan was repaid, BlackRock blocked Aviron's efforts to access additional funding for upcoming film releases.

13.   Mark Volosov asks Aviron to arrange a private screening of "After" for his two daughters, months before the official theatrical release date. Following the screening, his daughters were so enthusiastic that Mark, uncharacteristically, encouraged Aviron to acquire and release the film, and that BlackRock would make available $10m, provided the loan was personally guaranteed by Defendant, and by Temerity Trust Management, LLC.

//

//

14.   When presented with the opportunity to have BlackRock's
      entire $75m loan guaranteed, along with any interest,
      BlackRock claims to have done its due dilligence on
      the credit worthiness of CBL Insurance.  In retrospect,
      it appears that BlackRock simply looked at the AM Best
      rating and concluded that it was a valuable guarantee.
      A company as large as BlackRock should have been
      aware of the looming risk.  Less than a year after
      the CBL guarantee was issued, the insurance company
      was put into liquidation by New Zealand regulators.

15.   Rather than immediately making a claim on the policy,
      for which Aviron had paid almost $2m in premiums,
      BlackRock has taken no action to make a claim for the
      benefit of the fund investors.

16.   Aware that Aviron needed additional funding to expand
      its portfolio of film and correspondingly reduce
      performance risk, BlackRock's Volosov and Robertson
      hosted a meeting at BlackRock's New York headquarters
      with prospective investors in Aviron.  White Horse
      Capital, looking to loan as much as $100m, were told
      by BlackRock's executives that they were very impressed
      and that the executives had learned valuable lessons
      from the underperformance of some of its films and
      made corrections to its risk management protocols.
      When asked by White Horse executives why BlackRock
      just didn't provide more capital to help Aviron expand,
      Robertson responded, "well, we probably will once our
      new fund is launched."  The White Horse executives
      left impressed by BlackRock's support, but dissuaded
      by the prospects of either co-investing with BlackRock
      or being excluded by BlackRock from participation.
      For White Horse, being the lead and the size of the
      loan are important factors.

17.   Following the White Horse Meeting, Defendant followed
      up with Robertson about his offer to provide additional
      funding.  Robertson gave Defendant a draft of the
      marketing materials prepared to raise another $1B fund,
      BlackRock Mortgage Investors II(BMI).  Following the
      positive discussion with Robertson, Aviron proceeded
      to expand its operations by taking over the available
      lease on the other half of the floor, and sought to
      hire executives with experience in film production,
      as well as marketing.

//

//

//

18.   Aware that Aviron had pledged the real estate
      collateral to Cairn for the "Serenity" loan that
      was maturing in mid-December, Robertson made an
      introduction to Jonathan Spira at Chase's Real
      Estate Group, to provide mortgage financing to solve
      the looming problem with Cairn.

19.   Defendant stopped seeking expansion funding from
      other sources and met in late August in New York
      with Randy Robertson.  During the breakfast meeting
      at the Baccarat Hotel in mid-town, Robertson
      suggested the terms -- $100m, at 8% interest, paid
      quarterly, possibly with warrants.  Robertson claimed
      to have soft commitments for about $200m, which is
      always the hardest part of fundraising, and that he
      would share the Private Placement Memorandum ("PPM")
      once Sidley Austin had completed it - "in about two
      weeks."  Robertson capped the Aviron funding at $100m
      because he said that he could not commit more than
      10% of the fund to one investment - a concentration
      issue.  Originally, the proposed structure was that
      BMI could only buy existing loans, but subsequently
      changed that requirement so that BlackRock could
      initiate a loan with Aviron.  He also suggested that
      if Aviron needed the full $150m that the company was
      seeking, that BMI could take the lead on $100m and
      let another lender participate.  "Lots of lenders
      will derive comfort with BlackRock in the lead," he
      reassured.

20.   Mark Volosov used the issuance of the BMI PPM and a
      funding commitment as an inducement for Aviron to pay
      the balance owed on the "After" loan.  As usual, the
      "committee" was putting pressure on Volosov, who
      almost daily was putting pressure on Aviron.  Volosov's
      constant refrain was, "Get "After" paid off.  Get the
      committee off my back, and we can continue to be good
      partners and make a lot more money available to you."

21.   Both Robertson and Volosov visited the Aviron offices
      in LA in early October to discuss with Aviron's senior
      management the proposed $100m funding by BMI.
      Encouraged, Aviron's acquisition team began reviewing
      acquisition opportunities with renewed enthusiasm.
      Volosov and Robertson promised that the BMI PPM would
      be available "any day now."

//

//

//

22.     As the weeks passed without a PPM, Defendant decided
        to continue the quest for funding from sources other
        than BlackRock.  At the invitation of the Chairman
        of the Finance Committee of Qatar's Shura Council,
        (legislature), Defendant met in early December with
        various lenders in Qatar, and received a soft funding
        commitment for $150m.  Qatar Sovereign Wealth Fund
        expressed disinterest in investing alongside BlackRock,
        believing BlackRock supported UAE's blockade of Qatar.
        That same day, Defendant was notified that he was being
        removed as the Manager of Aviron Pictures and Aviron
        Capital, and its subsidiaries, as was BlackRock's
        right in the event of a default.  The action
        referenced the copy and paste incident.

23.     BlackRock, on or about December 20, 2019, filed an
        injunction against Defendant falsely alleging Defendant
        received $3 million dollars from Purely Capital
        proceeds for personal use.

24.     BlackRock subsequently failed its fiduciary duties
        in winding down the affairs of Aviron.

//

//

//

-13-



-14-

**E.   Repayment Protections**

Defendant set up repayment protection on every loan-film funding as follows:

A)   All film exploitation revenues, from all sources, (i.e. theaters; home entertainment - Universal; streaming - Netflix) were directed (by contract - "directions to pay") into a third-party managed collection account for each film, and that bank account was further secured by a "Deposit Account Control Agreement" (DACA) which gave BIT the right to access or seize the account with a simple notice to the bank.

B)   Further, funds in the collection account were disbursed by Fintage, the third-party manager, in accordance with a "waterfall" signed by all parties (the producers, Aviron, BIT).  The order of disbursement always put BIT in first position (except for Guild/union royalty payments to talent) to collect "P&A" funds disbursed for the film.

Additionally, Aviron also established a "DACA" interest reserve bank account wherein two quarterly payments of the interest amount were held on deposit, and controlled by a "DACA".  In accordance with the "DACA", no funds could be withdrawn without BIT's signed authorization.

-15-

**F.  Aviron's Asset Purchase**

Aviron's release of "My All American" did not produce the
distribution income sufficient to cover the operating expenses
to repay the $12 million BlackRock loan.

When BlackRock directed Aviron to acquire the distribution
rights to "Drunk Parents", it did so by securing a $5 million
dollar  bridge loan from the UK-based The Fyzz Facility, which
was to pay Bron, the Vancouver, Canada-based production company
of "Drunk Parents", the required minimum guarantee.  BlackRock
agreed to guarantee the bridge loan with the understanding that
it would ultimately loan $20 million for the release of the
film.  The $20 million included the repayment of the bridge loan.

When BlackRock loaned Aviron the $20 million, Bron required
Aviron to evidence that it had segregated the funds for Print
and Advertising ("P&A") for the film and to allocate such funds
to the advertising.  At the time, Aviron used the ad agency
MediaCom.

Aviron was unimpressed with the past result's of MediaCom's
advertising campaign for "My All American."  Aviron was in the
process of changing agencies, a sometimes involved process of
interviewing alternative agencies.  One such prospective
replacement ad agency was MediaStorm.

To comply with Bron's contractual requirements and not to force Aviron to make a premature decision about the choice of ad agancy, Aviron created a new in house ad agency company under Aviron's parent company, Temerity Trust Management, LLC. The new ad agency company was named Group M Media Services, a Delaware Limited Liability Company.  To assist in the media purchases for the film, Aviron transferred the proceeds in the Group M Media account for the purpose of satisfying Bron's contractual advertising funds set-aside requirements for the marketing and release of "Drunk Parents."

Bron missed the delivery deadline and continued to re-edit the film because it consistently tested poorly with sample audiences.  Bron could not promise a delivery date after missing the deadline.

Bron was once more delinquent with the film's delivery.  In October 2017, Aviron's parent company purchased a $14 million dollar real estate investment in Beverly Hills, CA.  This asset was provided as collateral or as a credit enhancement, the same model as Meghan Ellison (Larry Ellison's daughter – Oracle) who owned a competitive film distribution company.  At this time the real estate market increased approximately fifteen (15) percent/per anum.  Under Ellison's model, and followed by Aviron, the cash purchase of the real estate, as compared to bank interest of less than 2%, was used as collateral.

-17-

Defendant personally invested $150,000 for home improvements (landscape and interior improvements) and personally paid $170,000 in yearly property taxes, each year held, as rent ($14,000 per month).  Aviron then pledged that real estate to First Republic Bank as collateral to pay off the loan for "My All American," which BlackRock received.

BlackRock knew about and approved the real estate investment. Randy Robertson thereafter arranged a meeting with Jonathan Spira, of Chase's Real Estate Group, to facilitate a refinance of the Beverly Hills real estate investment.  Though the Chase refinance did not go through, Aviron repaid First Republic Bank from subsequent film distribution income.  Thereafter, the real estate was again used as collateral to secure a loan  for the film "Serenity."  The distribution fee income from "Serenity" would have allowed Aviron to stay current on its interest payments to BlackRock and to pay down the loan.

//

//

//

## G.  Uniform Commercial Code Liens

As previously set forth herein, BlackRock pressured Aviron to pay down the debt more quickly when the reliability of the CBL Insurance Surety Bond became questionable.  In December 2018, Defendant found a UK-based buyer, Purely Capital, to acquire a bundle of receivables from various Aviron film releases.  BlackRock approved the transactions.  Robertson signed the UCC releases on or about December 24, 2018. BlackRock's attorney, Sidley Austin, forwarded the signed UCC's to Aviron's counsel, Paul Hastings, to be released upon completion of the receivable's funding.  Purely Capital's funding source withdrew and the transaction did not conclude.

During the first half of 2019, BlackRock continued to pressure Defendant to sell the bundle of receivable's and pay down the BlackRock loan.  In July 2019, Purely Capital returned with a different funding source, ready to complete the previously approved receivable's sale.  Defendant called Volosov at BlackRock's New York office, informing Volosov that Robertson needed to re-sign the UCC's.  Volosov told Defendant that Robertson, age 56, was "out of the country having a fling with his 22-year old college student girlfriend" and could not be disturbed.

//

//

//

Volosov's solution was to swap out the signature pages.
BlackRock's attorney, Sidley Austin, suggested the same
approach to Aviron's counsel, Paul Hastings.  It was then
realized that solution was not feasible because the new lender
was different than the previously signed lender.

Volosov then instructed Defendant to copy Robertson's
digital signature and paste it to the new document, because
Robertson had personally approved any new transactions on
similar terms.  The transaction closed in mid July, 2019.
The funding totalled $3.2 million, of which $3 million went
to pay Cairn Capital, who previously provided a loan to Aviron
for the film "Serenity."  Aviron used the $200,000 to pay legal
and transaction closing expenses.  These transactions were fully
disclosed and reflected in Aviron's financial statement sent to
BlackRock in September 2019.  BlackRock's attorney, Sidley
Austin, acknowledged being provided a complete accounting
statement in February 2020.  The $3 million was paid to Cairn
and not to BlackRock because the payment offset $3 million that
was diverted by MediaStorm from Cairn Capital's $22 million loan
for "Serenity."  MediaStorm had incurred $3 million of accrued
expenses for previous films that BlackRock failed to timely fund.

Due to BlackRock's delays, combined with the growing number
of attractive film opportunities being lost to these funding
delays and Robertson and Volosov's interference in the operation

Defendant sought alternative funding possibilities, including a proposed offer from various lenders in Doha, Qatar.

On December 16, 2019, after successful fundraising meetings, Defendant e-mailed Robertson and Volosov from Doha, updating them on the successful meetings.  Defendant requested that BlackRock be patient and allow the Doha financing to proceed, to retire BlackRock's loan in full.  Additionally, Defendant informed Robertson that Purely Capital was prepared to acquire receivables for the film "After," a point of angst for Robertson and Volosov, since the "After" film had matured and BlackRock's credit committee and legal department was pressuring Volosov.

Within a couple of hours of sending the e-mail to Robertson and Volosov about the fundraising success in Doha, Qatar, BlackRock's counsel sent an e-mail to Defendant, through Aviron's counsel, Paul Hastings, informing Aviron that BlackRock was exercising its rights and taking over Aviron Capital (the borrower) and the operating affiliates, Aviron Pictures, by seeking an injunction in the New York courts. This public action undermined Aviron's fundraising initiatives in Qatar and was contrary to BlackRock's best interest.  The related publicity ruined Aviron's standing in the film community and its ability to attract quality productions from experienced producers.

BlackRock fraudulently misrepresented to the New York court, in seeking their injunction, the facts surrounding the UCC releases and who benefitted financially from the transaction. BlackRock knew the truth but represented otherwise to the court, leaving Aviron without a manager for several weeks.  BlackRock hastily took the injunction action knowing that Defendant was in Qatar and could not possibly attend the injunction hearing, leaving Aviron without any representation to argue its defense.

In an earnest effort to retain most of the Aviron management team and employees and to preserve the ability to finance the operations of the ongoing business with funding from Qatar investors, on February 11, 2020, Defendant made an offer to BlackRock, through counsel, to acquire from BlackRock, the film library rights, the office lease obligation, leasehold improvements, furniture, equipment, any unused media, and the lease security deposit, for $22 million.  BlackRock rejected the offer and by March 2020, had agreed to accept approximately $200,000 from a third party to take over the lease and purchase all of the furniture and equipment.  BlackRock's shareholders did not even recover the cost of hiring Sierra Constellation, the management company charged with liquidating Aviron office assets.  BlackRock's decision to reject Defendant's legitimate offer in favor of accepting a $200,000 low-ball offer,

squandered millions for BlackRock investors, and further resulted
in all of the Aviron employees being dismissed.  Aviron had
far more value as a going concern, which was reflected by
Defendant's $22 million offer, than in liquidation.

In March 2020, Defendant's attorney provided BlackRock a
written offer to purchase the Aviron assets in the amount of
$53 million dollars.  This new financing would allow BlackRock
to get out of the movie/film business and allow Aviron to
continue with its operations and employees.  The financing
agreement would also provide ongoing film financing. [Exhibit 4].

BlackRock, for reasons unknown, rejected the Aviron offer
and terminated all employees, abandoned the office lease,
including, but not limited to the $8 million in office
improvements, and then accepted an offer of $5.25 million for
the same Aviron assets.

In BlackRock's second quarter financial statement, it
states that the reduction of the Aviron debt is set forth.

In August 2020, BlackRock issued a press release to the
market that it had recovered the Aviron loan proceeds, in full,
with a profit.  The BIT shares rebounded in value upon the
announcement. [See Exhibit 5].

-23-

This recovery was partially paid by Armour Reinsurance Company, which, for $32 million, acquired the surety bond issued by CBL Insurance Company, New Zealand, in the face amount of $75 million, which Defendant facilitated on behalf of BlackRock.  [Refer to Exhibit 5].

## H.   BlackRock Securities Exchange Commission Investigation

The Securities Exchange Commission ("SEC") in February 2020, began an investigation into BlackRock for violations.  During this period, Randy Robertson was fired for failing to disclose that he arranged for his daughter to appear and receive a role in one of Aviron's Pictures' films that BlackRock helped finance, "After", when Robertson was the primary Managing Partner at BlackRock and responsible for directing BlackRock funds to Aviron.

The SEC investigation into Robertson was based on undisclosed conflicts of interest, related concerns about his decisions to lend millions of dollars of BlackRock funds to Aviron, and his subsequent monitoring of those investigations and the employees involved.

The U.S. Attorney prosecuting the Defendant requested the SEC Attorney to suspend their investigation because it was undermining the criminal prosecution of the Defendant.

I. **BlackRock Profited From Aviron Loan**

In 2020, BlackRock issued various press releases and financial statements that reflect being paid in full and that the company actually profitted from the Aviron loan. [Exhibit 5].

3. **Defendant's Severe Medical Condition**

Defendant is 69 years old with an elevated PSA and Gleason 6, grade group 1, prostrate cancer.  The prostrate cancer is on the right side of the prostrate in the anterior zone extending from the base to apex with broad capsular contact though the prostatic capsule appear to be completely intact.  [See Exhibit 7].

Defendant's condition was diagnosed on or about December 9, 2022.  On or about January 19, 2023, Defendant met with his specialist, Dr. Michael Ahdoot.  Defendant was given treatment options: (1) radical prostectomy; (2) given the location of the prostrate cancer, focal therapy with HIFU would not be an option as the lesion is greater than 4cm from the rectal wall.  The lesion however could be treated with a transurethral approach of after a TURP/HoLEP was performed.

Due to Defendant's pending incarceration, he chose active surveillance as a treatment modality though surgery radiation was discussed.  [Refer to Exhibit 8].

FCC Lompoc Camp ("Lompoc") is aware of Defendant's cancer condition and has failed to evaluate him or refer him to a urologist for any type of treatment.  This is not adequate medical care.  There has been no Uroflow and postvoid residual testing since Defendant's incarceration at Lompoc.

Defendant's condition is progressively worsening as the Lompoc doctors and health services personnel do nothing and ignore his cancer.  This is an extraordinary and compelling reason to grant relief.

//

//

//

## ARGUMENT

### III.   LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, a district court can reduce a defendant's term of imprisonment if he first exhausted administrative remedies. Id., § 3582(c)(1)(A). If the defendant has exhausted administrative remedies, the court must find extraordinary and compelling reasons warrant the requested reduction. Id., § 3582(c)(1)(A). Next, the court must consider the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable.

Section 3582 further requires a reduction to be "consistent with applicable policy statements issued by the Sentencing Commission. Id., § 3582(c)(1)(A). In 2006, the Sentencing Commission issued a Policy Statement addressing what qualifies as "extraordinary and compelling reasons" to release a defendant from BOP custody. See U.S.S.G. § 1B1.13 (last amended Nov. 1, 2018).

On June 27, 2022, the Supreme Court in Concepcion v. United States, 142 S. Ct. 2389, expanded the scope of factors district courts may consider in resentencing a defendant who was convicted and sentenced for a covered offense.

-27-

Specifically, on that date, the Supreme Court addressed the question of "whether a district court adjudicating a motion under the First Step Act may consider other intervening changes of law (such as changes to the Sentencing Guidelines) or changes of fact (such as behavior in prison) in adjudicating a First Step motion." Id., 142 S. Ct. at 2396.  The Supreme Court answered that question in the affirmative noting that the text of the First Step Act "does not so much as hint that district courts are prohibited from considering evidence of rehabilitation, disciplinary infractions, or unrelated Guidelines change." Id., at 2401-02, 2402 (holding that "the First Step Act allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence pursuant to the First Step Act." Concepcion, allows the opening of a closed case.

## IV.  ADMINISTRATIVE REMEDY

On May 6, 2023, Defendant began the administrative remedy process by requesting consideration for compassionate release to the Warden. [See Exhibit 1].  On May 19, 2023, the Warden denied Defendant's request.  However, it was not until July 6, 2023, that Defendant received a copy.  [See Exhibit 2].  The administrative remedy process at FCC Lompoc was described by Senior District Judge Consuelo B. Marshall in Torres v. Milusnic, No.: CV-20-4450-CBM-PVC (C.D. CA July 14, 2020) as

-28-

follows: "The Court finds ... administrative remedies are <u>NOT</u> available." (emphasis added). This is still true today. Since 30 days have passed from Defendant's written notice to the facility Warden, Defendant has met his burden and can proceed. See Section 3582(c)(1)(A).

The BOP does not have the authority to grant a Reduction in Sentence. See <u>Booth v. Churner</u>, 532 U.S. 731, 736 (2001); See also <u>Washington v. Barr</u>, 925 F. 3d 109, 118 (2nd Cir. 2019), (failure to exhaust; where it would be futile, when "the administrative remedy would be incapable of granting adequate relief"). Since the BOP cannot grant the remedy requested, Defendant requests it be waived.


## V.  INDICTMENT

The government stated the following in their indictment, referring to Count One as "Wire Fraud Advertising Scheme."

From at least in or about 2016, up to and including in or about March 2020, in the Southern District of New York and elsewhere, William Sadleir, the defendant willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused

-29-

to be transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, ... for
the purpose of executing such scheme and artifice, to wit
Sadleir who was the chairman and chief executive officer
of Aviron Pictures, LLC (together with its affiliated
entities, "Aviron"), misappropriated millions of dollars
in investor funds from Aviron for his own personal use
through fraud and deceit, including through the use of
a sham advertising company he created to carry out the
scheme (Title 18 United States Code 1342 and 2). [Dkt.6].

Count Two the government uses the term "Wire Fraud - UCC
Scheme."

In or about 2019, in the Southern District of New York ...
defendant willfully and knowingly, having devised and
intending to devise ... to wit Sadleir caused the forging
of the signature of one of the managers of an investment
fund (the "Fund") that invested in Aviron on documents
used to remove Uniform Commercial Code liens on Aviron
assets that secured loans made by the Fund to Aviron, and
Sadleir then sold the Aviron assets without the Fund's
consent. (Title 18 United States Code, Section 1343 and
2). [Dkt.6].

## IV. INSUFFICIENT FACTS TO SUPPORT WIRE FRAUD CONVICTION

Defendant contends and the facts show that the government's evidence to convict under the wire fraud statute 18 U.S.C. § 1343 is insufficient.  The evidence which is undisputed cannot support proof beyond a reasonable doubt for each element of the offense and therefore, Defendant is being unconstitutionlly held - Defendant is actually and factually innocent of the elements set forth by the government in counts one and two of the indictment.

The wire fraud statute prohibit's a person who "devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," from using wire facilities "for purpose of executing such scheme or artifice or attempting to do so." Crawford v. Franklin Credit Management, Corp., 758 F. 3d 473, 488 (2nd Cir. 2014)(quoting 18 U.S.C. § 1343).  In other words, "The gist of the offense is a scheme to defraud and the use of interstate communications to further that scheme." United States v. O'Malley, 535 F. 2d 589, 592 (10th Cir. 1976).

Wire fraud has three elements: (1) a scheme to defraud; (2) money or property that is the object of the scheme, and; (3) use of the wire to further that scheme. See Empire Merchs.,

LLC, 902 F. 3d at 139 (citation omitted). The first element, the scheme to defraud, is measured by a nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general business life of member society." Id. (citations and quotation marks omitted). "To meet the second element, the plaintiff must show that the object of the scheme - 'the thing obtained,' or to be obtained is [money or] 'property in the hands of the victim....'" Id. (quoting Cleveland v. United States, 531 U.S. 12, 15 (2000)). "[A]ny ... wire that 'is part of the execution of the scheme [to defraud] as conceived by the perpetrator at the time' satisfies the third element." Id. (quoting Schmuck v. United States, 489 U.S. 705, 715 (1989)). "Although ... wire fraud communication need not itself be fraudulent to violate [the fraud statutes], it must, by the terms of the statutory sections, be made in furtherance of the fraudulent scheme." Crawford, 758 f. 3d at 488.

"Because the mail and wire fraud statutes use the same relevant language [courts] analyze them the same way." United States v. Weaver, 860 f. 3d 90, 94 (2nd Cir. 2017)(quoting United States v. Greenberg, 835 F. 3d 295, 305 (2nd Cir. 2016); See also United States v. Connolly, 24 F. 4th 821, 833 (2nd Cir. 2022)("Section 1343 uses the same 'scheme or artifice to defraud' language that is used in 18 U.S.C. § 1341, which prohibits fraudulent or deceptive use of the mails, and thus

the two statutes are analyzed the same way.'" (quoting <u>United States v. Slevin</u>, 106 F. 3d 1086, 1088 (2nd Cir. 1996))).

## A.  A Scheme To Defraud

### 1.  Materiality and Intent

"The gravamen" of wire fraud offense is whether there is a "scheme to defraud." <u>Greenberg</u>, 835 F. 3d at 305 (citing <u>United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.</u>, 822 F. 3d 650, 657 (2nd Cir. 2016)).  To demonstrate the existence of a scheme to defraud, the government must prove that a defendant made material misrepresentations and acted with the requisite scienter.  See <u>Weaver</u>, 860 F. 3d at 94 (first citing <u>O'Donnell</u>, 822 F. 3d at 657; then citing <u>Greenberg</u>, 835 F. 3d at 305-06).

"A statement is material if the 'misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct.'" <u>Id</u>. (quoting <u>United States v. Rybicki</u>, 354 F. 3d 124, 145 (2nd Cir. 2003)). The materiality of a statement is dependant upon whether the statement "has a natural tendency to influence or is capable of influencing, the decision of the decisionmaker to which it was addressed." <u>Id</u>. (citing <u>United States v. Corsey</u>, 723 F. 3d 366, 373 (2nd Cir. 2013)); See also <u>United States v. Connolly</u>,

No. 16-CR-0370, 2018 U.S. Dist. LEXIS 84198, 2018 WL 2411760 at *5 (S.D.N.Y. May 15, 2018)("The Supreme Court had quite recently emphasized that a false and fraudulent statement will not support a federal conviction unless it was material to some decision that had to be taken by the person to whom the statement was made." (citing Univ. Health Servs., Inc. v. United States, 579 U.S. 176, 192-93 (2016)). Moreover, "[f]raud requires more than deceit. A person can dissemble about many things, but a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal." Corsey, 723 F. 3d at 373.

To establish fraudulent intent, the government "need not prove 'that the victims of the fraud were actually injured,' but only 'that defendant's contemplated some actual harm or injury to the victims.'" Greenberg, 835 F. 3d at 306 (quoting United States v. Novak, 443 F. 3d 150, 156 (2nd Cir. 2006)) (emphasis in original). "It is not sufficient that [a] defendant realizes that the scheme is fraudulent and that it has the capacity to cause harm to its victims." United States v. Guadagna, 183 F. 3d 122, 129 (2nd Cir. 1999)(citing United States v. Gabriel, 125 F. 3d 89, 97 (2nd Cir. 1997)). Rather, "the proof must be demonstrated that the defendant had a conscious knowing intent to defraud ... [and] that the defendant contemplated or intended some harm to the property

-34-

rights of the victim." Id. (quoting United States v. Leonard'
61 F. 3d 1181, 1187 (5th Cir. 1995)(alteration in original).
"'[D]irect proof of defendant's fraudulent intent is not
necessary,' and '[i]ntent may be proven through circumstantial
evidence, including by showing that defendant made
misrepresentations to the victim(s) with knowledge that the
statements were false.'" United States v. Defilippo,
No. 17-CR-0585, 2018 U.S. Dist. LEXIS 240820, 2018 WL 11211500,
at *5 (S.D.N.Y July 23, 2018)(quoting Guadagna, 183 F. at 129)).

    The materiality and fraudulent intent elements for mail
and wire fraud are intertwined.  As acknowledged by the Second
Circuit"

    We have noted the connection between materiality elements
    and the additional requirement that the government prove
    fraudulent intent.  United States v. Thomas, 377 F. 3d
    232, 242 (2nd Cir. 2004).  The "role of the ordinary
    prudence and comprehension standard [in the materiality
    element] is to assure that the defendant's conduct was
    calculated to deceive, not to grant permission to take
    advantage of the stupid or careless." Id.; See United
    States v. Svete, 556 F. 3d 1157, 1165 (11th Cir. 2009)
    (observing that "the focus of the mail fraud statute,
    like any criminal statute, is on the violator," meaning
    that "the purpose of the element of materiality is to

ensure that a defendant actually intended to create a scheme to defraud"). That is, the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent in designing the fraudulent scheme, whereas the materiality of the false statement does. Weaver, 860 F. 3d at 95.

## B.   Participation In The Scheme With Intent

## 1.   Money or Property

To meet this element there must be the participation in the scheme to obtain, or to be obtained "is money" or property in the hands of the victim. Se Cleveland v. United States, 531 U.S. 12, 15 (2000). In other words, a defendant had to have participated in the scheme for the purpose of causing some financial or property loss to another. There must be proof that the defendant had intended to deprive the victim of the money or property. Moreover, to establish the existence of a scheme to defraud, the government must prove the materiality of a defendant's false statements or misrepresentations. United States v. Weaver, 860 F. 3d 90, 94 (2nd Cir. 2017).

//

//

//

It is obvious when a person is deprived of money or
property when someone else takes his money or property away
from him.  But a person can also be deprived of money or
property when he is deprived of the ability to make an informed
economic decision about what to do with his money or property,
referred to as being deprived of the right to control money
or property.

Because the government need only show that a scheme to
defraud existed, not that it succeeded, would result in economic
harm to the victim.  Economic harm is not limited to loss on the
company's bottom line.  See United States v. Binday, 804 F. 3d
558 (2nd Cir. 2015) U.S. App. LEXIS 18671, at *53.

## C.  Use of the Wires to Further the Scheme

## 1.  Execution of the Scheme

The last element requires 'the execution of the scheme to
defraud as conceived by the perpetrator at the time' satisfies
the third element.  Empire Merchs, LLC, 902 F.3d at 139
(quoting Schmuck v. United States, 489 U.S. 705, 715 (1989)).
"Although the mailed or wired communication need not itself be
fraudulent to violate [the fraud statutes], it must, by the
terms of the statutory sections, be made in furtherance of the
fraudulent scheme."  Crawford v. Fanklin, 758 F. 3d 473 (2nd

-37-

Cir. 2014).  "In order to prove the existence of a scheme to
defraud, [a party must prove both] 'that the misrepresentations
were material' ... and that the defendant acted with fraudulent
intent."  Id., (alternation in original)(quoting Weaver, 860
F. 3d at 94).


## VII.  DEFENDANT'S CONDUCT

The government stated in the indictment the following
elements of Defendant's conduct.  That he "willfully and
knowingly, having devised and intending to devise a scheme
and artifice to defraud, and for obtaining money and property
by means of false and fraudulent pretenses, representations
and promises, transmitted and cause to be transmitted by means
of wire ...." [See Indictment, Counts One and Two).


## 1.  Materiality and Intent of Defendant

Defendant's conduct was not "willfully and knowingly,"
mens rea.  None of the allegations made in the indictment set
forth that Defendant intended to act "willfully and intentionally,"
just the opposite is true.

Defendant from the onset followed the Credit Agreement.
First, on October 20, 2015, Aviron pledged certain collateral,
including all of the "equity interests issued by" Aviron Capital

and another related entity, Aviron Pictures.  Defendant signed
the Pledge Agreement on behalf of Aviron Group.  That same day,
BlackRock filed a UCC-1 financing statement regarding the Pledge
Agreement.

On July 17, 2017, Aviron and BlackRock entered into a
Note Purchase Agreement (the "NPA"), in which BlackRock
provided Aviron with a $75 million loan in return for
"collateral" that would "include all of the Issuer's right,
title and interest in and to," among other things "100% of
the equity interests issued by each Qualifying Picture SPV
now owned or hereinafter acquired by" Aviron.  At this point,
Aviron represented the largest investment in the BlackRock
Multi-Sector Income Trust ("BIT") portfolio.

Defendant's actions do not support "willfully and
intentionally," or "devised or intending to devise".  [See
Section 1343].  According to the indictment, the government
must prove beyond a reasonable doubt that Defendant "knowingly"
or "intentionally" acted to create the fraud and then Defendant's
intent was in furtherance of the fraudulent scheme, See Lundy
v. Catholic Health Sys. of Long Island., Inc., 711 F. 3d 106,
119 (2nd Cir. 2013).

Rule 7(c), Fed. R. Crim. P. states that an indictment
need only contain "a plain, concise and defined written

-39-

statement of the essential facts consisting of the offense
charged."

In Count One the Indictment alleges Defendant through
Aviron "Misappropriated millions of dollars in investor funds
from Aviron for his own personal use through fraud and deceit,
including through a sham advertising company he created to
carry out the scheme." [See Indictment Count One].

Although the indictment need not allege that the victims
of the fraud were in fact injured, it is required to allege
that the Defendant contemplated actual harm that would befall
victims due to his deception in order to meet the "scheme to
defraud" prong. See United States v. Novak, 443 F. 3d 150,
156 (2nd Cir.) Cert. denied 549 U.S. 997 (2006).

Criminal law generally seeks to punish conscious wrongdoing.
Thus, when interpreting criminal statutes, the court "start[s]
from a longstanding presumption ... that Congress intends to
require a defendant to possess a culpable mental state."
Rehaif v. United States, 139 S. Ct. 2191, 2195 (2019). This
culpable mental state, known as scienter, refers to the degree
of knowledge necessary to make a person criminally responsible
for his or her acts. See ibid. The presumption of scienter
applies even when a statute does not include, as here, a scienter
provision, and when a statute does "includ[e] a general scienter

-40-

provision," "the presumption applies with equal or greater force"
to the scope of that provision. Ibid. the Court has accordingly
held that a word such as "knowingly" modifies not only the words
directly following it, but also those statutory terms that
"separate wrongful from innocent acts." Id., at 2197. See
also Morissette v. United States, 342 U.S. 246, 251 (1952)
(requiring "viscious will."): with few exceptions, "wrongdoing
must be conscious to the criminal." Elonis v. United States,
575 U.S. 723, 734 (2015)(quoting Morissette, 342 U.S. at 252).

Applying the presumption of scienter, we have read into
criminal statutes that are "silent on the required mental
state" - meaning statutes that contain no mens rea provision
whatsoever - "that mens rea which is necessary to separate
wrongful conduct from 'otherwise innocent conduct'" Elonis,
575 U.S., at 736 (quoting Carter v. United States, 530 U.S.
255, 269 (2000)). Unsuprisingly, given the meaning of scienter,
the mens rea the Supreme Court has read into such statutes is
often that of knowledge or intent. See e.g., Staples v.
United States, 511 U.S. 600, 619 (1994). United States v.
Gypsum Co., 438 U.S. 422, 444-446 (1978).

The facts reveal there was no intent, nor was there any
misappropriated investor funds. Defendant not only complied
with the terms and conditions of the BlackRock Pledge Agreement
and Note Purchase Agreement, he also procured additional

-41-

assurances to repay the loan through a Surety Bond.

## 2.  Scheme or Artifice to Defraud

An essential element of the government's proof for a wire
fraud prosecution is proof of a "scheme or artifice to defraud."
18 U.S.C. § 1343.  Critical to a showing of a scheme to defraud
is proof that Defendant possessed a fraudulent intent.  Although
the government is not required to prove actual injury.  (See
Durland v. United States, 161 U.S. 306, 315 (1896); United
States v. Andreadis, 366 F. 2d 423, 431 (2nd Cir. 1966)(no
actual pecuniary injury, therefore, need result to the victim
of the fraud)) it must, at a minimum, prove that defendant's
contemplated some actual harm or injury to their victims.
Only a showing of intended harm will satisfy the element of
fraudulent intent.  Such was the holding in United States v.
Regent Office Supply, Co., 421 F.2d 1174 (2nd Cir. 1970).

In Regent, an indictment was handed down charging defendant
with mail fraud.  It appeared that defendant's salesmen
engaged in aggressive marketing techniques designed to sell
their products, including frequent misrepresentations of certain
facts.  For instance, the salesmen represented that they had
been referred by a friend, that they had a large inventory to
be disposed  of, or that the agent was a doctor who needed to
dispose of stationary.  These facts, however, were only collateral

-42-

to the sale and did not concern the quality or nature of the goods being sold.  The misrepresentations, therefore, did not go to the basis of the customer's bargain with the salesmen. The customers received exactly what they paid for and no customer testified that they had been cheated.  On the basis of these facts, the Second Circuit concluded in <u>Regent</u> that defendant did not contemplate an actual injury to the alleged victims of the fraud.  At most, the evidence in <u>Regent</u> showed an intent to deceive and to induce the customers to enter into the transaction.  Absent any evidence of intent to harm the victims, however, the court concluded that the evidence was insufficient to demonstrate a fraudulent intent as the statute required.

The decision in <u>Regent</u> identifies an important distinction where misrepresentations amount to deceit are insufficient to maintain mail or wire fraud prosecution.  Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself.  Such harm is apparent where exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intented to deliver."  421 F. 2d at 1182.

Here, facts clearly show that the government adduced no
evidence of an intent to harm BlackRock.  All reasonable
inferences point to BlackRock being the largest and most
influential equity firm, managing retirement funds of government
employees, used its influence to seek prosecution against
Defendant to deflect bad publicity away from the SEC, BlackRock,
Robertson scandal.

The indictment fails to plea wire fraud with the requisite
particularity.  While the government alleges that Defendant'
"misappropriated millions of dollars in investor funds from
Aviron for his own personal use through fraud and deceit,
including through the use of a sham advertising company he
created to carry out the scheme."

Once more, the facts show no misappropriated money.  Second,
the advertising funds per the specification of the contractual
agreement to set aside advertising money for the release
of the film.  The funds sat in the account for that specific
purpose.  There are no facts to support the government's
allegations that Defendant used the funds for personal use or
gain.  The government's allegations are false, once more
bending to BlackRock pressure.

Further, the indictment as to Count Three, alleging that
Defendant caused the forging of the signature of one of the

managers [Randy Robertson] of an investment fund (the "Fund") that invested in Aviron on documents used to remove Uniform Commercial Code liens on Aviron assets that secured loans made by the fund to Aviron ... then sold the Aviron assets without the fund's consent.

BlackRock executives Robertson and Volosov previously approved the sale of the bundle of UCC secured receivables. Volosov instructed Defendant "cut and paste" Robertson's signature to make the transaction happen.  Further, Blackrock benefitted as $3 million, which was fully disclosed on the Aviron financial statements, was paid by Aviron for delinquent advertising not paid as agreed by BlackRock.  The $3 million was paid to Cairn Capital for the film "Serenity" that was diverted by the ad agency MediaStorm to offset BlackRock's failure to fund.

Again, there was no intent.  Defendant did not willfully and knowingly devise or intend to devise a scheme to defraud BlackRock, or anyone.  The facts all show Defendant was instructed to do certain things that ultimately benefited BlackRock's interest.

## VIII.  THE PLEA AGREEMENT - WAIVER

Facts recently discovered conclude that the government

knew or should have known that the money loss enhancement and the restitution order is invalid because the Supreme Court held in Hughes v. United States, 495 U.S. 411 (1990) that a sentencing court may order restitution to a victim "only for the loss caused by the specific conduct that is the basis of the offense of conviction." Id., at 413.

On August 11, 2020, BlackRock announced it "will receive a total of over $72 million, which allows BIT to fully recover the amounts it loaned to Aviron and to realize a rate of return that is the same or better than the rate of return of the other assets in BIT's investment portfolio during the relevant investment periods...." [See Exhibit 4]. See also Annual and Semi-Annual Reports and other regulatory filings of the Fund with the SEC at www.sec.gov and on BlackRock's website at www.blackrock.com.

It is undisputed that on the advice of counsel Defendant knowingly and voluntarily agreed to the plea agreement and the waiver. Defendant argues that the plea waiver is inapplicable in this instance because the sentence exceeded the maximum of punishment, which was an error under 18 U.S.C. § 2259. Because this order to pay restitution affected the fairness, integrity, and public reputation of judicial proceedings were seriously undermined when the court ordered "Defendant shall pay restitution in the total amount of

-46-

$31,597,000 to the victim [BlackRock] of the offense charged in Counts One and Two of the Indictment." [Dkts.85,89].

Additionally, Defendant was enhanced for the money loss. These facts were available to the government and Defendant's attorney who failed to inform the court. The withholding of this information allowed Defendant to receive a twenty-two (22) level enhancement. The fact that BlackRock announced they collected $32 million from the insurer Defendant put in place previously makes the victim whole. [refer to Exhibit 4]. "... no further payments to the Fund from proceeds are anticipated at this time." Id.

The date of the BlackRock announcement was August 11, 2020, which clearly shows BlackRock was made whole and that there was "no further payment to the Fund." Id. These facts were known before Defendant's sentence being imposed on September 9, 2022.

The Mandatory Victim Restitution Act ("MVRA") is not mandatory in all circumstances. Persons convicted of certain offenses are required to make full restitution to an identifiable victim who suffered a direct or proximate pecuniary loss. See 18 U.S.C. § 3663(a)(1)-(2). The purpose of restitution "is not [ ] to provide a windfall for crime but rather to ensure that victims, to the greatest extent possible, are made whole for

-47-

their losses." United States v. Huff, 609 F. 3d 1240, 1249

(11th Cir. 2010)(internal quotations omitted); See also

United States v. Boccagna, 450 F. 3d 107, 117 (2nd Cir. 2006)

("[The Court] cannot award the victim a 'windfall,' i.e., more

in restitution than he actually lost."); The "purpose of

restitution" under the MVRA however is not to punish the

defendant, but to "make the victim [ ] whole" again by restoring

him or her the value of the losses suffered as a result of

defendants crime. United States v. Gordon, 393 F. 3d 1044,

1052 n.6 (9th Cir. 2004)). The amount of restitution,

therefore "is limited to the victims actual losses."

United States v. Bussell, 504 F. 3d 956, 964 (9th Cir. 2007),

See also United States v. Fair, 699 F. 3d 508, 514, 403 U.S.

App. D.C. 39 (D.C. Cir. 2012)("The MVRA demands that restitution

be awarded only for the victim's actual, provable loss....").


Under the MVRA, the court "shall [ ] reduce [ ] "restitution

by any amount received as compensatory damages for the same

loss by the victim in ... any federal civil proceedings: and

... e.g. United States v. Doe, 374 F. 3d 851, 856 (9th Cir. 2004)

offset is only proper where the victims received the funds.

United States v. Bright, 353 F. 3d 1114, 1122-23 (9th Cir. 2004).


Considering that BlackRock, the victim, announced in

August 2020, two years before Defendant's sentencing, the

government under Brady v. Maryland, 373 U.S. 83 (1963) was

-48-

required to disclose evidence favorable to the defendant  when
such evidence is material to guilt or punishment.  In United
States v. Bagley, 473 U.S. 667 (1985), the court held that the
government's duty under Brady arises regardless of whether the
defendant specifically requests material or favorable evidence.
Favorable evidence is "material" if there is a reasonable
probability that disclosure of the evidence would have changed
the outcome of the proceedings.  Id., at 682; Id., at 685
(White, J. concurring in part and concurring in the judgment).
A "reasonable probability" under Bagley is "a probability
sufficient to undermine confidence in the outcome."  Id., 473
U.S. at 678, 682.  When assessing evidence's materiality, the
court must take into account the cumulative effect of the
suppressed evidence in light of other evidence, not merely the
probative value of the suppressed evidence standing alone.
See Kyles v. Whitley, 514 U.S. 419, 436 (1995).  The government's
intent behind the withheld evidence must be considered because,
had the evidence been submitted the outcome would have been
different.

     Specifically, had the government disclosed that BlackRock,
prior to sentencing collected the $32 million from the Surety
Bond Defendant put into place to protect BlackRock and
the forfeited proceeds also went to BlackRock, resulting in
a windfall.

However, had the government or defense counsel been aware that there was no loss, the 22 point money loss enhancement would not have applied at sentencing.  Therefore, Defendant's actual offense level is 11, Category I resulting in 8-14 months.

Additionally, Defendant asks the Court to reconsider the Special Offense characteristic pursuant to § 2B1.1 which he was enhanced 4 points.  The only sophistication committed by Defendant was to put in place the Surety Bond to guarantee BlackRock's full payment. [See PSR TP 106-107].

This, and the other actions taken by Defendant, showed his intent from the start to make sure the loan was paid in the event of a default, which paid BlackRock and because of this Surety Bond, there was no loss.

Pursuant to 18 U.S.C. § 3663(j)(3) Defendant's restitution order must be offset and then terminated for all the reasons set forth herein.

## IX.  DEFENDANT'S PROSTRATE CANCER

Defendant is 69 years old and has gone unseen and untreated by the Lompoc Medical Staff.  He suffers from hypercholesterolemia, (2005); Acne Vulgaris, (3/31/2010); Hypertension, (10/2019); (CAD S/P Stents to RCA and LCX x 2)(2/2020); Thyroid nodule,

left, (3/2020); Biceps Tendon Tear, right, (11/20/2019);
Insomnia, (current); Tubulovillous Adenoma (7/2019) among other
conditions.  [See Exhibit ].  None of these conditions have
been or are being monitored or treated.

Prior to his self-surrender, Defendant was being treated
in the Urologic Oncology Clinic at Cedars Sinai Medical Center
for prostrate cancer.  [See Exhibit ].

Additionally, Defendant has a heart condition which the BOP
has and continues to fail to provide adequate care.  [See
Exhibit ].

Defendant continues to keep inforce his Blue Shield health
insurance, which upon release, he will immediately visit his
various doctors in hopes that the BOP's failure to treat has
not become too advanced or irreversible.  The BOP is well aware
of Defendant's prostrate cancer.

The compassionate release provision of 18 U.S.C. § 3582
(c)(1)(A) provides an exception to the rule that a court may not
modify a term of imprisonment once it has been imposed.  A
defendant must satisfy three requirements for the court to
grant a motion for compassionate release.  See United States v.
Keitt, 21 F. 4th 67, 71 (2d. Cir. 2021).  These requirements are
(1) exhaustion of administrative remedies; (2) extraordinary

-51-

and compelling reasons; and (3) consideration of § 3553(a)
factors.

Defendant's medical conditions combined with the lack of
care, and advanced age, and the need to undergo treatment
for his prostrate cancer as previously discussed herein, is
supported by the records submitted.  The failure to receive
adequate medical care for his conditions are extraordinary and
compelling reasons alone.  See United States v. Demeo, 2022
U.S. Dist. LEXIS 8123, 17-CR-545(KAM)(granting sentence
reduction due to heart disease and prostrate cancer).

When consideration is given to there being no loss amount
and the fact that Defendant's sentence once corrected will be
8-14 months or less, the Court should resentence Defendant to
time served, or Home Confinement for the duration of  the few
months left, allowing him to seek medical care immediately.

## X.   SECTION 3553(a) FACTORS

With full consideration of the § 3553(a) factors, a
reduction would result in a sentence sufficient, but not greater
than necessary, and would reflect the seriousness of the offense
and protect the public from further crimes.

Extraordinary and compelling reason exists not only because of Defendant's medical conditions, but also due to the plain error or withholding of the evidence pertaining to the restitution amount.  The fact that Defendant was sentenced to approximately five (5) years more than what the Guideline range should have been, "extraordinary and compelling reasons" exist.

"[A] district court's discretion in this area - as in all sentencing matters - is broad." United States v. Booker, 976 F. 3d 228, 237 (2d. Cir. 2020)(a court may "consider the full scale of extraordinary and compelling reasons that an imprisoned person might bring before them" and has "discretion in determining what are extraordinary circumstances.").  "Where no single factor alone may justify release, the total circumstances may still rise to the level of extraordinary and compelling reasons for release." United States v. Resto, No. 08 Crim. 757, 2021 U.S. Dist. LEXIS 54641, 2021 WL 1109467, at *2 (S.D.N.Y. Mar 23, 2021)(internal quotation marks omitted).

The Court must consider relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).  See also Pepper v. United States, 502 U.S. 478, 490-93 (2011).  Following Pepper, the court must consider "the most up-to-date picture of the defendant's history and characteristics, which sheds light on the likelihood

that [the defendant] will engage in future criminal conduct."
Id., at 492.   Protecting the public is one of the four purposes
of sentencing, 18 U.S.C. § 3553(a)(2)(C), along with deterrence,
just punishment and providing the defendant with needed
training and medical care "in the most effective manner."
18 U.S.C. § 3553(a).   Moreover, it remains "critical" in
sentence reduction proceedings that the court deem the sentence
"sufficient, but not greater than necessary," to serve the
purpose of sentencing.   United States v. Lizarraras-Chacon,
14 F. 4th 961, 967 (9th Cir. 2021).

    Defendant's criminal history is entirely non-violent.   The
BOP has determined that he is a minimal recidivism risk.   He has
shown rehabilitation in incarceration through consistent prison
employment, which supports a modest reduction in sentence,
fully consistent with the § 3553(a) factors.

    Defendant believes that the § 3553(a) factors favor a
sentence reduction and also meets the goals of of § 3553(a).

## XI.  CONCLUSION

    The facts set forth herein are undisputed in the record, or
the Security Exchange Commission BlackRock Robertson investigation.

Defendant went over and above his obligation of Aviron to make sure that the loan was repaid, which BlackRock announced in August 2020.  There never was any intent and Defendant's state of mind was always to follow the contractual obligations.

However, from the beginning, BlackRock, through Robertson and Volosov, was intimately involved in asserting influence over Defendant and Aviron.

These facts clearly reveal a possible pattern of RICO, breach of contract, breach of duty of good faith and fair dealing, tortious interference with contract, and Lender liability.  These claims are based on BlackRock's improper interference with Defendant's film distribution and marketing business pursuant to a Note Purchase Agreement, but repeatedly overstepped their role as Lender, improperly overruling Defendant's choices in films to acquire, failing to distribute funds as required by the terms of their agreement, and otherwise meddling in the day-to-day affairs of Aviron.  With these facts known, Defendant requests a criminal referal to investigate BlackRock's business practices and strong arm tactics in their loan/funding practices.

For all the foregoing reasons and conclusions of law, Defendant William K. Sadleir respectfully urges the Court to

grant his relief to time served or reduce the sentence to the low end of the new calculated Guideline Range.

Respectfully submitted,

Dated:

William Sadleir,
Defendant.

# Exhibit #1

Exhibit #1

TRULINCS  79460112 - SADLEIR, WILLIAM - Unit: LOM-A-A

--------------------------------------------------------------------------------------------------

FROM: 79460112
TO: AWOperations
SUBJECT: ***Request to Staff*** SADLEIR, WILLIAM, Reg# 79460112, LOM-A-A
DATE: 05/06/2023 02:44:46 PM

To: Warden Birkholz
Inmate Work Assignment: VT Horticulture

Dear Warden:]

I would like to be considered for compassionate release.

I am 69 years-old, have prostate cancer, and have two minor children at home who depend on me.

Thank you for your consideration. Please advise.

William Sadleir

# Exhibit #2

Exhibit #2



**U.S. Department of Justice**
**Federal Bureau of Prisons**
**Federal Correctional Complex**

---

*Office of the Warden*                    *Lompoc, California 93436*

May 19, 2023

MEMORANDUM FOR SADLIER, WILLIAM REG. NO. 79460-112

FROM:          C. J. Weber
               B. Birkholz, Warden

SUBJECT:       Compassionate Release Review

Your request for Compassionate Release/Reduction in Sentence
(RIS) has been reviewed pursuant to Program Statement 5050.50,
Compassionate Release/Reduction in Sentence: Procedures for
Implementation of 18 U.S.C §§3582(c)(1)(A) and 4205 (g).  It has
been determined that we will not be pursuing a request for
Compassionate Release/RIS in your case.

The documentation you provided was reviewed and considered, in
addition to a review of your central file and medical records.
Based on this review, it was determined you do not meet the
criteria to be considered for a Compassionate Release/RIS based
on medical circumstances, nor non-medical circumstances.
Therefore, you do not meet the criteria in which the Bureau of
Prisons would file a motion to the court.

Accordingly, your request is denied.  If you are not satisfied
with this reply, you may submit an appeal on the appropriate
form (BP-9) to this office within 20 calendar days of the date
of this response.



# Exhibit #3

Exhibit #3

| | | |
|---|---|---|
| Hematocrit | 45.2 | 10/25/2022 |
| MCV | 88.6 | 10/25/2022 |
| Platelet Count | 201 | 10/25/2022 |
| RDW | 12.5 | 10/25/2022 |

| Component | Value | Date |
|---|---|---|
| Glucose | 94 | 10/25/2022 |
| Creatinine | 0.81 | 10/25/2022 |
| Urea Nitrogen | 21 | 10/25/2022 |
| BUN/Creatinine Ratio | NOT APPLICABLE | 10/25/2022 |
| Sodium | 140 | 10/25/2022 |
| Potassium | 4.1 | 10/25/2022 |
| Potassium | 3.8 | 11/20/2019 |
| Chloride | 104 | 10/25/2022 |
| Carbon Dioxide | 31 | 10/25/2022 |
| Anion Gap | 12 | 02/26/2020 |
| Calcium, Serum | 9.9 | 10/25/2022 |

| Component | Value | Date |
|---|---|---|
| INR | 1.0 | 02/25/2020 |
| Patient Protime | 12.2 | 02/25/2020 |
| PTT | 31 | 02/25/2020 |

| Component | Value | Date |
|---|---|---|
| Glucose, UA | NEGATIVE | 11/11/2022 |
| Protein, UA | NEGATIVE | 11/11/2022 |
| Leukocyte Esterase, UA | NEGATIVE | 11/11/2022 |
| Blood, UA | NEGATIVE | 11/11/2022 |

**IMAGING**:
No results found for this or any previous visit from the past 365 days 10 hours.

Recent Results (from the past 365 days 10 hours)

**MRI PELVIS WO/W IV CONTRAST SOFT TISSUE**

**Impression**
1. Lesion 1; left anterior transition zone mid gland (calculated volume 0.59 mL); PI-RADS 4: Clinically significant cancer is likely.
2. Lesion 2; right anterior transition zone base to mid gland (calculated volume 0.49 mL); PI-RADS 5: Clinically significant cancer is highly likely.
3. Lesion 3; right anterior transition zone apex (calculated volume 0.58 mL); PI-RADS 4: Clinically significant cancer is likely.
4. Lesion 4; left peripheral zone mid gland (calculated volume 0.26 mL); PI-RADS 3: Clinically significant cancer is equivocal.

- PI-RADS v2.1 score 5: clinically significant cancer is highly likely to be present.
- No MRI evidence for macroscopic extraprostatic extension.
- No seminal vesicle invasion.
- No suspicious pelvic lymph nodes.
- No suspicious osseous lesions.
- No prior MRI prostate available for comparison.

Standardized reporting guidelines follow recommendations by ACR-ESUR PIRADS v2.1

PIRADS 1 - Very low (clinically significant cancer is highly unlikely to be present)
PIRADS 2 - Low (clinically significant cancer is unlikely to be present)
PIRADS 3 - Intermediate (the presence of clinically significant cancer is equivocal)
PIRADS 4 - High (clinically significant cancer is likely to be present)
PIRADS 5 - Very high (clinically significant cancer is highly likely to be present)

Reviewed and Interpreted by: Yaniv Raphael, M.D.  12/9/2022 10:07 AM

**ASSESSMENT AND PLAN:**

Patient is a 68 year old male with an elevated PSA and Gleason 6, grade group 1, prostate cancer.  The prostate cancer is on the right side of the prostate in the anterior zone extending from base to apex with broad capsular contact though the prostatic capsule appears to be completely intact.  He has concurrent bladder diverticulum suggesting bladder outlet obstruction though he is largely asymptomatic.  His prostate MRI is highly heterogeneous suggesting BPH and components of prostatitis.

We discussed his newly identified Gleason 6 prostate cancer, and the natural history of this disease.  I explained that over a 10-year period approximately 50% of patients will have disease progression and ultimately require treatment.  We discussed radical prostatectomy as a treatment option however is complicated by the risk of erectile dysfunction and incontinence.  Given that Gleason 6 prostate cancer is rarely lethal unless high risk disease was missed I felt that treatment with surgery or radiation would likely be greater risk than active surveillance.  Given the location of the prostate cancer focal therapy with HIFU would not be an option as the lesion is greater than 4 cm from the rectal wall.  The lesion however could be treated with a transurethral approach or after a TURP/HoLEP was performed.

After discussion he favored active surveillance as a treatment modality though surgery radiation were discussed.  I agree with this decision and think it is the most appropriate choice and the best balance of risks and benefits.

PLAN:
- We will return to clinic in 6 months with PSA.  Visit must be in person.
- Uroflow and postvoid residual testing at next follow-up

Michael Ahdoot MD

# Exhibit #4

Exhibit #4

# Asset Purchase Proposal  -- Summary of Terms

| | |
|---|---|
| **Borrower:** | To be formed Delaware LLC ("Borrower"); provided Borrower may be revised based on acquisition structure. Lender may require additional subsidiaries of Holdings to be co-borrowers. |
| **Guarantors:** | (i)  Asset holding subsidiaries of Borrower (post acquisition)<br>(ii)  William Sadleir<br>(iii)  Any trust or other entity holding real property pledged as collateral |
| **Lender & Administrative Agent:** | Das & Co., LLC and/or one of its affiliates or designees selected in its discretion |
| **Credit Facility:** | Up to $53 million first lien Term Loan ("Term Loan") |
| **Maturity:** | 5-year anniversary of the closing date |
| **Pricing:** | [8]% per annum, (inclusive of surety bond premium payments, if any). |
| **Use of Proceeds, Availability:** | (1) Up to $27,650,000 to acquire certain operating assets from Aviron Pictures, LLC and Aviron Capital, LLC, including all furniture, fixtures, and equipment, leases and leasehold improvements, media credits, intangible assets, etc.<br>(2) $14,000,000 to acquire the Cairn Capital loan to Aviron Finance, LLC<br>(3) Up to $11,350,000 for operating capital, including (a) payments to professional advisory firms, (b) payments to Taslimi Construction and FKA, (c) interest reserves, (d) OID and transaction costs, including legal, and (e) for operating overhead. |
| **Security:** | First priority perfected security interest in substantially off assets of the Borrower and Guarantors, whether owned on the closing date or thereafter acquired. |
| **Conditions Precedent:** | (i)  Due diligence of all assets to be acquired in this transaction.<br>(ii)  Reasonable and customary conditions precedent for transactions of this type, including satisfactory completion of definitive documentation. |
| **Other Conditions:** | Full release from any claimants to the Aviron assets including BlackRock entities, Cairn Capital, and any other parties that may have claims |
| **OID** | 98.0% |
| **Interest/Premium/Fee Reserve:** | Reserve account funded with two quarters of estimated interest, surety premium, and other fees |
| **Governing Law** | State of New York |

This proposal is indicative and for discussion purposes only.  It does not imply a commitment of any sort.

# Exhibit #5

Exhibit #5

# BlackRock.

### Statement on BlackRock Multi-Sector Income Trust (BIT)

**New York, August 11, 2020** – In connection with the previously announced write-down of the value of loans made by the BlackRock Multi-Sector Income Trust ("BIT" or the "Fund") to Aviron Capital, LLC and its affiliates ("Aviron"), BlackRock, Inc. ("BlackRock"), as advisor to the Fund, took a number of actions to recover value for BIT, including filing a lawsuit on BIT's behalf against Aviron and its principal, installing a restructuring officer at Aviron to assist in maximizing value for BIT, and working with BlackRock's insurers.

As a result of that process, BIT will receive a total of over $72 million, which allows BIT to fully recover the amounts it loaned to Aviron and to realize a rate of return that is the same or better than the rate of return of the other assets in BIT's investment portfolio during the relevant investment periods. Previously this year, BIT recovered $40 million through a contribution by BlackRock and transactions relating to the defaulted loans. Those recoveries are already reflected in the Fund's net asset value, or NAV. BlackRock's insurers committed to pay the Fund approximately $32 million, which has been reflected in the Fund's NAV as of August 11, 2020. While litigation against Aviron's principal continues, no further payments to the Fund from that process are anticipated at this time.

### Availability of Fund Updates

BlackRock will update performance and certain other data for the Fund on a monthly basis on its website in the "Closed-end Funds" section of www.blackrock.com as well as certain other material information as necessary from time to time. Investors and others are advised to check the website for updated performance information and the release of other material information about the Fund. This reference to BlackRock's website is intended to allow investors public access to information regarding the Fund and does not, and is not intended to, incorporate BlackRock's website in this release.

### Forward-Looking Statements

This statement and other statements that BlackRock or the Fund may make, may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act, with respect to the Fund's or BlackRock's future financial or business performance, strategies or expectations. Forward-looking statements are typically identified by words or phrases such as "trend," "potential," "opportunity," "pipeline," "believe," "comfortable," "expect," "anticipate," "current," "intention," "estimate," "position," "assume," "outlook," "continue," "remain," "maintain," "sustain," "seek," "achieve," and similar expressions, or future or conditional verbs such as "will," "would," "should," "could," "may" or similar expressions.

BlackRock cautions that forward-looking statements are subject to numerous assumptions, risks and uncertainties, which change over time. Forward-looking statements speak only as of the date they are made, and BlackRock assumes no duty to and does not undertake to

# Exhibit #6

Exhibit #6

Name: WILLIAM Kent Sadleir | DOB: 3/22/1954 | MRN: 200275395 | PCP: Steven Michael Krems, MD | Legal Name: William Kent Sadleir

# Medical and Surgical History

This is an overview of your past medical and surgical history according to our medical records.

Go to Ask About My Care to send a non-urgent message to your physician's office.

## Past Medical History

| Diagnosis | When |
|---|---|
| Hypercholesterolemia | 2005 |
| Right wrist fracture | |
| Acne vulgaris | 3/31/2010 |
| Hypertension | 10/2019 |
| CAD S/P stents to RCA and LCX x 2 | 02/2020 |
| Thyroid nodule, left | 03/2020 |
| Biceps tendon tear, right | 11/20/2019 |
| Insomnia | |
| Tubulovillous adenoma | 07/2019 |

## Personal Notes About My Medical History

You can enter comments in the Personal Notes section on this page. These are for your personal use only. The notes are not added to your medical record and **cannot be viewed by your provider**.

## Past Surgical History

| Procedure | When |
|---|---|
| HX TONSILLECTOMY | 1966 |
| HX CATARACT REMOVAL | 08/29/2012 |
| HX CVIC-COR ONLY | 02/25/2020 |
| HX GI-COLONOSCOPY | 04/06/2021 |
| HX OTHER SURGICAL HISTORY | |
| HX CATARACT REMOVAL | 12/22/2022 |

# Personal Notes About My Surgical History

You can enter comments in the Personal Notes section on this page. These are for your personal use only. The notes are not added to your medical record and **cannot be viewed by your provider**.

# Social History

Smoking Tobacco Use:
Never

Smoking Tobacco Types:

Smokeless Tobacco Use:
Never

Smokeless Tobacco Types:

# Exhibit #7

Exhibit #7

1/19/23, 4:33 PM

My CS-Link - Visit Summary

Name: WILLIAM Kent Sadleir | DOB: 3/22/1954 | MRN: 200275395 | PCP: Steven Michael Krems, MD | Legal Name: William Kent Sadleir

Progress Notes

Dr. Ahdoot at 1/17/2023  1:30 PM



Cedars-Sinai Medical Center
Urology Academic Practice
8635 West Third Street - Suite 1070 - W. Los Angeles CA 90048
Office (310) 423-4700 - Fax (310) 423-4711
www.cedars-sinai.edu/urology

1/17/2023

Self Referred
Steven Michael Krems, MD

RE:  WILLIAM Kent Sadleir

CSMC MR#: 200275395

Dear Dr. Self Referred and Dr. Steven Michael Krems

We had the pleasure of seeing WILLIAM Kent Sadleir in the Urologic Oncology Clinic at Cedars Sinai Medical Center for his elevated PSA in the context of PIRADS 5 and 4 lesions.  A prostate biopsy was performed which demonstrated Gleason 6 prostate cancer in 2 lesions on the right.  We discussed prostatectomy, radiation and active surveillance and at this time the patient prefers active surveillance.  We will see him again in 6 months with a PSA and plan a confirmatory biopsy at 1 to 2 years from the time of initial biopsy based on PSA trajectories.

I appreciate the opportunity to participate in his care and will keep you closely apprised of his progress.

Sincerely yours,

Michael Ahdoot, MD


## UROLOGY NOTE

### HISTORY OF PRESENT ILLNESS:

WILLIAM Kent Sadleir is a 68 year old Caucasian gentleman who presents with an elevated PSA status post MRI targeted prostate biopsy which identified Gleason 6 prostate cancer within 2 MRI visible lesions on the right. No cancer was seen on the left. Systematic biopsy was omitted given the presence of a PI-RADS 5 lesion.

Prostate cancer history:
1/10/2023– transrectal prostate biopsy MRI targeted only. Pathology: Gleason 6 prostate cancer seen in right anterior transition zone base and right anterior transition zone apex biopsies. No systematic biopsies performed. Left-sided lesions x2 demonstrated no cancer

| Component | Value | Date |
|---|---|---|
| PSA | 6.14 (High) | 10/25/2022 |
| PSA | 6.89 (High) | 12/16/2021 |
| PSA | 4.6 (High) | 03/30/2021 |
| PSA, Free | 0.74 | 10/09/2019 |
| PSA, Free Pct | 12.85 (Low) | 10/09/2019 |


CC: follow-up of prostate cancer

WILLIAM Sadleir is a 68-year-old male presenting to clinic.

The patient is following up for prostate cancer.

He denies blood clot, hematuria, bone pain, appetite changes, energy level changes, chills, urinary hesitancy, fatigue, fever, flank pain, incontinence, nausea, night sweats, vomiting, unexplained weight loss.

The patient is not currently seeing an oncologist, and is not currently taking medications for his prostate cancer.

The patient does not believe that lab testing, imaging, medication changes, or lifestyle changes were recommended at the last clinic visit.

· My CS-Link - Visit Summary

Since the last visit, the patient denies recent hospitalizations. He also notes being diagnosed with additional medical problems, since the last clinic visit.

Recent imaging has included a MRI.

No additional shared information.

His symptoms include:
Nocturia x 1-2
Urine Flow Characteristics: stream feels moderate
Straining to Void: no
Double Voiding: occasionally
Frequency: no
Urgency: no
Incontinence: no
Dysuria: no

**International Prostatism Symptom Score (IPSS)**:
7

**Sexual Health Inventory for Men (SHIM)**:
Score: 24
No ED

4: How do you rate your confidence that you could get and keep an erection? (High)
5: When you had erections with sexual stimulations how often were your erections hard enough for penetration? (Almost Always)
5: During sexual intercourse, how often were you able to maintain your erection after you had penetrated your partner? (Almost Always)
5: During sexual intercourse, how difficult was it to maintain your erection to completion of intercourse? (Not Difficult)
5: When you attempted sexual intercourse, how often was it satisfactory for you? (Almost Always)

**Incontinence Impact Questionnaire (IIQ-7)**:
Not Asked

**Urogenital Distress Inventory (UDI-6)**:
Not Asked

**The patient's PSA history is as follows:**

| Component | Value | Date |
|---|---|---|
| PSA | 6.14 (High) | 10/25/2022 |
| PSA | 6.89 (High) | 12/16/2021 |
| PSA | 4.6 (High) | 03/30/2021 |
| PSA, Free | 0.74 | 10/09/2019 |
| PSA, Free Pct | 12.85 (Low) | 10/09/2019 |

PSA Density: 0.11

**Hereditary Risk Factors:**
The patient does not  have a family history suggestive of a hereditary prostate cancer syndrome.

*Key of hereditary prostate cancer syndromes and associated manifestations*

| Genetic Alteration | Manifestations |
|---|---|
| BRCA1 | Breast cancer, prostate cancer |
| BRCA2 | Breast cancer, prostate cancer |
| CHEK2 | Breast cancer, colorectal cancer, prostate cancer |
| ATM | Breast cancer, pancreatic cancer, prostate cancer |
| EPCAM/MLH1/MSH2/PMS2(Lynch) | Brain cancer, colorectal cancer, endometrial cancer, gastric cancer, hematologic cancers, ovarian cancer, urothelial cancer, prostate cancer |
| HOXB13 | Prostate Cancer |
| NBN | Breast cancer, ovarian cancer, prostate cancer |
| TP53     (Li Fraumeni) | Brain cancer, breast cancer, sarcomas, adrenocortical carcinoma, hemaologic cancers, prostate cancer |

He denies bloody urine, bone pain, weight changes, fatigue, and change in energy level.

**MEDICATIONS:**

No outpatient medications have been marked as taking for the 12/13/22 encounter (Appointment) with Ahdoot, Michael, MD.

**Current Outpatient Medications**

| Medication | Sig |
|---|---|
| • semaglutide (Ozempic) 2 mg/dose (8 mg/3 mL) pen for injection | Inject 2 mg subcutaneously once a week. |
| • ketorolac (Acular LS) 0.4 % ophthalmic drops | Instill 1 drop into left eye 3 times daily. |
| • ciprofloxacin HCl (CILOXAN) 0.3 % ophthalmic drops | Instill 1 drop into left eye 3 times daily. |
| • prednisoLONE acetate (Pred Forte) 1 % ophthalmic drops | Instill 1 drop into left eye 3 times daily. |
| • METOprolol succinate (TOPROL XL) 50 mg SR tablet 24 hr | TAKE ONE TABLET BY MOUTH EVERY DAY |
| • benazepril-HCT (LOTENSIN | Take 1 tablet by mouth daily. |

| HCT) 20-12.5 mg oral tablet | |
|---|---|
| • atorvastatin (LIPITOR) 80 mg tablet | TAKE 1 full TABLET BY MOUTH EVERY DAY. |
| • aspirin (ECOTRIN LOW STRENGTH) 81 mg EC DR tablet | Take 1 tablet by mouth daily. |
| • zolpidem (AMBIEN) 10 mg tablet | TAKE 1/2-1 TABLETS BY MOUTH AT BEDTIME AS NEEDED FOR SLEEP. |

No current facility-administered medications for this visit.

**ALLERGIES:**
Patient has no known allergies.

**PAST MEDICAL HISTORY:**

**Past Medical History:**
Diagnosis

Date

- Acne vulgaris  —  3/31/2010
  *doxy prn outbreaks*
- Biceps tendon tear, right  —  11/20/2019
- CAD S/P stents to RCA and LCX x 2  —  02/2020
  *unstable angina, +stress test, (3/20): LAD: prox 50-60%, several 20-40% areas in prox to mid, D1: 50%, LCx: prox 95% stenosis (stented) and 70% in AV groove (stented); RCA: mid 90% stnesois (stented)*
- Hypercholesterolemia  —  2005
  *pretreatment LDL > 200, lipitor 40*
- Hypertension  —  10/2019
- Insomnia
- Right wrist fracture  —  03/2020
- Thyroid nodule, left
  *2 cm, FNA done but not diagnostic*
- Tubulovillous adenoma  —  07/2019
  *(7/2019): TVA x 1, TA x 4; (2006): TA*

**Patient Active Problem List**
Diagnosis
- Hypercholesterolemia
- Tubular adenomas
- Pseudophakia
- Hypertension
- Insomnia
- Thyroid nodule, left, 2 cm
- CAD s/p angioplasty
- Tubulovillous adenoma
- Overweight with body mass index (BMI) of 28 to 28.9 in adult

- Rosacea
- Elevated prostate specific antigen (PSA)

## PAST SURGICAL HISTORY:

**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • CVIC-COR ONLY | N/A | 2/25/2020 |
| *Performed by Nakamura, Mamoo, MD at MAIN CARDIAC CATH LAB* | | |
| • GI-COLONOSCOPY | N/A | 4/6/2021 |
| *Performed by Midani, Deena, MD at SURGERY CENTER CS ENDOSCOPY* | | |
| • HX CATARACT REMOVAL | Right | 08/29/2012 |
| *ReStor IOL* | | |
| • HX CATARACT REMOVAL | Left | 12/22/2022 |
| • HX OTHER SURGICAL HISTORY | | |
| *undefined. Updated by Health Note* | | |
| • HX TONSILLECTOMY | | 1966 |

## SOCIAL HISTORY:

**Social History**

Socioeconomic History
- Marital status:            Married
      Spouse name:       Not on file
- Number of children:    Not on file
- Years of education:     Not on file
- Highest education level: Not on file

Occupational History
- Not on file

Tobacco Use
- Smoking status:         Never
- Smokeless tobacco:    Never

Vaping Use
- Vaping Use:               Never used

Substance and Sexual Activity
- Alcohol use:              Yes
- Drug use:                  Never
- Sexual activity:          Yes
      Partners:             Female

## FAMILY HISTORY:

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| • COPD | Mother | 85 |
| • Stroke | Father | 76 |
| • No Significant Medical Problems | Sister | 61 |
| • No Significant Medical Problems | Brother | 63 |

No family history of prostate cancer.

## REVIEW OF SYSTEMS:

A 14 point review of systems was performed.  See HPI for relevant findings.

Genitourinary:
 Yes: blood in urine.
 No: difficulty emptying bladder, difficulty starting stream of urine, frequent urination, incontinence, leaking of urine, painful or burning with urination, waking to urinate.

General:
 No: excessive fatigue, fever, night sweats, weight gain, weight loss.

Cardiac:
 No: buttock or calf pain with exertion, chest pain or angina, leg pain while walking, palpitations, shoulder pain, swelling in feet or hands.

Respiratory:
 No: bloody sputum, bronchitis, chronic cough, painful breathing, previous chest x-ray, shortness of breath.

## PHYSICAL EXAMINATION:

There were no vitals filed for this visit.
**General:** Well nourished, well developed male, in no apparent distress
**Video visit**

## LABS:

| Component | Value | Date |
|---|---|---|
| PSA | 6.14 (High) | 10/25/2022 |
| PSA | 6.89 (High) | 12/16/2021 |
| PSA | 4.6 (High) | 03/30/2021 |
| PSA, Free | 0.74 | 10/09/2019 |
| PSA, Free Pct | 12.85 (Low) | 10/09/2019 |

| Component | Value | Date |
|---|---|---|
| WBC | 5.8 | 10/25/2022 |
| Hemoglobin | 15.3 | 10/25/2022 |

# Exhibit #8

Exhibit #8

My CS-Link - Visit Summary                                                                                    1/30/23, 12:40 PM

Name: WILLIAM Kent Sadleir | DOB: 3/22/1954 | MRN: 200275395 | PCP: Steven Michael Krems, MD | Legal Name: William Kent
Sadleir

## Progress Notes

Dr. Kedan at 5/25/2021  2:30 PM

**ASSESSMENT**
67 year old man with HTN, dyslipidemia, CAD status post PCI, presents for a
cardiology follow up visit.

The patient is euvolemic, normotensive and asymptomatic.

1. HTN -- medical management
2. Dyslipidemia -- medical management
3. CAD status post PCI -- medical management
4. Thyroid nodule -- endocrinology following

The patient is hypertensive at home.

The patient has symptoms of snoring and elevated morning BP's.

The patient has nonspecific symptoms.

The patient is progressing well post PCI.

I discussed the importance and benefit of therapeutic lifestyle change with
weightloss.

**PLAN**
1. Therapeutic lifestyle change with weightloss
2. Discontinue plavix
3. Aspirin 81 mg po qd
4. Thyroid ultrasound
5. Decrease amlodipine to 2.5 mg po qd
6. Renal ultrasound
7. Call to check on BP in 1 month
8. Follow up in 4 months

**Referred by:** John B Andrews, MD

**Referring Provider Phone:** 310-423-8828
**PCP:** John B Andrews

**Chief Complaint**
Patient presents with
* Follow-up

## HISTORY OF PRESENT ILLNESS

67 year old man with HTN, dyslipidemia, CAD status post PCI, presents for a cardiology follow up visit.

The patient is feeling ok.

The patient has no complaints of chest pains, shortness of breath, palpitations, dizziness, syncope, orthopnea, PND.

The patient is overall having some ankle swelling.

The patient has not noticed a change in the exercise tolerance.

The patient is overall feeling well.

The patient checks his BP at home and it runs in the normal range.

No Known Allergies

**Current Outpatient Medications**

| Medication | Sig |
| --- | --- |
| • doxycycline (VIBRAMYCIN) 50 mg capsule | Take 1 capsule by mouth 2 times daily. |
| • clopidogrel (PLAVIX) 75 mg tablet | TAKE ONE TABLET BY MOUTH EVERY DAY |
| • METOprolol succinate (TOPROL XL) 50 mg SR tablet 24 hr | Take 1 tablet by mouth daily. |
| • benazepril-HCT (LOTENSIN HCT) 20-12.5 mg oral tablet | TAKE ONE TABLET BY MOUTH EVERY DAY |
| • atorvastatin (LIPITOR) 80 mg tablet | TAKE HALF (1/2) TABLET BY MOUTH EVERY DAY. |
| • amLODIPine (NORVASC) 5 mg tablet | Take 1 tablet by mouth daily. |
| • zolpidem (AMBIEN) 10 mg tablet | TAKE 1/2-1 TABLETS BY MOUTH AT BEDTIME AS NEEDED FOR SLEEP. (Patient not taking: Reported on 3/30/2021) |
| • aspirin (ECOTRIN LOW STRENGTH) 81 mg EC tablet | Take 81 mg by mouth daily. |

No current facility-administered medications for this visit.

**Past Medical History**
HTN
CAD
Dyslipidemia

echo -- 5-25-2021 -- EF 65%

stress echo -- 2-25-2020 -- 10:51 min Bruce; EF 70%; basal inferior HK

cath -- 2-25-2020 -- LCx 3.0 x 12 Synergy (DES), 2.25 x 28 Synergy (DES); RCA 4.0 x 16 Synergy (DES); LAD 40-60%

**Surgical History**
Tonsillectomy

**Family History**
Father -- CVA in 70's

**Social History**
No tobacco
No etoh
No drugs
1 cup coffee per day

Married
2 children
Born in Colorado; moved to LA 2008
Lives in Beverly Hills
College at BYU; Harvard Business School
Finance and entrepreneur -- CEO

Review of Systems
Constitutional: Negative for chills, diaphoresis, fever, malaise/fatigue and weight loss.
HENT: Negative for hearing loss.
Eyes: Negative for blurred vision and pain.
Respiratory: Negative for shortness of breath.
Cardiovascular: Negative for chest pain, palpitations, orthopnea, claudication, leg swelling and PND.
Gastrointestinal: Negative for abdominal pain, blood in stool, constipation, diarrhea, nausea and vomiting.
Genitourinary: Negative for hematuria.
Musculoskeletal: Negative for back pain, joint pain, myalgias and neck pain.
Skin: Negative for rash.
Neurological: Negative for dizziness, weakness and headaches.

Endo/Heme/Allergies: Does not bruise/bleed easily.
Psychiatric/Behavioral: Negative for depression. The patient is not nervous/anxious and does not have insomnia.

**Vital Signs:**
Blood pressure 123/71, pulse 60, temperature 97.3 °F (36.3 °C), height 1.854 m (6' 1"), weight 98.2 kg (216 lb 9.6 oz), SpO2 96 %.
Body mass index is 28.58 kg/m².
Body surface area is 2.23 meters squared.

**Wt Readings from Last 3 Encounters:**
05/25/21      98.2 kg (216 lb 9.6 oz)
04/06/21      93.9 kg (207 lb)
03/30/21      97.1 kg (214 lb)

**POCUS:**  EF 60%; basal inferior HK; no valvular lesions; IVC collapsing > 50%; no gall stones; possible bilateral hydronephrosis; bilateral carotid atherosclerosis

**Physical Exam**
<u>Constitutional</u>:
    General: He is not in acute distress.
    Appearance: He is well-developed. He is not diaphoretic.
<u>HENT</u>:
    Head: Normocephalic and atraumatic.
<u>Eyes</u>:
    General: No scleral icterus.
    Conjunctiva/sclera: Conjunctivae normal.
<u>Neck</u>:
    Thyroid: No thyromegaly.
    Vascular: No JVD.
<u>Cardiovascular</u>:
    Rate and Rhythm: Normal rate and regular rhythm.
    Pulses:
      Carotid pulses are 2+ on the right side and 2+ on the left side.
      Radial pulses are 2+ on the right side and 2+ on the left side.
      Posterior tibial pulses are 2+ on the right side and 2+ on the left side.
    Heart sounds: S1 normal and S2 normal.
    Comments: **S1, S2 regular with no extra heart sounds or murmurs**
<u>Pulmonary</u>:
    Effort: Pulmonary effort is normal. No respiratory distress.
    Breath sounds: Normal breath sounds. No wheezing or rales.
<u>Abdominal</u>:
    General: Bowel sounds are normal. There is no distension.
    Palpations: Abdomen is soft.
    Tenderness: There is no abdominal tenderness.
<u>Musculoskeletal</u>:
    General: No swelling, tenderness or deformity.

Skin:
    General: Skin is warm and dry.
    Coloration: Skin is not pale.
    Findings: No erythema or rash.
    Nails: There is no clubbing.
Neurological:
    Mental Status: He is alert and oriented to person, place, and time.
    Coordination: Coordination normal.
    Comments: **Grossly nonfocal and symmetric**
Psychiatric:
    Behavior: Behavior normal.
    Thought Content: Thought content normal.
    Judgment: Judgment normal.



| IVC Cardiology | 2/25/2020 | 3/3/2020 | 5/25/2021 |
|---|---|---|---|
| **IVC Diameter (cm)** | 1.81 | 1.5 | 1.09 |
| **IVC Collapsing** | Yes | Yes | Yes |

Kidneys

 

**Lab Results**

| Component | Value | Date |
|---|---|---|
| Glucose | 95 | 03/30/2021 |
| Creatinine | 0.91 | 03/30/2021 |
| Urea Nitrogen | 20 | 03/30/2021 |
| BUN/Creatinine Ratio | NOT APPLICABLE | 03/30/2021 |
| Sodium | 139 | 03/30/2021 |
| Potassium | 3.9 | 03/30/2021 |
| Potassium | 3.8 | 11/20/2019 |
| Chloride | 105 | 03/30/2021 |
| Carbon Dioxide | 25 | 03/30/2021 |
| Anion Gap | 12 | 02/26/2020 |
| Calcium, Serum | 9.6 | 03/30/2021 |

**Lab Results**

| Component | Value | Date |
|---|---|---|
| Cholesterol | 192 | 03/30/2021 |
| HDL Cholesterol | 49 | 03/30/2021 |
| LDL Calculated | 118 (H) | 03/30/2021 |
| Triglycerides | 134 | 03/30/2021 |
| Cholesterol/HDL Ratio | 3.9 | 03/30/2021 |

**Lab Results**

| Component | Value | Date |
|---|---|---|
| TSH | 1.71 | 03/30/2021 |

EKG --

**Ilan Kedan MD MPH FACC FASE**
*Cedars Sinai Medical Group*
*Cardiology*

Patient Instructions

Dr. Kedan at 5/25/2021  2:30 PM

**PLAN**
1. Therapeutic lifestyle change with weightloss
2. Discontinue plavix
3. Aspirin 81 mg po qd
4. Thyroid ultrasound
5. Decrease amlodipine to 2.5 mg po qd
6. Renal ultrasound
7. Call to check on BP in 1 month
8. Follow up in 4 months

## Nursing Note

Shanai Bailey at 5/25/2021  2:30 PM

Please answer the following questions.  Do you have:

1. Fever greater than or equal to 100.0 F or chills         NO
2. Cough                                                                          NO
3. Shortness of breath or difficulty breathing      NO
4. Fatigue                                                                       NO
5. Muscle or body aches                                    NO
6. Headache                                                                 NO
7. New loss of taste or smell                             NO
8. Sore Throat                                                    NO
9. Congestion or runny nose                           NO
10. Nausea or vomiting                                     NO
11. Diarrhea                                                              NO
12. Any above mentioned symptoms in the past 10 days? NO
13. Do you have pending Covid test results?      NO

MyChart® licensed from Epic Systems Corporation © 1999 - 2023

# Exhibit #9

Exhibit #9


blue
california

**Member:**
WILLIAM K SADLEIR

**ID#:** XEE980523410

**Copayments**
**PCP/SPC/ER:** $0/$0/$125
STEVEN M KREMS  MD
(310) 306-6966
CEDARS SINAI HLTH ASSOCS

**MEDICARE ADVANTAGE** | **HMO**

**Blue Shield Inspire (HMO)**

**Group #:**         W0051752
**Card Issued:**     12/04/2022

**Plan code:**     043
**RxBin:**         004336
**RxPCN:**         77993322
**Issuer:**        80840
                   CMS H0504-043

**MedicareR**
Prescription Drug Coverage X

---

blue of california

**Members:**
In an emergency, call 911 or go to the nearest ER.

**Submit Medical claims to:**
Blue Shield of California
P.O. Box 272640
Chico, CA 95927-2640

**Submit Rx claims to:**
Blue Shield of California
P.O. Box 52066
Phoenix, AZ 85072-2066

Providers: Please file all claims with your local BCBS licensee
in whose service area the member received services.

blueshieldca.com

**Customer Care:**
**(800) 776-4466**

**NurseHelp 24/7:**
**(877) 304-0504**
TTY: **711**

**Physicians/Providers:**
eligibility verification
**(800) 541-6652**

Blue Shield of California is an independent
member of the Blue Shield Association.

# Exhibit #10

Exhibit #10

**Bureau of Prisons**
**Health Services**
**Medical Duty Status**

| | |
|---|---|
| Reg #:  79460-112 | Inmate Name:  SADLEIR, WILLIAM |

## Housing Status

__ confined to the living quarters except  __ meals  __ pill line  __ treatments  Exp. Date: _____

__ on complete bed rest:  __ bathroom privileges only  Exp. Date: _____

__ cell:  __ cell on first floor  __ single cell  __ lower bunk  __ airborne infection isolation  Exp. Date: _____

X other:  I/M with prostate cancer.Needs frequent toilet visitis.Has incontinence  Exp. Date:  03/25/2024
,frequency and urgency of urination

## Physical Limitation/Restriction

__ all sports  Exp. Date: _____

__ weightlifting:  __ upper body  __ lower body  Exp. Date: _____

__ cardiovascular exercise:  __ running  __ jogging  __ walking  __ softball  Exp. Date: _____
__ football  __ basketball  __ handball  __ stationary equipment

__ other: _____  Exp. Date: _____

## May have the following equipment in his / her possession:

| Equipment | Start Date | End Date | Return Date |
|---|---|---|---|
| Eye Glasses | 02/06/2023 | | |

## Work Restriction / Limitation:

Cleared for Food Service:  **Yes**

X  No Restrictions

**Comments:**  Care level 1

| | |
|---|---|
| **Dhaliwal, Jaspal (MAT) MD** | 03/28/2023 |
| Health Services Staff | Date |

| | | | |
|---|---|---|---|
| Inmate Name: **SADLEIR, WILLIAM** | Reg #:  **79460-112** | Quarters:  **A09** |

*ALL EXPIRATION DATES ARE AT 24:00*