UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

WILLIAM SADLEIR,

Defendant.

20 Cr. 320 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

The Court has received a motion from defendant William Sadleir, seeking compassionate release from the Lompoc Federal Correctional Center Satellite Camp in Lompoc, California, pursuant to 18 U.S.C. § 3582(c)(1)(A). Dkt. 96 ("Def. Mtn."). For the reasons that follow, the Court denies the motion as meritless.

## I.    Background

### A.    Sadleir's Frauds

Sadleir's offense conduct, as set out in his guilty plea allocutions to two counts of wire fraud in this District and in the unobjected-to presentence report ("PSR"), is briefly summarized. *See* Dkt. 75 ("Plea Tr."); Dkt. 86 ("PSR"). Sadleir was chairman and chief executive officer of Aviron Pictures, LLC ("Aviron"), a film production and distribution company based in Los Angeles, California. He participated in two distinct fraudulent schemes relating to an approximately $75 million investment made in Aviron by the BlackRock Multi-Sector Income Trust ("BIT" or "the Fund") and affiliated entities. *See generally* PSR ¶¶ 9–97.

In one scheme, the "Advertising Scheme," Sadleir lied to BIT, falsely telling BIT that its money had been invested in prepaid media credits with a subsidiary of GroupM Worldwide Inc. In fact, Sadleir had diverted more than $25 million of that money into a sham company that he

created and called GroupM Media Services LLC ("Sham GroupM").  He used those funds for a variety of unauthorized purposes.  Some were personal to Sadleir, such as buying and renovating a $14 million private Beverly Hills residence.  In service of this scheme, Sadleir pledged a portion of the supposed prepaid media credits to BIT as collateral for additional loans, but in fact, the claimed credits did not exist, and Sadleir misappropriated BIT's funds.  Also in service of the scheme, Sadleir created a fake identity of a purported New York–based female employee of Sham GroupM named "Amanda Stevens."  Posing by email as Stevens, Sadleir corresponded with a representative of BIT, falsely assuring BIT that Aviron maintained a balance of approximately $27 million in prepaid media credits with Sham GroupM.  *See* PSR ¶¶ 16, 18–86.

In the other scheme, the "UCC Scheme," Sadleir victimized BIT by engineering the fraudulent sale and refinancing of assets worth about $3 million that had secured BIT's loans to Aviron.  Sadleir used the forged signature of a BlackRock portfolio manager, Randy Robertson, on releases to remove the Fund's UCC liens on the secured assets, without the Fund's consent.  That deprived BIT of its collateral on outstanding loans—loans on which Aviron was ultimately defrauded.  *See* PSR ¶¶ 17, 87–97.

Sadleir also participated in a third fraudulent scheme—the "PPP Fraud"—for which he was simultaneously prosecuted in the Central District of California.  In this scheme, Sadleir fraudulently obtained approximately $1.7 million in Paycheck Protection Program ("PPP") loans from the United States Government during the height of the COVID-19 pandemic.  He did so by falsely representing that those funds would be used for the business purposes of three Aviron entities, and by making false representations about the entities' payroll expenses, number of employees, and operational status.  Contrary to Sadleir's representations that the PPP funds would be used to retain workers, maintain payroll, and make mortgage interest payments, lease

payments, and utility payments, Sadleir misappropriated these funds in substantial part for his personal use, transferring nearly $1 million of these funds to his personal checking account, and to pay expenses unauthorized by PPP administrators.  The PPP fraud began after Sadleir's frauds on BIT had been detected, and after BIT had taken civil action against him.  *See* Dkt. 81 ("Gov't Sent. Mem.") at 7–8; Dkt. 90 ("Sent. Tr.") at 65–66.

### B.    Sadleir's Prosecution

On May 22, 2020, Sadleir was arrested on a complaint filed in this District charging him with, *inter alia*, two counts of wire fraud, corresponding to the Advertising Scheme and the UCC Scheme.  Dkts. 1, 3.  He was simultaneously arrested in California on charges arising from the PPP Fraud.  On June 23, 2020, the Grand Jury returned the Indictment in this case, charging the same offenses as the Complaint.  Dkt. 6.

On January 19, 2022, less than one week before trial in this case was scheduled to begin and after substantial pretrial motions practice, Sadleir pled guilty to Counts One and Two, each charging wire fraud.  He did so pursuant to a plea agreement that calculated an offense level of 31, a criminal history category of I, and an advisory Sentencing Guidelines range of between 108 and 135 months' imprisonment.  *See* Dkts. 70, 75.

On September 9, 2022, the Court sentenced Sadleir principally to a term of 72 months' imprisonment on both Counts One and Two, the terms to run concurrently, to be followed by three years of supervised release.  The Court adopted the Guidelines calculation in the parties' plea agreement.  In imposing this sentence, the Court assessed at length the 18 U.S.C. § 3553(a) factors.  Considered together, it found, these factors—predominantly the interests in just punishment and promotion of respect for the law, but with degrees of support from the interests in specific and general deterrence, and the need to protect the public—minimally required the

3

72-month prison sentence imposed.  The Court, with the parties' consent, took into account the PPP Fraud in arriving at the sentence, as Sadleir's plea agreement in the Central District of California had provided that the prison sentence imposed there would run concurrent to his sentence in this case.  The Court also imposed restitution in the amount of $31,597,000, based on (1) the $28,597,000 that Sadleir had falsely claimed to have invested in Sham GroupM, and (2) the $3 million in assets that Sadleir unlawfully sold in the UCC fraud.  *See* Dkt. 87 (judgment); *see also* Sent. Tr. 59–85.  On October 18, 2022, Sadleir was sentenced in the PPP Fraud case principally to a term of 41 months' imprisonment, to be served concurrently with his sentence in this case.

Sadleir did not appeal his conviction or his sentence.  He began serving his sentence in February 2023.  The Bureau of Prisons ("BOP") estimates that, assuming Sadleir earns maximal good-time credit, he will complete his prison sentence in or about January 2028.

Shortly before Sadleir reported to begin serving his sentence, the Court received a letter from Sadleir's wife, Hannah Sadleir, seeking on the Sadleir family's behalf to modify his sentence, to permit him to serve his sentence at home, and citing childcare and related burdens and medical diagnoses.  The Court rejected that application.  It explained that (1) it lacked authority to modify the sentence, and (2) even if had such authority, the Court would not have had any inclination to do so, because "[t]he 72-month prison sentence imposed remains the just and reasonable one here, given, inter alia, the gravity, duration, greed, and shamelessness of the multi-million [dollar] frauds committed by Mr. Sadleir."  Dkt. 94.

### C.  Sadleir's Compassionate Release Motion

On or about August 7, 2023, Sadleir, *pro se*, filed the compassionate release motion. Dkt. 96.  On September 7, 2023, the Government filed its opposition.  Dkt. 98 ("Gov't Opp.").

The Government acknowledges that Sadleir has exhausted his administrative remedies for the purpose of the motion, in that he asked the BOP to move for compassionate release, and the warden of his facility denied that request on or about May 19, 2023.

## II.    Discussion

### A.    Standards Governing Compassionate Release Motions

"[U]pon motion of the defendant," and "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," the Court may reduce such defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A). The defendant bears the burden of proving he is entitled to compassionate release.  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf.  *United States v. Philibert*, 557 F. Supp. 3d 456, 459 (S.D.N.Y. 2021).  However, "[a]s part of the First Step Act of 2018, Congress authorized courts to reduce a term of imprisonment upon motion by a defendant." *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).

Congress tasked the Sentencing Commission with identifying the circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence.  *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020) (citing 28 U.S.C. § 994(t)).  The Commission did so

in U.S.S.G. § 1B1.13 and its commentary, which, *inter alia*, (1) define various circumstances that present extraordinary and compelling reasons justifying release; and (2) require that a defendant not be a danger to the safety of the community.  U.S.S.G. § 1B1.13(1)–(3) & cmt. n.1.  However, the guidance under this provision applies only to a "motion of the Director of the Bureau of Prisons."  *Id.* § 1B1.13.  It does not apply "to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases.  *Brooker*, 976 F.3d at 236 (internal quotation marks omitted); *see also id.* at 237 ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").  Thus, when assessing a motion brought by an imprisoned defendant and not the BOP, the Court is not constrained by U.S.S.G. § 1B1.13's enumeration of extraordinary and compelling reasons and may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release."  *Id.* at 237.[1]  Even if such reasons are present, the Court must also assure itself that release is consistent with "the factors set forth in section 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A).

### B.    Analysis

Sadleir pursues compassionate release on three grounds.  He claims that he is not receiving adequate medical care; that he is factually innocent because he did not act with

---

[1] Although the Sentencing Commission has since amended the Guidelines to cover defendant-initiated petitions as well, those amendments will not go into effect until November 1, 2023, and thus do not govern this petition.  *See generally* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023), *available at* https://www.federalregister.gov/documents/2023/05/03/2023-09332/sentencing-guidelines-for-united-states-courts.

fraudulent intent; and that the Government failed to disclose to him that BIT, the victim of the Advertising Scheme and the UCC Scheme, recovered some of its losses through an insurance policy.

The Court denies Sadleir's motion, for the following two independent reasons.

*First*, the Court does not find extraordinary and compelling circumstances sufficient to justify reducing his sentence. Sadleir's three arguments on this point fall far short, substantially for the reasons cited in the Government's opposition, which the Court incorporates by reference. *See* Gov't Opp. at 5–7.

As to medical care, the BOP records attached to the Government's opposition indicate that Sadleir has received regular medical examinations and treatment. *See generally* Gov't Opp. Ex. A. This includes physical examinations, medications for high blood pressure, active surveillance of his prostate cancer, and medical scans. Sadleir's conclusory allegations that he has not received adequate care are unsubstantiated. And Sadleir's suggestion that the BOP might be unable to meet his needs in the future—if, for instance, he requires further treatment for his prostate cancer—is speculative.[2] As substantiated in numerous cases, the BOP has access, including pursuant to contracts, to medical professionals and facilities capable of providing appropriate attention and care. *See, e.g.*, *United States v. Mood*, No. 19 Cr. 113 (VB), 2020 WL 3256333, at *1 (S.D.N.Y. June 16, 2020) (the BOP has "effectively managed" the defendant's health issues with "routine monitoring and medication"); *United States v. Binday*, No. 12 Cr. 152

---

[2] Sadleir's external physician, Dr. Michael Ahdoot, M.D., recommended "active surveillance" of Sadleir's prostate cancer, rather than "treatment with surgery or radiation," which he felt would "likely" pose a "greater risk" to his health. Def. Mtn., Ex. 3 at 3 (medical assessment as of January 19, 2023). He further noted that the type of prostate cancer with which Sadleir has been diagnosed is "rarely lethal," such that, "over a 10-year period[,] approximately 50% of patients will have disease progression and ultimately require treatment." *Id.*

(CM), 2020 WL 4017822, at *6 (S.D.N.Y. July 16, 2020) (the BOP "is capable of providing . . . adequate medical care, and appears to be doing so" in the defendant's case, given his detailed health records and the BOP's comprehensive treatment plan); *United States v. Little*, No. 20 Cr. 57 (GBD), 2023 WL 3570965, at *2 (S.D.N.Y. May 18, 2023) (the BOP "is monitoring and managing" the defendant's "renal and gastrointestinal conditions in an adequate manner," having referred her to outpatient specialists and adopted their prescribed medical regiment).

Sadleir does not articulate any reason to believe these resources would prove unavailable to him should these conditions worsen. According to Sadleir's medical records, BOP medical personnel have monitored these conditions and tested his prostate-specific antigen ("PSA") levels. Sadleir's medical conditions, which are familiar for persons of his age (69) and fall short of the life-threatening conditions the Court has found to justify compassionate release,[3]

---

[3] This Court has granted numerous petitions under § 3582(c) for compassionate release. These involved prisoners urgently seeking relief in the pre-vaccine phase of the COVID-19 pandemic, whose demonstrated medical conditions, often respiratory, put them at grave risk of death from COVID-19. The prisoners had also generally served the majority of their sentences. *See, e.g.*, *United States v. Phillibert*, 557 F. Supp. 3d 456, 461 (S.D.N.Y. 2021) (ordering compassionate release of defendant with an obstructive pulmonary disease who had served approximately 90% of his sentence); *United States v. Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at *6 (S.D.N.Y. Jan. 15, 2021) (ordering compassionate release of defendant with obesity and hypertension who had served 70% of his sentence); *United States v. Benjamin*, No. 15 Cr. 445-15 (PAE), 2020 WL 10356810, at *3 (S.D.N.Y. Sept. 15, 2020) (ordering compassionate release of defendant with asthma who had served 105 months of his 124-month sentence); *United States v. Wilson*, 16 Cr. 317 (PAE), Dkt. 656 at 4–7 (S.D.N.Y. Aug. 31, 2020) (ordering compassionate release of defendant with heightened vulnerability who had served the substantial majority of his sentence and played a low-level role in a drug trafficking conspiracy); *United States v. Simon*, 482 F. Supp. 3d 151, 157 (S.D.N.Y. 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played a low-level role in a drug trafficking conspiracy); *United States v. Davies*, 469 F. Supp. 3d 175, 180 (S.D.N.Y. 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played low-level role in drug trafficking conspiracy); *United States v. Brown*, 467 F. Supp. 3d 209, 213 (S.D.N.Y. 2020) (same); *United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) (ordering compassionate release of defendant with asthma who had served 17 months of his 24-month sentence and publicly cooperated against members of his former gang); *United States v. Jasper*, No. 18 Cr. 390-18 (PAE), 2020 WL 1673140, at *2 (S.D.N.Y. Apr. 4, 2020) (ordering

therefore, do not qualify as extraordinary or compelling.  *See, e.g.*, *United States v. Bradley*, No. 19 Cr. 632, 2023 WL 3004660, at *2 (S.D.N.Y. Apr. 19, 2023) (no "extraordinary and compelling" reasons for release where 61-year-old defendant suffered from Type 2 diabetes, hypertension, and obesity); *United States v. Barnett*, No. 90 Cr. 913 (LAP), 2021 WL 3550217 (S.D.N.Y. Aug. 10, 2021) (no "extraordinary and compelling" reasons for release where 67-year-old defendant suffered from Type 2 diabetes, hypertension, glaucoma, and an enlarged prostate), *aff'd,* No. 21-2319, 2023 WL 2375684 (2d Cir. Mar. 7, 2023); *United States v. Borelli*, No. 84 Cr. 63 (LAP), 2021 WL 2228075 (S.D.N.Y. June 2, 2021) (no "extraordinary and compelling" reasons for release where 72-year-old defendant suffered from Type 2 diabetes, hypertension, heart disease, and cataracts); *United States v. Sabir*, 481 F. Supp. 3d 270, 275 (S.D.N.Y. 2020) (no "extraordinary and compelling" reasons for release where 66-year-old defendant suffered from prediabetes, hypertension, and asthma, and likely had prostate cancer).

As to Sadleir's claim of factual innocence, for multiple reasons, that argument fails to secure compassionate release.  For one, it is flatly inconsistent with Sadleir's guilty plea.  There, under oath, he allocuted in detail to knowingly engaging in the two schemes to defraud, admitted

---

compassionate release of defendant with an immune-inflammatory disease who had served all but 34 days of a four-month sentence).  Sadleir's circumstances are a far cry from these.

As the assembled case law reflects, the availability of vaccines since early 2021, and the consequent ability of prisoners to protect themselves against extreme outcomes, has greatly reduced the force of § 3582(c) applications based on COVID-19.  *See, e.g.*, *United States v. Gonzalez-Casillas*, No. 07 Cr. 527-1 (PAE), 2022 WL 446011, at *4 (S.D.N.Y. Feb. 11, 2022) (denying release request where defendant had not shown himself more vulnerable to COVID-19 than average inmate at his facility and had been vaccinated); *United States v. O'Bryant*, No. 16 Cr. 317-3 (PAE), 2022 WL 17168192, at *3 (S.D.N.Y. Nov. 22, 2022) (same); *United States v. Barnett*, No. 90 Cr. 913 (LAP), 2021 WL 3550217, at *3 (S.D.N.Y. Aug. 10, 2021) (denying release request where defendant had been vaccinated, making him "no longer at high risk for severe illness caused by COVID-19").

that he knew that what he was doing was wrong and illegal, and apologized for his knowingly illegal conduct. *See* Plea. Tr. 23–25. At sentencing, Sadleir reiterated these admissions and apologies. He stated that he took full responsibility for his actions and admitted that there had been no excuse for them. *See* Sent. Tr. 55.[4] He put it as follows: "I betrayed my family, my upbringing, my education, and many people who trusted me, and in particular BlackRock. The two individuals at BlackRock really trusted me. . . . I ask for their forgiveness, the forgiveness of my family, and again, I am deeply saddened and ashamed of my conduct." *Id.* at 58.

Sadleir's attempt to distance himself from his fraudulent schemes as a means to secure release from prison is also inconsistent with the facts set out in the PSR, which Sadleir has admitted are accurate. These describe Sadleir as personally having elaborately and shamelessly choreographed the two blatant fraudulent schemes over a period of years, to obtain millions of dollars for his and his family's personal benefit. These facts and circumstances make implausible the self-serving claim in Sadleir's § 3582(c) motion that he acted without criminal intent or moral culpability. *See* PSR ¶¶ 9–97. The Court discounts as cynical and dishonest— and of a piece with the disgraceful me-first conduct underlying his offense conduct—Sadleir's disingenuous attempt, with sentencing behind him, to shirk responsibility for his multiple crimes. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *Menna v. New York*, 423 U.S. 61, 62 n.2 (1975) (per curiam)

---

[4] The Court accorded Sadleir credit at sentencing for the acceptance of responsibility reflected in his guilty plea, with the result being a lower sentence than otherwise would have been imposed. Had the Court imposed sentence on Sadleir aware of his present repudiation of those admissions, the Court would not have accorded him that credit, and would have imposed a higher sentence.

("[A] counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case.").

Finally, even if Sadleir could have non-frivolously claimed to have acted without the requisite *mens rea* in connection with his offense conduct, that argument, as a matter of law, is not a basis to secure release under § 3582(c). Such claims instead are properly pursued on direct appeal, on a motion for a new trial under Federal Rule of Criminal Procedure 33, or on a petition for habeas corpus pursuant to 28 U.S.C. § 2255. *See Amato*, 48 F.4th at 63 ("[W]hen considering a motion for [supervised release], a district court does not have discretion to consider new evidence proffered for the purpose of attacking the validity of the underlying conviction in its balancing of the 18 U.S.C. § 3553(a) factors. Facts and arguments that purport to undermine the validity of a federal conviction must be brought on direct appeal or pursuant to [a habeas petition].").[5]

As to Sadleir's observation that BIT's loss was partly covered by insurance, for multiple reasons, it, too, does not avail him. For one, that information is not new. At sentencing, Sadleir and his counsel, drawing upon the PSR, noted that BIT had recovered some $72 million of the loss Sadleir caused, including $32 million from an insurance recovery. *See* Sent. Tr. 46–49, 57–

---

[5] For much the same reasons, Sadleir may not relitigate, in the context of a compassionate release motion, the calculation of his Sentencing Guidelines range. *See, e.g.*, *United States v. Garcia*, No. 21-1181-CR, 2022 WL 2154675, at *2 n.1 (2d Cir. June 15, 2022) (cleaned up) ("a defendant may not use a compassionate release motion to second-guess the sentence previously imposed"); *United States v. Ebbers*, 432 F. Supp. 3d 421, 429 (S.D.N.Y. 2020) (compassionate release is not an opportunity "to reconsider whether the motion the original sentence was just"); *United States v. Correa*, No. 8 Cr. 1026 (VEC), 2020 WL 7490098, at *6 (S.D.N.Y. Dec. 21, 2020) (same); *see also United States v. Antney*, No. 17 Cr. 229 (CBA), 2021 WL 4502478, at *5 (E.D.N.Y. Sept. 30, 2021) ("a faulty guidelines calculation," like other claims of legal error in a "judge's imposed sentence," is not cognizable in a motion for compassionate release). And even if such were permissible, the Court independently determined, based on the facts in the PSR, that, as the parties had stipulated in the negotiated plea agreement, Sadleir's offense level was 31 and that the Guidelines called for a sentence between 108 and 135 months' imprisonment.

58.  For another, that Sadleir's immediate fraud victim was able to shift some losses to an insurance carrier is not, at all, mitigating as to Sadleir.  Regardless whether the victim had insurance, the fraud loss figure under the Sentencing Guidelines for the perpetrator, Sadleir, would remain the same, as would his moral culpability.  *See, e.g.*, *Brandon v. United States*, No. 9 Civ. 7720 (JGK), 2011 WL 4801362, at *5 (S.D.N.Y. Oct. 11, 2011) (rejecting as "frivolous" the argument that because "investors were eventually compensated by insurance proceeds, . . . there was no loss").  And even if this data point had been new and mitigating, for the reasons above, it would not supply a lawful basis for compassionate release.  Any bid for relief on this ground would instead properly be made under Rule 33 or § 2255.

*Second*, even if the Court had found extraordinary and compelling circumstances within the meaning of § 3582(c), the § 3553(a) factors would not justify a reduced sentence.  Quite the contrary, the Court's firm judgment is that any sentence below the 72-month sentence imposed would disserve these factors, considered as a whole.  At sentencing, the Court, rejecting Sadleir's audacious request for a sentence of one day (time served) imprisonment, expanded at length on why the § 3553(a) factors demanded a six-year sentence.  *See* Sent. Tr. 50, 59–82.  Sadleir's bid now for release under § 3582(c), six months into his imprisonment, completely ignores, and reflects disregard for, the Court's considered assessment.

The Court need not reproduce its full sentencing remarks here.  It suffices to reproduce the Court's assessment of just the first set of § 3553(a) factors—the interests in just punishment and promotion of respect for the law—to drive home why a 72-month sentence was necessary and why Sadleir's motion for release under § 3582(c) is an outrageous non-starter.

The Court stated:

These scams are gravely serious for obvious reasons.  They spanned a four-year period.  They deprived victims, private and public, of millions of dollars.  And the

money you stole from your victims was real hard cash. In some fraud cases, the loss is measured by the drop in a company's market capitalization or the valuation of an asset. This crime involved taking cold hard cash, whether from BlackRock in the case of the advertising scheme or the Federal Government and, therefore, indirectly its taxpayers in the PPP scheme.

Your sentencing submission portrays your crimes here as aberrational. I'm completely unpersuaded by that portrait. It is refuted by the fact that you carried off a series of crimes over a period of years. Twice you found a new unlawful means to obtain money when an old one ran dry or as the authorities were closing in on an old one—once when you pivoted from the advertising scheme to the UCC scheme, and later, when you pivoted in 2020 to the PPP scheme. A defendant with an otherwise clean record who commits a brief one-time offense can fairly call the crime aberrational. I've had cases like that—defendants, for example, who help themselves to someone else's money opportunistically during a short period, with little forethought or planning, or defendants who briefly fell in with a bad element and briefly joined in criminal conduct that others initiated. That is not the portrait I see here. It is true that you had a clean record and record indeed of good works before starting in on the advertising scheme in 2016. And had you stopped looting BlackRock soon after you started, then the crime perhaps could be considered aberrational. But you let the advertising scheme persist for a couple of years with the price tag rising to more than $25 million, and as reflected in the PSR, you took lots of steps along the way to deceive others and cover up the fraud. And from then on, you went on to other fraud schemes—the UCC scheme and the PPP scheme—with no evidence of hesitation or remorse. In all these schemes, you were the leader. You carried these off, and by all accounts, you acted alone. And the schemes arguably got more exploitative over time. You were an accomplished CEO who had credentials and skills and relationships and advantages and life and work experience that others would dream of and which you could have put to lawful use to make money as you had earlier in your life. But your final scheme, the PPP scheme, entailed defrauding the Government during a once-in-a-century pandemic of money it had set aside for vulnerable workers who otherwise would have been unable to be paid. That is very, very low.

So I find it profoundly wrong to view your crime as a one-time aberrational blip. Yours is not a case of a fleeting, one time, immediately regretted mistake for which a substantial punishment would be disproportionate. And I say this advisedly—your case is a case of a person "Breaking Bad." Late in your career, you dipped your toe in crime, but rather than being repelled, you found that it paid, and you gradually plunged deeper and deeper and deeper in. Put a little differently, for the first four

decades of your working life, your career was that of an executive.  For the last four years of your life before your arrest, in substantial part, your career was that of a criminal.

Your crimes are also serious, as the Government points out, because of the diverse and sophisticated and audacious means you used to pull them off.  You invented a company, GroupM LLC, whose name was nearly identical to a legitimate company in the advertising space, so as to fake out BlackRock about where its millions were going.  You created a website for the fake company.  You invented a person, Amanda Stevens, and corresponded using her name to parry BlackRock's refund requests.  You even made up a story about Amanda's being on maternity leave and attending a baby shower.  You developed a ruse to shed a UCC lien, which required you to forge the signature of a BlackRock executive.  And in the PPP scam, in the spring of 2020, when the U.S. and its economy seemed at times to be teetering, you chose to make up a false narrative about three companies and their phantom employees . . . to enable you to feed at [the] Government trough.  Although there is no evidence that it, in fact, did so, at the time you carried out the PPP fraud, your conduct in that fraud at least had the potential to crowd out deserving applicants for PPP funds.  That makes it all the more serious.

Your crimes were also serious because they were motivated in part by greed.  I've seen frauds where a defendant gets into debt and fraudulently secures loans to enable him to pay back his creditors.  In those cases, although the victim experiences the same monetary loss, the defendant at least put the money entirely to repay earlier creditors.  There appears to be a degree of that here in that Aviron was struggling and you used some of the fruits of the advertising scheme to pay its expenses, no doubt about that.  But there was also a significant personal greed dimension to this offense.  You bought a $14 million residence in Beverly Hills, and to call that purchase, as your sentencing submission does, an investment in valuable Los Angeles real estate really obfuscates the facts.  You weren't investing in it for someone else living in it with the rent being payable, say, to BlackRock.  The Beverly Hills residence wasn't being held in trust for BlackRock.  The investors weren't going to live there.  This was a personal residence for you and your family to use, and the emails between you and your interior decorator and the decorator's final bill—these are Government Exhibits 339 and 337 attached to the sentencing submission of the Government— prove the point.  They put the lie to the idea that this was some sort of abstract "investment" disconnected from your family's personal enjoyment.

Those expenditures described there were overtly for the benefit of you and your wife and your young children.  There are repeated expenses on Government Exhibit 337

for nursery items and window treatments for your boys' bedroom and for custom-curved sofas and for a resin coffee table and for family room throw pillows, and for a crib and nursery carpet. Your email to the designer at Government Exhibit 339 from October 2017, deep into the advertising fraud, is a wish list of your likes, not those of the future buyer, for your home. You set out what you wanted as to your "man cave" and rec room and dining room and wallpaper in the children's room, and so forth. The record leaves no indication that you could have afforded this on your own. The inference is inescapable that a motive for the fraud on BlackRock was to use BlackRock's money to live a life of luxury in Beverly Hills with your wife and children. And the same is true of the PPP fraud. Within days of the PPP loans being funded by the United States, you transferred—and this is right out of the plea agreement—$966,000, nearly a million dollars, to your personal checking account. You then used those funds to pay for utility bills, mortgage expenses, and your personal attorney.

Sent. Tr. 66–71.

The Court's evaluation of this set of factors ended with this: "I have been on the bench, effective a couple weeks from now, for 11 years. Yours was one of the most brazen and cynical and persistent and, frankly, given all the advantages you had and all the lawful means of accumulating wealth at your disposal, disappointing fraud schemes I have seen." Sent. Tr. 71.

The Court's assessment remains the same today. Despite being afforded all sorts of advantages, Sadleir carried off three successive multi-million dollars frauds, for the purpose of personal and familial enrichment. These culminated in a fraud that looted a public benefits program during a once-in-a-century catastrophic pandemic. Sadleir engaged in these crimes undeterred by the inevitability of detection, and at an age at which he cannot credibly claim to have acted out of youth and immaturity. In these circumstances, as the Court explained at sentencing, the § 3553(a) factors demanded, at a bare minimum, the sentence imposed.

For these reasons, the Court denies Sadleir's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The Clerk of Court is respectfully directed to terminate the motions pending at Docket 96 and 100.[6]


        SO ORDERED.

                                        *Paul A. Engelmayer*
                                        _____
                                        PAUL A. ENGELMAYER
                                        United States District Judge

Dated: October 5, 2023
       New York, New York

---

[6] On October 3, 2023, as preparation of this decision was nearing completion, Sadleir, *pro se*, filed a letter seeking leave to file a reply to the Government's opposition. Dkt. 100. The Court denies that request. For the reasons set forth herein, Sadleir's motion for compassionate relief is disingenuous and utterly devoid of merit. There is nothing that a reply from Sadleir could say that would salvage this motion.